```
1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF DELAWARE

3                                - - -

4     GALDERMA LABORATORIES, L.P. and
      TCD ROYALTY SUB LP,                :   CIVIL ACTION
5                                        :
                      Plaintiffs,        :
6     v                                  :
                                         :
7     LUPIN INC. and LUPIN LIMITED,      :     21-1710-SB
                                         :
8                       Defendants.
                                - - -
9
                      Telephone Conference
10
              Thursday, March 30, 2023 at 11:00 a.m.
11
                                - - -
12
      BEFORE: HON. STEPHANOS BIBAS, U.S. CIRCUIT COURT JUDGE
13
                                - - -
14

15    APPEARANCES:

16
                 MORRIS NICHOLS ARSHT & TAYLOR, LLP
17               BY:  JEREMY A. TIGAN, ESQ.

18                   and

19               CAHILL GORDON & REINDEL LLP
                 BY:  GERALD J. FLATTMANN, JR., ESQ.
20               And, ANDREW J. COCHRAN, ESQ.
                     (New York, New York)
21
                         Counsel for Plaintiffs Galderma
22                       Laboratories, L.P. and
                         TCD Royalty Sub LP
23

24
      REPORTED BY:
25
      Brian P. Gaffigan, RMR, FCRR
```

1    APPEARANCES:   (Continued)

2

3            PHILLIPS, MCLAUGHLIN & HALL, P.A.
             BY:  JOHN C. PHILLIPS, JR., ESQ.

4                and

5            RAKOCZY MOLINO MAZZOCHI SIWIK LLP
             BY:  JOSEPH T. JAROS, ESQ.

6            And, ADRIANNE C. ROSE, Esq.
                 (Chicago, Illinois)

7
                     Counsel for Defendants Lupin Inc.

8                    and Lupin Limited

9

10   Also present:

11   David Banchik
     Chief Counsel

12   Galderma, S.A.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        - oOo -

 2              P R O C E E D I N G S

 3              (REPORTER'S NOTE:  The following Zoom

 4    conference was held remotely, beginning at 11:00 a.m.)

 5              THE COURT:  Good morning.

 6              MR. FLATTMANN:  Good morning, Your Honor.

 7              THE COURT:  Are we waiting for anyone else

 8    before we get going?

 9              MR. TIGAN:  Not for plaintiffs, Your Honor.

10              A VOICE:  You are on mute.

11              MR. PHILLIPS:  Your Honor, not for

12    defendants.  We're all here.

13              THE COURT:  Okay.  Very good.

14              This is Judge Stephanos Bibas sitting by

15    designation in the District of Delaware in Case

16    Number 21-cv-1710, Galderma Laboratories versus

17    Lupin.

18              This meeting is being recorded to the

19    cloud.  I'm joined off camera by my law clerk Henry

20    Walter.  Why don't we get plaintiffs' counsel to

21    enter appearances and tell me who will be taking the

22    lead for plaintiffs in this case.

23              MR. TIGAN:  Yes, Your Honor.  This is

24    Jeremy Tigan with Morris Nichols in Wilmington for

25    Galderma.  I'm joined by my co-counsel, Gerald
```

1   Flattmann and Andrew Cochran today, and Mr. Flattmann

2   plans to present our arguments.

3           THE COURT:  Mr. Flattmann.  I see

4   Mr. Cochran.  I see -- so is it, did you say, Gerald

5   Flattmann?

6           MR. TIGAN:  Yes, Your Honor.

7           MR. FLATTMANN:  Yes, Your Honor.

8           THE COURT:  Let's get your name up there.

9           And Mr. Cochran.  What is your first name?

10  What's his?

11          MR. TIGAN:  Andrew.

12          THE COURT:  All right.  We've got that.

13  And so Mr. Flattmann is taking the lead for

14  plaintiffs.

15          And who is here for defendants?

16          MR. PHILLIPS:  Your Honor, it's Jack

17  Phillips from Phillips, McLaughlin & Hall in

18  Wilmington, and with me on the call are Joe Jaros and

19  Adrianne Rose from Rakoczy Molino.  Mr. Jaros will

20  address the Court.

21          THE COURT:  Okay.  Joe Jaros, and you said?

22          MR. PHILLIPS:  Adrianne Rose from Rakoczy

23  Molino.

24          THE COURT:  Okay.  So --

25          MR. TIGAN:  Your Honor, I was remiss.  I

1    should have noted, too, our client representative

2    David Banchik is on the call.  He is Chief IP Counsel

3    at Galderma.  I apologize for that.

4             THE COURT:  Banchik.  What is the ending of

5    your name, sir?  C-K?

6             MR. BANCHIK:  B-a-n-c-h-i-k.

7             THE COURT:  Banchik.  Okay.  Sorry.  There

8    is a D.  Oh, I see, Chuck Banchik'd, that's what it

9    is.

10            MR. BANCHIK:  No, this is a goofy IT

11   acronym.

12            THE COURT:  Look, people who have, you

13   know, strange Greek names don't throw stones about

14   spellings.

15            All right.  Very good.

16            So you said it's Mr. Flattmann for

17   plaintiffs and Mr. Jaros for defendants.

18            MR. PHILLIPS:  Correct, Your Honor.

19            THE COURT:  Very good.  We are here on

20   defendants' motion for leave to amend, answer and

21   counterclaims, and the number of the dispute here is

22   how the extent to which plaintiffs have gone and

23   changed their theories such that defendants ought to

24   be able to argue indefiniteness.

25            So let me raise a few questions.

1                    Let me ask, I'll just call them Galderma

2      and Lupin.  I think it's a little clearer.

3                    So Mr. Jaros is here for Lupin.  What is

4      it that you think is really new about Galderma's

5      supplemental infringement contentions?  I'll ask you

6      that, and then I will turn to Mr. Flattmann to

7      respond.

8                    MR. JAROS:  Thank you, Your Honor.

9                    As we laid out in our reply on March 3rd,

10     what is really new is the test method that they

11     disclosed that were relied upon.  And that test

12     method is the 4.5 pH in 40 minutes --

13                    THE COURT:  Right.

14                    MR. JAROS:  -- to determine immediate

15     release.

16                    THE COURT:  Okay.  But it was clear from

17     the beginning that this was all about how much in

18     vitro and in vivo are synced up or different, and

19     there is reference in the patents to having changing

20     pHs in the GI tract and the acidic environments in

21     the stomach being different from intestinal fluids,

22     and, you know, so there, there are some references

23     to pH 4.5, pH sensitive layers, and greater pHs in

24     the small intestine.

25                    So it's been clear from the beginning that,

1    you know, when you are dealing with enterics in

2    dissolution, you've got to deal with different

3    environments in different parts of the GI tract.

4              Mr. Jaros, do you dispute that?

5              MR. JAROS:  We do, Your Honor.

6              THE COURT:  Okay.

7              MR. JAROS:  What Lupin's position is, is

8    with respect to their contentions.

9              THE COURT:  Okay.

10             MR. JAROS:  So the July 2022 contentions

11   did not even include the words "in vitro," would

12   not identify dissolution test method, and did not

13   expressly state that they were contending Lupin's

14   product contains a ratio of 30/10.  Those words just

15   didn't appear.

16             On February 3rd of this year, for the first

17   time, Galderma disclosed its intention to rely on

18   what it calls biorelevant dissolution testing, but

19   there were no specifics, a series of references.

20             THE COURT:  Right.

21             MR. JAROS:  There was no test method

22   identified, and still there was no express

23   allegation --

24             THE COURT:  Right.

25             MR. JAROS:  -- that the Lupin products

1    contained 30/10.

2              THE COURT:   But the nub here is, is this a

3    substantive change or is it a clarification?   Because

4    if it's a clarification, I don't see the need to

5    allow the amendment.   What makes this a substantive

6    change?

7              MR. JAROS:   I would call it a substantive

8    disclosure.   So this started in January when we

9    issued discovery saying if you contend Lupin

10   literally infringes, tell us what method.   Tell us

11   how you would conduct the test to show that Lupin's

12   product contains 30/10.

13             And in response to that, in response to our

14   pressing them on what their actual contentions were,

15   on February 3rd, they had the broad disclosure of the

16   concept of biorelevant testing.

17             And then we pressed further.   Days later,

18   we pressed further and said, what do you mean by

19   biorelevant testing?

20             And in response to those discovery

21   requests, on March 3rd they revealed their actual

22   theory that we literally infringed based on a method

23   that is nowhere disclosed in the patent.   There is no

24   such method using 4.5 pH in the patent or in the

25   references they --

1          THE COURT:  Let's talk about the '532

2    patent at column 6.  The bottom of 6 to the top of 7,

3    there is a reference to delayed release profiles and

4    the changing pH of the GI tract.

5          Column 7, a little further down, there is a

6    reference to enteric materials, and, you know, the

7    environment of the stomach and what soluble at the

8    intestinal pH is.

9          A little further down on column 7, there

10   is references to the pH of below 4.5 and the pH

11   sensitive layer.

12         So it's clear from the patents on that,

13   we're going to be talking about how to measure and

14   track those pHs.

15         MR. JAROS:  Lupin disagrees, Your Honor.

16   That's simply description of how the compositions are

17   intended to function throughout the body and the

18   purpose of an enteric coating.

19         THE COURT:  Right.

20         MR. JAROS:  It's not a test methodology.

21   It's not a literal infringement theory.

22         THE COURT:  Okay.

23         MR. JAROS:  Right?  So under the original

24   contentions, it was an and/or.  Maybe they'll assert

25   literal, maybe they will assert Doctrine of

1    Equivalents, maybe they will assert both.

2                On February 13th, for the first time, they

3    made it express we contend Lupin's composition

4    contains 30/10.

5                We immediately followed up and said under

6    what test?  Identify a test anywhere where Lupin's

7    composition contains 30/10.

8                And that's how we ended up with the

9    March 3rd contention saying, oh, we can go into your

10   ANDA, a document we had since May of 2022, your ANDA

11   and your testing under a different method under

12   what is called a multimedia comparative dissolution

13   report.  We will point you back to your ANDA and

14   we're going to interpret certain data in that ANDA

15   as proving you literally infringed with a ratio of

16   30/10.

17               That was new on March 3rd, never before

18   disclosed.

19               THE COURT:  All right.  Let me hear what

20   Mr. Flattmann wants to say about that.

21               MR. FLATTMANN:  Thank you, Your Honor.

22               We have expressed the fact that we were

23   going to assert literal infringement from the very,

24   very beginning in our complaint, in vitro dissolution

25   testing, including the testing that was found out

1    of Lupin's own ANDA, it's Lupin's own data was a

2    giant part of the proofs and evidence in all the

3    preceding cases that defendants are aware of.

4              Our infringement theories were in our

5    original docketed 2022 infringement contentions.  We

6    expressly stated in all of our claim construction

7    briefing that we were going to rely and intended to

8    rely on in vitro/in vivo correlations and a variety

9    of pH in vitro dissolution testing.

10             And that actually provoked Lupin in its

11   claim construction briefing to raise the specter of

12   indefiniteness for the very first time, and that was

13   before the deadline for amending the pleadings.

14             They subsequently requested an additional

15   week to decide whether or not to amend the pleadings,

16   and they decided not to even after noting our

17   theories in our claim construction briefing and in

18   our constant requests for discovery, which we have

19   attached as an exhibit to our opposition letter,

20   the in vivo/in vitro correlation data in testing

21   throughout discovery in this case ever since July of

22   2022.

23             So they have been consistently on notice

24   that in vivo -- in vitro/in vivo dissolution testing

25   over a variety of pHs was going to be a big part of

1     the evidence in this case, and this attempted hook

2     to excuse their belated motion to amend four months

3     after the fact and after they decided not to pull

4     the trigger even after raising the specter of

5     indefiniteness in their claim construction briefs

6     would result in an incredible prejudice to us.

7               They have been on notice, the additional

8     information that was included in the supplemental

9     infringement contentions, which, by the way, we haven't

10    even reached the deadline for those contentions yet.

11    It's some time next month for supplementation, Your

12    Honor.  That was simply additional evidence that we

13    found through discovery in the ANDA materials that

14    Lupin produced.  So they were also aware of that

15    evidence.

16              THE COURT:  Okay.  Where -- show me where

17    you think the patents disclose a single testing

18    method that requires a specific pH and a specific

19    timeframe.  What are you relying on for that?

20              MR. FLATTMANN:  Well, we're not, Your

21    Honor.  We believe that the patents don't require one

22    specific testing method.  And that is borne out in

23    Judge Stark's decision in the *Sun* case where he

24    expressly stated that, at pages 281 and 289 that it

25    doesn't matter whether the dissolution profile is the

1    same as a ratio, et cetera.  What matters is whether

2    or not functionally you can use test and evidence to

3    show that these functional portion terms are met.

4              THE COURT:  Well, let me get Mr. Jaros's

5    response on that.

6              How do you think that the patents are

7    limited to a single testing method and a specific pH

8    such that, you know, that connects up with your

9    argument that you don't infringe?

10             MR. JAROS:  Yes, Your Honor.  So Figure 3

11   is the dissolution profile --

12             THE COURT:  Right.

13             MR. JAROS:  -- which I believe Mr.

14   Flattmann stated at the *Markman* hearing.  Figure 3 is

15   a dissolution profile of a ratio, and it provides two

16   parameters:  1.1 and a time point of two hours.

17             THE COURT:  Okay.  So it's labeled 1.1, but

18   also two of the figures have a label of pH 7 also.

19             MR. JAROS:  They do, Your Honor.  So that's

20   the second stage of the test.  And I want to be very

21   careful to distinguish a test methodology that can be

22   very broad.  We can talk about conceptionally in

23   vitro dissolution, but then I'm going to talk about

24   what the patent tells you to do to determine the ratio.

25             The patent says to determine the ratio, use

1    in vitro dissolution.

2                    THE COURT:  Right.

3                    MR. JAROS:  Figure 3 gives you the pH.  And

4    the reason I focused on pH 1.1 is because that tells

5    you what your IR component is.

6                    THE COURT:  Okay.

7                    MR. JAROS:  And whatever is left over and

8    what doesn't dissolve by pH 1.1 at two hours is by

9    definition the DR portion, the remainder.

10                   THE COURT:  All right.  What, what term or

11   terms?  You don't identify what particular terms you

12   think are indefinite that you want to argue.

13                   MR. JAROS:  So, Your Honor, in our reply

14   brief, I believe we attempted to identify with

15   clarity the two terms.  So it's 30 milligrams

16   immediate release -- this is on page 2 -- or

17   10 milligrams delayed release.

18                   THE COURT:  Okay.  Is it the word release?

19                   MR. JAROS:  No.

20                   THE COURT:  Which part of that?

21                   MR. JAROS:  It's the entire phrase, Your

22   Honor.  If you have the '532 handy, I can direct you

23   to an example there.

24                   THE COURT:  Okay.

25                   MR. JAROS:  So '532, claim 1, column 12.

1          THE COURT:  Um-hmm.

2          MR. JAROS:  "Consisting of (i) an immediate

3   release portion comprising a drug wherein the drug

4   consists of about 30 milligrams of doxycycline."

5          So the "about 30 milligrams doxycycline,"

6   the context of that entire phrase would be indefinite

7   if different tests give you different numbers.

8          THE COURT:  Why isn't that, the pH or

9   the testing method a matter for fact-finding?  Why

10  is it we just throw our hands up and treat it as

11  indefinite?

12         MR. JAROS:  We definitely won't throw our

13  hands up, Your Honor.

14         So the way the record stands right now, I

15  believe Galderma has essentially conceded under the

16  pH 1.1 test, and this date is in the ANDA and in our

17  reports, that Lupin' product releases 22/18.  It's

18  about 55 percent/45 percent.  So under that test

19  described in the patents of pH 1.1, the number would

20  be 22.

21         Under their new theory at 4.5, depending

22  on how you interpret the data -- we don't agree with

23  it, but under their theory you can get an IR value

24  for Lupin's product of 30 if you wait four hours

25  (240 minutes) at a pH of 4.5.

1                    Now, that is obviously the matter of

2      expert testimony.  If they present that theory at

3      trial and the Court accepts it as evidence of what

4      the IR portion or the DR portion is, that would have

5      a noninfringing result, 22, and an infringing result,

6      30, a literally infringing result.

7                    That is the basis of indefiniteness.  Your

8      Honor is absolutely right, we'll need to hear expert

9      testimony on that.  We'll need to see what their

10     theories are on June 2nd.

11                   As Mr. Flattmann acknowledged, they can

12     still supplement, they can still throw in new

13     theories, new pHs, new methods, and all of that

14     will become part of the indefiniteness case and the

15     subject of expert testimony.

16                   THE COURT:  If we extend, if we allow this

17     amendment that you seek, would we need to extend fact

18     discovery?

19                   MR. JAROS:  We would not, Your Honor.

20                   THE COURT:  Okay.

21                   Mr. Flattmann, do you beg to differ?

22                   MR. FLATTMANN:  I certainly do, Your Honor.

23     We haven't even received validity contentions from

24     defendant.  And even now, I don't know what term

25     they're saying is indefinite.  It's certainly not a

1    term that has anything to do with in vitro

2    dissolution because that term does not appear in

3    the patent claims.  We're talking about evidence,

4    not about indefiniteness, and we added additional

5    evidence to our infringement contentions, as was our

6    right to supplement during discovery.

7            We, we certainly believe that if you were

8    to grant the motion, we, we believe that at this late

9    stage that would not be the correct ruling, that we

10   would need to extend the entire schedule.

11           We haven't received any fact discovery

12   relating to indefiniteness.  We framed our entire

13   case based on the representation of defendants at the

14   very first scheduling conference that this is not a

15   case about invalidity, we will not raise invalidity

16   defenses.  And as Mr. Jaros said, this was just an

17   infringement case.

18           And they argued that to get an expedited

19   schedule.  They did get a somewhat expedited schedule

20   based on that representation.  We would have needed

21   more time for discovery to begin with, and we

22   certainly do now with only seven days left on the

23   clock to take discovery and no invalidity contentions

24   in hand.

25           We also, Your Honor, have served no

1    interrogatories on this point, no requests for

2    production on this point, no RFPs on this point.  It

3    even potentially, depending on what term they're

4    actually saying is indefinite, could implicate claim

5    construction issues, Your Honor.

6           So this, this is a giant can of worms

7    way too late in the game which is being attempted

8    based on a very flimsy, flimsy strand that the one

9    additional piece of evidence -- not a theory,

10   additional piece of evidence was added to our

11   infringement contentions, Your Honor.

12           THE COURT:  Let me give Mr. Jaros the last

13   word, if he wants to reply.

14           MR. JAROS:  I do, Your Honor.  I just

15   want to focus the Court's attention on Exhibit 10 to

16   our letter.  And that's where the Court will see

17   highlighting in yellow which is what was added on

18   February 3rd.  That's the first time that the word

19   "vitro dissolution" appears in their contentions.

20           And then in blue, the Court will see that

21   this new theory of literal infringement that the

22   Lupin composition literally contains 30/10 is in

23   blue.  And it's not an easy read.  You have to

24   attempt to follow the logic about the different pH

25   and what they're pointing to in Lupin's study.

1          We don't agree with the interpretation,

2     but that very substantive addition in blue reflects

3     proof, and it's the first time we've had proof of

4     what they meant by some in vitro/in vivo test method,

5     a more biorelevant test method.  What they're

6     calling, on February 3rd, a more biorelevant test

7     method, and then disclosed on March 3rd as pH 4.5 at

8     240 minutes.

9          That is a substantive disclosure which put

10    us on notice for the first time they would contend

11    there is literal infringement.  That literal

12    infringement gave rise to an indefiniteness defense

13    which we could not have raised.

14          THE COURT:  All right.  So this is the blue

15    highlighting at pages 17 to 18 of Exhibit 10.

16          MR. JAROS:  The blue highlighting.  Yes,

17    Your Honor.

18          THE COURT:  Okay.  Yes.

19          MR. JAROS:  That is where pH 4.5 appeared

20    for the first time, and they said for the first time

21    literally Lupin's product contains a ratio of 30/10.

22          THE COURT:  Okay.

23          MR. JAROS:  And one final note, Your Honor.

24          THE COURT:  Okay.

25          MR. JAROS:  The deadline to serve written

1    discovery passed, but they were on notice that we

2    intended to seek leave to amend, and they could have

3    issued discovery, and they already served discovery.

4    They served interrogatories on March 3rd directed to

5    their new theory, directed to a pH of 4.5, and also a

6    broader request directed to a pH of 2.0.

7              And two days ago, they took the deposition

8    of our primary witness, our primary corporate

9    designee, and half of the deposition was about this

10   theory.  And the report that they identified, they've

11   had it since May 2022, but the blue highlighting you

12   see was the subject of a deposition two days ago.

13             So I don't see what additional discovery

14   they would need to take because our indefiniteness

15   defense is contingent entirely on their literal

16   infringement theory.

17             THE COURT:  Okay.  Mr. Flattmann, do you

18   want to say anything limited to what Mr. Jaros just

19   said about discovery that has already been taken and

20   produced on the blue highlighting and the pH 4.5?

21             MR. FLATTMANN:  I do, Your Honor.

22             The additional material that he is

23   referring to is no different from what was already

24   before defendants earlier in the case.  We said that

25   the 30/10 ratio was met literally in our complaint,

1    and we said so multiple times during discovery and

2    in our claim construction papers, which is what led

3    them to raise that specter of indefiniteness way back

4    then.

5            This is simply additional evidence that

6    comes directly from materials that Lupin submitted to

7    the government in order to obtain approval for its

8    product.

9            THE COURT:  Okay.  Just a moment.

10           (Pause.)

11           THE COURT:  All right.  Thank you, all.

12           The Court is going to deny the motion.

13   It's not that I don't see a reason why people

14   couldn't argue about this, but fundamentally I don't

15   think Galderma has shifted its ground.  It has

16   clarified, it's been clear that the fight all along

17   has been over in vitro, and we have some more

18   specificity here, but I don't think it's really a

19   different ground.

20           I agree that this is an infringement case,

21   not an invalidity case.  I see from the face of the

22   patents and in the arguments that the pH levels of

23   the, you know, stomach versus intestine have been

24   here all along, even though there are some figures

25   labeled pH 1.1 and pH 7.

1            I find it telling that Lupin can't really

2    tell me what is indefinite about 30 milligrams

3    immediate release and 10 milligrams delayed release.

4    I mean I think there is an argument over the word

5    "release," and I think that is ultimately going to be

6    an argument for fact-finding that needs to be done at

7    trial.

8            I also do think we would need to reopen

9    discovery and delay this case, and this case is on a

10   tight timeline that Lupin itself has wanted to move

11   the case along.

12           So I'm denying it.  I will do so with an

13   oral order today.  And I'd like to know if there is

14   anything else the parties would like from me, any

15   assistance in moving this case along promptly.

16           MR. JAROS:  Your Honor, on behalf of Lupin,

17   we do have a couple of potential discovery disputes.

18           THE COURT:  Okay.

19           MR. JAROS:  We're are awaiting depositions

20   about Galderma.  Galderma has assured us just earlier

21   today that they are going to provide dates for those

22   depositions very soon.  So we don't anticipate there

23   will be a dispute, but we just want to let the Court

24   that --

25           THE COURT:  All right.

```
 1                    MR. JAROS:  -- we're awaiting.

 2                    THE COURT:  I think it's very fair to say

 3       that, you know, if Galderma is getting the benefit of

 4       its expedited scheduling in my keeping, you know, all

 5       the invalidity claims out, you know, what is good for

 6       the goose is good for the gander.  I expect Lupin

 7       likewise to live with the impending discovery

 8       deadline and to make, you know, every effort to make

 9       those witnesses available within the deadline.

10                    Mr. Flattmann, are you going to be able to

11       do that?

12                    MR. FLATTMANN:  Yes, Your Honor.  Not --

13       we've agreed that we would be able to do so very

14       shortly thereafter.  That was the subject of the meet

15       and confer that my colleague had with Mr. Jaros

16       earlier today.

17                    THE COURT:  Very good.  Very good.  I will

18       hold you to that.  I thank you all, and please be in

19       touch with my clerk Henry Walter at, you know, the

20       earliest sign that something requires the Court's

21       attention.

22                    MR. FLATTMANN:  Thank you, Your Honor.

23                    THE COURT:  You're welcome.  All right.

24                    MR. PHILLIPS:  Thank you, Your Honor.

25                    THE COURT:  And you are all welcome.  This
```

1    has been recorded to the cloud.  If either side needs

2    a copy of it or have it transcribed or anything else,

3    just email Mr. Walter and he can make the link

4    available to both of you, both sides.

5              MR. FLATTMANN:  Thank you, Your Honor.

6              THE COURT:  All right.  Good-bye.

7              MR. JAROS:  Thank you.

8              (Telephone conference ends.)

9

10        I hereby certify the foregoing is a true and
     accurate transcript from my stenographic notes in the
11   proceeding.

12
                         /s/ Brian P. Gaffigan
13                       Registered Merit Reporter

14

15

16

17

18

19

20

21

22

23

24

25