IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GALDERMA LABORATORIES, L.P. and TCD ROYALTY SUB LP, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. 21-1710 (SB) |
| LUPIN INC. and LUPIN LIMITED, | ) ) | |
| Defendants. | ) | |

## **PLAINTIFFS' OPENING POST-TRIAL BRIEF**

OF COUNSEL:

Gerald J. Flattmann, Jr.
Andrew J. Cochran
Margaret A. Barone
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
(212) 701-3000

February 2, 2024

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

**Page**

I.   THE EVIDENCE AT TRIAL PROVES INFRINGEMENT ................................................. 1

II.   LUPIN DESIGNED ITS ANDA PRODUCT AS "EQUIVALENT IN ALL ASPECTS" TO ORACEA® .......................................................................................................................... 3

III.  LUPIN'S OWN DATA CONFIRMS LITERAL INFRINGEMENT .................................... 4

    A.   Lupin's ANDA Product Functionally Releases 30 mg Immediately and Delays the Remaining 10 mg ........................................................................................................ 6

        1.   Lupin's in vitro data show 30 mg immediate release ....................................... 7

        2.   Lupin's remarkably similar blood levels viewed through doxycycline's absorption window support infringement ..................................................................... 15

        3.   Lupin designed its ANDA Product to function as 30:10 IR/DR .................................. 18

    B.   Lupin's Defense is a Series of Distractions ........................................................ 20

        1.   Lupin's over-reliance on pH 1.1 dissolution data is misplaced .................................. 21

        2.   Lupin's hotspot phenomenon is not scientifically-supported ...................................... 22

        3.   The data from Lupin's litigation-inspired samples are irrelevant ................................ 25

IV.  LUPIN'S ANDA PRODUCT ALSO INFRINGES AS AN EQUIVALENT ...................... 27

V.   ADMINISTERING LUPIN'S ANDA PRODUCT AS INSTRUCTED INFRINGES ........ 30

VI.  THE COURT SHOULD FIND FOR PLAINTIFFS .............................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams Respiratory Therapeutics Inc.* v. *Perrigo Co.*,
616 F.3d 1283 (Fed. Cir. 2010)...........................................................................14

*AstraZeneca LP* v. *Apotex, Inc.*,
633 F.3d 1042 (Fed. Cir. 2010)...........................................................................30

*Bristol-Myers Squibb Co.* v. *Aurobindo Phama USA Inc.*,
477 F. Supp. 3d 306 (D. Del. 2020)....................................................................26

*Broadcom Corp.* v. *Emulex Corp.*,
732 F.3d 1325 (Fed. Cir. 2013)...........................................................................14

*C.R. Bard Inc.* v. *AngioDynamics, Inc.*,
979 F.3d 1372 (Fed. Cir. 2020)...........................................................................26

*Eli Lilly & Co.* v. *Actavis Elizabeth LLC*,
435 F. App'x 917 (Fed. Cir. 2011) ......................................................................30

*Forest Lab'ys Holdings Ltd.* v. *Mylan Inc.*,
206 F. Supp. 3d 957 (D. Del. 2016).....................................................................30

*Galderma Lab'ys, L.P.* v. *Amneal Pharms., LLC*,
337 F. Supp. 3d 371 (D. Del. 2018), *aff'd in part, rev'd in part on other
grounds*, 806 F. App'x 1007 (Fed. Cir. 2020) ...........................................8, 9, 21, 22

*Galderma Lab'ys, L.P.* v. *Sun Pharm. Indus. Ltd.*,
411 F. Supp. 3d 271 (D. Del. 2019)............................................................... *passim*

*Glaxo, Inc.* v. *Novopharm, Ltd.*,
110 F.3d 1562 (Fed. Cir. 1997)...........................................................................27

*Intel Corp.* v. *U.S. Int'l Trade Comm'n*,
946 F.2d 821 (Fed. Cir. 1991).............................................................................28

*Liebel-Flarsheim Co.* v. *Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004)...............................................................................9

*Martek* v. *Biosciences Corp.*
579 F.3d 1363 (Fed. Cir. 2009)...........................................................................26

*Michalic* v. *Cleveland Tankers, Inc.*,
364 U.S. 325 (1960).............................................................................................13

*Par Pharm., Inc.* v. *Eagle Pharms., Inc.*,
    44 F.4th 1379 (Fed. Cir. 2022) .......................................................................................8

*Par Pharm., Inc.* v. *Hospira, Inc.*,
    835 F. App'x 578 (Fed. Cir. 2020) ..............................................................................8, 26

*Phillips* v. *AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)....................................................................................9, 10

*Recro Gainesville LLC* v. *Actavis Lab'ys FL, Inc.*,
    2017 WL 1064883 (D. Del. Feb. 24, 2017) ...................................................... *passim*

*Rsch. Found. of State Univ. of New York* v. *Mylan Pharms. Inc.*,
    723 F. Supp. 2d 638 (D. Del. 2010)..............................................................................6

*Rsch. Found. of State Univ. of New York* v. *Mylan Pharms. Inc.*,
    809 F. Supp. 2d 296 (D. Del. 2011), *aff'd in part, vacated in part (on validity*
    *grounds)*, 531 F. App'x 1008 (Fed. Cir. 2013) .......................................................14

*Sunovion Pharms.* v. *Teva Pharms. USA, et al.*,
    731 F.3d 1271 (Fed. Cir. 2013)..................................................................................5, 8, 26

*Teva Branded Pharms. Prod. R&D, Inc.* v. *Cipla Ltd.*,
    2023 WL 4996825 (D.N.J. June 21, 2023) ...........................................................13

*Warner-Jenkinson Co.* v. *Hilton Davis Chem. Co.*,
    520 U.S. 17 (1997)....................................................................................................27, 29

## I.    THE EVIDENCE AT TRIAL PROVES INFRINGEMENT

Plaintiffs have met their burden of proving by a preponderance of the evidence that Lupin has infringed the Chang patents, both literally and under the doctrine of equivalents, and will further infringe those patents if it markets its ANDA Product in the United States.

Plaintiffs showed during the three-day trial that their position is simple and straightforward, and is supported by science, data, and statements that Lupin made in its own ANDA and filed with the FDA.  That ANDA, and all it contains, controls the infringement inquiry as a matter of law. Plaintiffs' infringement positions are further supported by and consistent with the Court's claim constructions and the understanding of a person of ordinary skill in the art.  Those positions are also supported by express evidence of Lupin's efforts to design its ANDA Product as a bioequivalent copy of Oracea®, which is undisputedly covered by the Chang patents.  Plaintiffs' Proposed Findings of Fact (Feb. 2, 2024) ("FF").  Lupin's arguments, in contrast, defy the Court's claim constructions and ignore, among other things, the clear evidence set forth in its own ANDA showing how its ANDA Product actually functions, including in the body.

The asserted claims of the Chang patents are directed to compositions that include an immediate release ("IR") portion of about 30 mg doxycycline, and a delayed release ("DR") portion of about 10 mg doxycycline.  FF ¶ 7.  Lupin conceded at trial that only the numerical elements (*i.e.*, 30 and 10) are in dispute.  FF ¶¶ 102–104.  Namely, Lupin asserted at trial that its ANDA Product could not meet the asserted claims because the ANDA Product's "immediate release" portion supposedly releases 22 mg doxycycline and its "delayed release" portion supposedly releases 18 mg doxycycline.  Notwithstanding these superficial labels, Lupin set about to create and did create an ANDA Product that, in the words of Lupin's own ANDA and lead formulator, is "pharmaceutically equivalent" and "equivalent in all aspects" to Oracea®.  FF ¶¶ 13, 67, 166, 177.  The evidence introduced at trial reveals Lupin's deliberate manufacturing

1

decisions—namely, to apply a precariously thin and weak enteric coat to its ANDA Product with alternating materials that do not adhere well to one another—to ensure that a sufficient amount of doxycycline from Lupin's so-called "delayed release" portion would be released immediately to be absorbed at doxycycline's narrow absorption window.  FF ¶¶ 29–38, 41–42, 87–95, 111–132. Lupin also deliberately tested and selected for a composition that would barely pass the rigorous pH 1.1 quality control test.  Although it presents its product as some drastic reformulation, somehow Lupin still achieves remarkably similar blood levels, and thus bioequivalence, to the 30:10 IR/DR product, Oracea®, despite contending with the very same narrow doxycycline absorption window.  FF ¶¶ 49–65, 87–95, 108–132.  Intent typically does not matter in patent infringement inquiries.  Here, however, it does because the Court's construction of "immediate release" expressly accounts for what was "intended."  *Markman* Order (D.I. 109).

The data from Lupin's ANDA evidence direct infringement of the asserted claims.  Those data prove that Lupin's individual capsules—it is the capsules that control based on the claims— literally infringe.  Some capsules immediately release nearly 75 percent of their doxycycline at a biorelevant pH 4.5.  FF ¶¶ 153–154.  That is sufficient for *literal* infringement under Federal Circuit law.  And Lupin also infringes under the doctrine of equivalents because the mean data for all tested capsules demonstrate that Lupin's ANDA Product immediately releases 71 percent and 75 percent of its composition at the one- and two-hour marks, respectively.  FF ¶¶ 150–152.  That, too, is sufficient under the controlling law.

Lupin failed to rebut any *single* fact entered by Plaintiffs into evidence.  Instead, the data Lupin relies on are either (1) insufficient for demonstrating how an enteric-coated drug dissolves in the stomach when taken as directed by Lupin's label, or (2) wholly irrelevant because they were created solely for the purposes of this litigation, not produced to the FDA, not tested for

bioequivalence, and not, as a matter of law, reliable data for the purposes of assessing infringement of an ANDA Product.  Moreover, Lupin's use of the so-called "hotspot" theory should be rejected. It is unproven, not scientifically sound, and an attempt to discredit Lupin's own data in its ANDA that it certified to the FDA to be true and accurate.

Ultimately, Lupin asks this Court to turn away from its own claim construction decision on actual claim terms and to inject other limitations into the claims that simply are not there.  This Court should find for Plaintiffs and decline Lupin's invitation to err.

## II.   LUPIN DESIGNED ITS ANDA PRODUCT AS "EQUIVALENT IN ALL ASPECTS" TO ORACEA®

Lupin's ANDA Product is a 40 mg doxycycline capsule for once-daily oral administration for the treatment of inflammatory lesions (papules and pustules) of rosacea in adult patients, with 22 mg doxycycline in what Lupin calls "immediate release pellets" ("IR" portion or "IR" pellets), and 18 mg from what Lupin calls "enteric coated pellets" (its so-called "delayed release" or "DR" portion).  FF ¶¶ 12, 21, 46.  Throughout its formulation development, Lupin designed its ANDA Product to be "pharmaceutically equivalent" and "equivalent in all aspects" to 30 mg IR, 10 mg DR Oracea®.  FF ¶¶ 13, 17, 67, 166, 177.  And Lupin succeeded.  Its final ANDA Product, as submitted to FDA, releases 75 percent of its 40 mg composition (30 mg) immediately.  FF ¶¶ 96– 184.  The remaining 25 percent (10 mg) thus releases at a time other than immediately following oral administration.  FF ¶¶ 96–184.

Lupin achieved this outcome by designing its enteric-coated pellets with a "thin and weak" coat of Eudragit L30D55—the same enteric-coating polymer used by Oracea®—that results in releasing immediately upon oral administration about 8 mg of doxycycline from those pellets. FF ¶¶ 5, 27, 29–37, 115, 120–132.  Lupin formulated its ANDA Product to achieve a weak enteric coat by selecting just an 18 percent average weight gain at the enteric coat stage, which is the

3

lowest possible weight gain that can occur without detectable leakage at pH 1.1. FF ¶ 131. An average weight gain of 18 percent at the enteric coat stage is outside of the "preferable range" recited in the patents' specification. FF ¶ 131. By comparison, the weight gain at the enteric coat stage for Oracea® is 30 percent. FF ¶¶ 37, 115. Moreover, based on Dr. Rudnic's uniquely pertinent experience, the weight gain of Eudragit L30D55 is 32 percent or greater for at least six other commercialized extended-release products. FF ¶ 132. Lupin's enteric coat is also deposited on top of a like-on-unlike solvent layering system—alternating between methylene chloride-based and water-based coats—that, in essence, "peel[s] right off" because the polymers cannot penetrate one another. FF ¶¶ 41, 112–113.

A numerical depiction of Lupin's ANDA Product follows, with the IR portion of about 30 mg doxycycline arising from a combination of 22 mg of IR pellets and an additional immediate release of approximately 8 mg (from Lupin's so-called DR portion) due to the insufficient enteric coat, and then followed by the true DR portion of 10 mg, which remains delayed release by virtue of its more robust enteric coat.



### III.    LUPIN'S OWN DATA CONFIRMS LITERAL INFRINGEMENT

As shown at trial, Plaintiffs have proven by a preponderance of the evidence that, despite Lupin's purported attempts to design around the Chang patents, Lupin's ANDA Product meets each and every element of the asserted claims. *See Recro Gainesville LLC* v. *Actavis Lab'ys FL, Inc.*, 2017 WL 1064883, at *3 (D. Del. Feb. 24, 2017) ("Under [the preponderance of the evidence

standard], a patent owner does not have to produce definite proof of infringement, but must instead demonstrate that infringement was more likely than not to have occurred." (citations and internal quotation marks omitted)).  The law requires that infringement be determined based on the data that Lupin submitted in its ANDA.  *See, e.g.*, *Sunovion Pharms.* v. *Teva Pharms. USA, et al.*, 731 F.3d 1271, 1278 (Fed. Cir. 2013) ("What [defendant] has asked the FDA to approve as a regulatory matter [in its ANDA] is the subject matter that determines whether infringement will occur[.]").  And Plaintiffs' evidence at trial—submitted to the FDA in Lupin's ANDA—showed exactly how Lupin's ANDA Product functions.  Lupin's ANDA Product infringes the asserted claims by immediately releasing 22 mg from its IR portion and approximately 8 mg from its so-called "delayed release" portion, which amounts to a 30 mg IR portion and 10 mg DR portion.

Independent claim 1 of the Chang '532 patent recites the following elements:

> **1. [1]** An oral pharmaceutical composition of doxycycline, **[2]** which at a once-daily dosage will give steady state blood levels of doxycycline of a minimum of 0.1 μg/ml and a maximum of 1.0 μg/ml, the composition consisting of **[3]** (i) an immediate release (IR) portion comprising a drug, wherein the drug consists of about 30 mg doxycycline; **[4]** (ii) a delayed release (DR) portion comprising a drug, wherein the drug consists of about 10 mg doxycycline, **[5]** in which the DR portion is in the form of pellets coated with at least one enteric polymer; **[6]** and (iii) one or more pharmaceutically acceptable excipients.

Similarly, independent claim 1 of the Chang '740 patent recites the following elements:

> **1. [1]** An oral pharmaceutical composition of doxycycline, **[2]** which at a once-daily dosage will give steady state blood levels of doxycycline of a minimum of 0.1 μg/ml and a maximum of 1.0 μg/ml, the composition consisting of **[3]** (i) an immediate release (IR) portion comprising 30 mg doxycycline; **[4]** (ii) a delayed release (DR) portion comprising 10 mg doxycycline; and optionally **[6]** (iii) one or more pharmaceutically acceptable excipients.

Lupin does not dispute that its ANDA Product, used in accordance with its proposed label, meets nearly all the elements of the asserted claims of the Chang '532 and '740 patents.  FF ¶¶ 102–

5

104. The only dispute is whether Lupin's ANDA Product meets the claim elements reciting an IR portion of *30 mg* doxycycline and a DR portion of *10 mg* doxycycline. FF ⁋⁋ 7, 102–104. And as set forth in Section III(A), below, Lupin's ANDA Product functions as a 30:10 IR/DR product that directly infringes the Chang patents.

Section III(B) addresses Lupin's flawed and incorrect rebuttal evidence, including Lupin's legally irrelevant and factually immaterial *post hoc* litigation batch.[1] Namely, Lupin's heavy reliance on *in vitro* dissolution testing at pH 1.1, which is not a biorelevant pH, ignores this Court's claim construction. And when faced with its own ANDA data, which Lupin certified to be true and correct in order to obtain tentative approval, FF ⁋⁋ 15–16, *Rsch. Found. of State Univ. of New York* v. *Mylan Pharms. Inc.*, 723 F. Supp. 2d 638, 647 (D. Del. 2010) ("[T]he law also requires that Mylan's [submission] must be truthful and accurate . . . [it was] submitted to the FDA under penalty of perjury."), Lupin casts doubts on the data's reliability by citing to imagined "hotspots" and to an unreliable litigation-inspired batch.

### A. Lupin's ANDA Product Functionally Releases 30 mg Immediately and Delays the Remaining 10 mg

The Court's *Markman* Opinion and Order (D.I. 108, 109) resolving the meaning of "immediate release portion" and "delayed release portion" provided important context for how to quantify doxycycline as either IR or DR within the framework of the patents. The term "release," in the phrase "immediate release," and the term "portion," were construed by this Court and the *Sun* Court as *functional* limitations.[2] D.I. 108 at 4; *Galderma Lab'ys*, 411 F. Supp. 3d at 297. In

---

[1] At trial, the parties referred to this batch as either the "May 2023" batch or the "June 2023" batch. Despite the different names, both refer to the same 6000-capsule batch bearing Batch No. DOC/4021/001, FF ⁋ 133, and is the same belatedly-produced batch that was subject to Plaintiffs' since-denied motion to strike, *see* D.I. 126, 130, 133, 139, 141; D.I. 152 (denial).

[2] The fact that several claim terms at issue are construed as functional limitations is important when considering infringement. A structural interpretation requires a court to analyze each part

particular, this Court construed the term "release" as a release that "alters the subject's steady-state blood level of doxycycline." D.I. 108 at 4, 6. And the term "portion" was construed by this Court and by Judge Stark to allow for "any part of the claimed composition" to contribute as immediate release or delayed release. D.I. 108 at 9; *Galderma Lab'ys*, 411 F. Supp. 3d at 305. Because both "release" and "portion" are defined functionally, and because "release" is also defined by its function to alter blood levels, infringement is necessarily tied to how Lupin's ANDA Product functions in the body. As such, the infringement inquiry must account for how the release and the timing of that release of ***any part*** of Lupin's ANDA Product ***functions*** to ***alter a subject's steady-state blood levels*** of doxycycline.

Applying the Court's claim construction, Lupin's ANDA Product meets the ratio limitations in elements [3] and [4] because the ANDA data, including *in vitro* dissolution testing at pH 4.5 (Section III(A)(1)), *in vivo* fasted-state bioequivalence data (Section III(A)(2)), and the evidence showing that Lupin intentionally designed and manufactured its enteric-coated pellets to have a weak enteric coat (Section III(A)(3)), prove that Lupin's ANDA Product functions as a 30 mg IR portion and 10 mg DR portion in the body.

### 1. Lupin's *in vitro* data show 30 mg immediate release

Lupin cannot run from its ANDA and the data incorporated in it. *See Par Pharm., Inc.* v. *Eagle Pharms., Inc.*, 44 F.4th 1379, 1383 (Fed. Cir. 2022) ("[The infringement] inquiry is

---

of an accused product for its structure and then characterize that structure as either IR or DR. *Galderma Lab'ys, L.P.* v. *Sun Pharm. Indus. Ltd.*, 411 F. Supp. 3d 271, 292 (D. Del. 2019). Accordingly, a structural interpretation would narrow the scope of the claims such that, for example, Sun's product (containing a bilayer tablet that had a 26.4 mg immediate release layer and 13.6 mg modified release layer) would not infringe. *Id.* But by construing the terms functionally, this Court and the *Sun* Court properly broadened the scope of the claims to capture as infringing a product containing a portion of doxycycline that "dissolves in a manner in which 30 mg (or about 30 mg) of doxycycline is released immediately after oral administration, regardless of where in the product that doxycycline comes from." *Id.*

controlled by the ANDA specification itself."); *Sunovion*, 731 F.3d at 1278 ("What [defendant] has asked the FDA to approve as a regulatory matter [in its ANDA] is the subject matter that determines whether infringement will occur[.]"); *Par Pharm., Inc.* v. *Hospira, Inc.*, 835 F. App'x 578, 586 (Fed. Cir. 2020) ("Even where internal documents suggest that a generic product will not meet a claim limitation in practice, representations about the ANDA's scope control the infringement analysis.").  Those data evidence that Lupin's enteric-coated so-called DR pellets, which should not release until pH 5.5 and higher, immediately release doxycycline at a biorelevant stomach pH of 4.5.  FF ¶¶ 54–63, 117, 144–155.  This results in infringement at the capsule level. The data show that capsules of Lupin's ANDA Product release doxycycline within a range that includes a release of 75 percent, or 30 mg, within 30 minutes (and 1 hour) after exposure to pH 4.5—a typical pH Lupin's ANDA Product will experience immediately after ingestion with water (as instructed).  FF ¶¶ 48, 71–81, 153.  In fact, one of the tested ANDA Product capsules released 78 percent of its doxycycline 30 minutes after exposure to pH 4.5.  FF ¶ 154.  These data **alone** are sufficient to prove literal infringement.  *See Recro Gainesville*, 2017 WL 1064883, at *3.

As an initial matter, it is important to dispel the notion that quantifying the IR portion of a doxycycline product is somehow tied to the 30-minute time point after exposure to acidic dissolution media.  While *in vitro* data at the 30-minute time point may be relevant, the claims of the patent are not beholden to this measure.  In the Pretrial Conference, Plaintiffs cited to the *Sun* and *Amneal* cases—which both involved claim 1 of the '740 and '532 patents—as factually similar to this case.  In *Amneal*, Judge Stark identified the 30-minute time point as relevant to determining the IR portion of Amneal's ANDA Product because dissolution data at pH 1.1 showed that Oracea® releases 30 mg of doxycycline in 30 minutes.  *Galderma Lab'ys, L.P.* v. *Amneal Pharms., LLC*, 337 F. Supp. 3d 371, 390 (D. Del. 2018), *aff'd in part, rev'd in part on other grounds*, 806 F.

App'x 1007 (Fed. Cir. 2020).  Similarly, in *Sun*, Judge Stark identified dissolution test results at the 30-minute time point as highly probative of whether release from Sun's infringing product was immediate or delayed.  *Galderma Lab'ys*, 411 F. Supp. 3d at 306.

The claims, however, are **by law** not limited by possible commercial embodiments.  *See Phillips* v. *AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments[,]" and "we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment[.]"); *Liebel-Flarsheim Co.* v. *Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("[T]his court has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.").  Nor do the claims themselves specify 30 minutes as a cutoff for quantifying an IR portion.  *See* FF ¶¶ 7–11.  Thus, although 30 minutes has been found to be relevant **factually**, neither the claims nor the construction of "immediate release" are **legally** bound to a strict 30-minute time window.  *See* D.I. 109 (construing "immediate release" without any temporal limits).

Relying solely on the 30-minute time point fails to account for how the IR portion alters a subject's steady-state blood levels, which (unlike any arbitrary time point) **is** a required element of the claims.  Accordingly, the Court's claim construction properly does not—and should not now—quantify any specific time for immediate release.[3]  Rather, as ordered, "immediate release" has been construed as a "dosage form that is **intended** to release substantially all of the active

---

[3] In fact, doing so is legally improper and invites error.  There is no support in the intrinsic record of the patents for adding a 30-minute time limit into the claims as part of "immediate release."  *See Phillips*, 415 F.3d at 1323 (explaining that extrinsic evidence "is less significant than the intrinsic record in determining the legally operative meaning of claim language." (citations and internal quotation marks omitted)).

ingredient on administration, where 'on' includes immediately after, and 'release' is a ***functional limitation*** referring to a release that alters the subject's steady-state blood level of doxycycline." D.I. 109 (emphasis added).  Given the focus of the Chang patents, FF ℙ 8, the Court properly construed the term to require consideration of how the product functions in the body to achieve blood levels sufficiently high for a therapeutic effect while being sufficiently low to avoid an antibiotic effect.

Applying the Court's claim construction, Lupin's "immediate release portion" must be determined based on evidence at trial about *in vivo* transit times of doxycycline.  Both Dr. Rudnic and Dr. Buckton agreed that the stomach is not an absorptive organ, so doxycycline must exit the stomach before it can be absorbed.  FF ℙ 80.  Dr. Rudnic and Dr. Buckton also agreed that fasted-state gastric residence times may extend to approximately 1 hour.  FF ℙ 81.  And, of course, any and all doxycycline released in the stomach would be available for absorption after reaching the duodenum.  FF ℙ 94.  Therefore, the release of doxycycline from Oracea® and Lupin's ANDA Product such that it may be available for absorption to alter a subject's blood levels may continue up to 1 hour after oral administration.[4]  FF ℙℙ 80–81, 94.  Accordingly, though the 30-minute time point is relevant, the functional limitations of the claim elements necessitate considering data at the 1-hour time point as well where, as here, doxycycline that is immediately released upon oral administration is still being absorbed and, therefore, still altering a subject's blood levels.

To that end, Lupin's ANDA data, as submitted to the FDA, show that its ANDA Product directly infringes the Chang patents at ***both*** the 30-minute and 1-hour time points after exposure to the biophysically-relevant stomach pH of 4.5.  FF ℙℙ 153–154, 71–81.  This infringement

---

[4] Dr. Buckton testified, and Plaintiffs agree, that, once in the duodenum, the time it takes for doxycycline to absorb into the bloodstream is negligible.  FF ℙ 81.

inquiry is thus properly assessed in the context of Lupin's *in vitro* dissolution testing at pH 4.5 because that pH exposed Lupin's capsules to conditions most similar to those it will face immediately upon oral administration with water (as instructed).  FF ¶¶ 48, 71–79.

As Dr. Rudnic explained at trial and as reported in the *Kalantzi* article, pH 4.5 is a pH that is present in the stomach in the fasted state immediately upon administration with the FDA-mandated 240 ml of water.  FF ¶¶ 71–79.  In fact, Dr. Rudnic explained how obtaining a pH 4.5 is simple common sense when you double the volume of the fasted stomach (~pH 2) with water (~pH 7).  FF ¶ 78.  Dr. Buckton did not dispute that drinking water with a pH higher than that of gastric fluid will raise the pH of the stomach.  FF ¶ 79.  Nor could he.  These observations are supported by *Kalantzi*, which showed that a pH of 4.5 persists in the stomach after ingesting water in the 75th percentile of patients for at least 20 minutes.[5]  FF ¶ 75.

It is undisputed that Lupin used the same test conditions as reported in *Kalantzi* (*i.e.*, the co-administration of 240 mL water)—which are FDA-mandated bioequivalence testing procedures—to establish bioequivalence with Oracea®.  FF ¶ 75.  It is also undisputed that Lupin's proposed label recommends administering Lupin's ANDA Product with "adequate amounts of fluid along with the capsules . . . to wash down the capsule."  FF ¶ 48.  As such, during the bioequivalence testing relied on by Lupin in its ANDA, Lupin's ANDA Product had immediate exposure to a pH of 4.5 when taken as the label instructs.  FF ¶¶ 48, 75.  Moreover, if and when Lupin's ANDA Product enters the market, it will have immediate exposure to a pH of 4.5 when

---

[5] It is not necessary to precisely identify the regression—linear or exponential—that would accurately predict the pH of the stomach of test subjects at time points earlier than 20 minutes. *Kalantzi* demonstrates that a pH of 4.5 has been shown to exist in the fasted stomach at time points at least as late as 20 minutes after drinking 240 ml water.  It logically follows that, at earlier time points, including initially after the time of ingestion, a pH of 4.5 exists in the stomach.  FF ¶ 77 (Dr. Rudnic testifying that he is aware of other articles that corroborated *Kalantzi*).

taken as instructed by Lupin's FDA-approved label.  FF ¶¶ 48, 71–79.  Indeed, the FDA required Lupin to perform *in vitro* dissolution testing at pH 4.5.  FF ¶ 75.  This makes pH 4.5 a biorelevant pH to assess dissolution and highly probative in the infringement inquiry.  FF ¶ 76.

At trial, Plaintiffs presented individual capsule data from Lupin's *in vitro* study, titled "Multimedia Dissolution study – pH 1.1 HCl Followed by pH 4.5 phosphate buffer," which showed the function of Lupin's ANDA product in a biophysically-relevant pH of 4.5.  FF ¶¶ 48, 71–79, 145.  These data show that Lupin's so-called "DR" portion in fact immediately releases at pH 4.5, despite being coated with Eudragit L30D55, a polymer that should not ionize and release until exposure to pH 5.5 and above.  FF ¶¶ 145–149.  Specifically, these data showed that 30 minutes after exposure to pH 4.5, capsules of Lupin's ANDA Product released doxycycline within a continuum, from 55 to 85 percent.  FF ¶ 153.  After 1 hour, the range expanded to between 57 and 95 percent.  FF ¶ 153.  ***Both*** of these ranges clearly and indisputably encompass an individual capsule release of 75 percent.  Given that Lupin intends to produce a high volume of capsules in each of its 230,000-capsule commercial batches, it is all but certain that many capsules will release 75 percent of their doxycycline within 30 minutes and at 1 hour after exposure to pH 4.5.[6]  FF ¶¶ 138, 142.

The high likelihood that Lupin will produce, and, in fact, has already produced, capsules that release 75 percent of their doxycycline immediately upon exposure to pH 4.5 (which, again, is the pH identified to exist in the stomach immediately upon taking Lupin's ANDA Product as instructed by Lupin's label) is sufficient to prove literal infringement of the 30 mg immediate release limitation of the asserted claims.  *See Recro Gainesville*, 2017 WL 1064883, at *3 ("It is

---

[6] The standard for finding infringement is not as demanding as "all but certain."  Instead, a showing that infringement "is more likely than not" is all that is required.  *See Recro Gainesville*, 2017 WL 1064883, at *3.

well established that a finding of direct infringement can be predicated on circumstantial evidence demonstrating that at least one person directly infringed an asserted claim."); *Teva Branded Pharms. Prod. R&D, Inc.* v. *Cipla Ltd.*, 2023 WL 4996825, at \*5, \*8 (D.N.J. June 21, 2023) (noting that "a patentee may prove infringement by . . . circumstantial evidence" and finding infringement despite acknowledging that patentee's expert did not conduct "perfect tests to prove an 'airtight' infringement case" because "[t]he evidentiary standard here . . . is neither clear and convincing nor beyond a reasonable doubt; rather, it is preponderance of the evidence"); *accord Michalic* v. *Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960) ("[D]irect evidence of a fact is not required. Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."). Those capsules of Lupin's ANDA Product releasing 75 percent of their doxycycline immediately will necessarily release their remaining doxycycline as a DR portion, because that portion of Lupin's DR pellets has a sufficient enough enteric coat to prevent release until a time other than immediately. FF ⁋ 144. That remaining 25 percent, or 10 mg, infringes the only remaining disputed limitation of the asserted claims. FF ⁋⁋ 10, 102–104. 144.

But the Court need not rely solely on this logical interpretation of Lupin's ANDA data to evidence direct literal infringement of the patents. At a more granular level, one of the tested capsules, Capsule 1, released 78 percent of its doxycycline, or 31.2 mg, 30 minutes after exposure to pH 4.5. FF ⁋ 154. That capsule falls within the permissible bounds of the *Sun* Court's previous construction of the '532 patent claim term "about," which, as Judge Stark has defined and as Lupin has acknowledged, allows for "10%" variation, in other words, "at most a range of 27 to 33 mg doxycycline." FF ⁋ 154; *Galderma Lab'ys*, 411 F. Supp. 3d at 281–82; Joint Claim Construction Br. (D.I. 45) at 6 n.4. Accordingly, at a minimum, Capsule 1 literally infringes claim 1 of the '532 patent.

It is well-settled law that a patentee need not prove that a defendant's product infringes each and every time it is tested.  *See Recro Gainesville*, 2017 WL 1064883, at *3; *see also Broadcom Corp.* v. *Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) ("It is well settled that an accused device that sometimes, but not always, embodies a claim[ ] nonetheless infringes." (citations and internal quotation marks omitted)); *Adams Respiratory Therapeutics Inc.* v. *Perrigo Co.*, 616 F.3d 1283, 1287 (Fed. Cir. 2010) (noting that a patentee is not required to show that the defendant's product will meet the claims "9 times out of 10"); *Rsch. Found. of State Univ. of New York* v. *Mylan Pharms. Inc.*, 809 F. Supp. 2d 296 (D. Del. 2011) , *aff'd in part, vacated in part (on validity grounds)*, 531 F. App'x 1008 (Fed. Cir. 2013) (finding infringement where, without rounding, one patient had plasma concentration levels that met the requirements of the asserted claims and, with rounding, a total of three (out of thirty one) patients' plasma levels met the claim elements).

Judge Sleet's decision in *Recro* is instructive here.  In *Recro*, Defendant Actavis argued that its bioequivalence studies showed no evidence that administering its product to patients would cause plasma concentration profiles that met the relevant claim construction when considering mean concentration levels and, thus, its product did not infringe.  *Recro*, 2017 WL 1064883, at *10.  The court rejected this argument.  Instead, it credited Plaintiff Recro's argument that Actavis's product met the claim limitation because some (but not all) patients experienced the required plasma concentration profiles.  *Id.* at *11–13.  In doing so, the court noted that, "[i]t is well established that a finding of direct infringement can be predicated on circumstantial evidence demonstrating that at least one person directly infringed an asserted claim."  *Id.* at *10.

Similarly here, Lupin's own *in vitro* dissolution data on Capsule 1 unequivocally establish that Lupin's ANDA Product infringes the asserted claims.  The data show that Lupin's ANDA

14

Product releases *about* 75 percent—or 30 mg—doxycycline immediately upon oral administration when taken according to the instructions on Lupin's label. FF ⁋⁋ 48, 154. And Lupin cannot escape infringement by attempting to ignore or discredit its own data. *See* Section III(B), *infra*. Indeed, the reliability of these data is supported by the fact that Lupin tested 12 capsules in this study, whereas typical *in vitro* dissolution tests involve no less than six samples. FF ⁋ 155. Lupin performed an "instant repeat" of the standard 6-sample test and, therefore, solidified the reliability of its test results. FF ⁋ 155. Moreover, Lupin did not question the results of this test, nor did it inform the FDA of any possible limitations of the test at the time it submitted its results. FF ¶ 155. Instead, it certified to the FDA that these data were accurate and reliable, and they were released by Lupin's quality assurance unit. FF ⁋ 14–16, 64–65. Lupin's own formulator, Mr. Avachat, testified that Lupin's data at pH 4.5 are accurate. FF ⁋⁋ 14–15, 64–65.

The *in vitro* dissolution data submitted in Lupin's ANDA, viewed in light of this Court's claim construction, prove that Lupin's ANDA Product meets the 30 mg IR portion and 10 mg DR portion in Claims 1 and 16 of the Chang '532 patent and Claims 1 and 20 of the Chang '740 patent, and thus infringes those claims.

### 2. Lupin's remarkably similar blood levels viewed through doxycycline's absorption window support infringement

Lupin's lead formulator testified that the objective of Lupin's development program was to develop a product that is "equivalent in all aspects" to Oracea®. FF ⁋⁋ 14, 67, 166, 177. Lupin further concedes that its ANDA Product meets the steady-state blood level elements of the asserted claims of the Chang patents. FF ⁋⁋ 10, 49. To achieve this, the evidence presented at trial showed that Lupin created a product that functions to release doxycycline and alter a subject's blood levels to be remarkably similar, and bioequivalent, to that of Oracea®, a known and undisputed 30:10 IR/DR product. FF ⁋⁋ 3, 49, 53.

The *Sun* court affirmatively cited to bioequivalence as evidence of infringement. *Galderma Lab'ys*, 411 F. Supp. 3d at 306 n.16. In doing so, that court recognized that "[w]hile bioequivalence is not the test for infringement, and a bioequivalent drug may not necessarily infringe patent claims covering the patented drug, bioequivalence may nonetheless be relevant to the infringement inquiry." *Id.* (citations and internal quotation marks omitted).

As in *Sun*, Lupin and its expert concede that its ANDA Product was shown to be bioequivalent to Oracea® in a rigorous study, which was the basis for Lupin's claim to the FDA that its ANDA Product is bioequivalent to, and thus may rely on the safety and efficacy of, Oracea®. FF ¶¶ 49–52. Indeed, Lupin's ANDA states that Lupin's ANDA Product "is pharmaceutically equivalent with [Oracea®] as proposed drug product is having same active ingredient, same dosage form, same route of administration and same strength (s)] [*sic*] which is essential factor to prove therapeutically equivalency." FF ¶ 17. Moreover, Lupin's label relies on results and data from pharmacokinetic studies in the Oracea® label, which it could only do if the FDA found Lupin's ANDA Product to be bioequivalent to Oracea®. *See* FF ¶¶ 51–52.

Here, Lupin's blood levels and bioequivalence are particularly relevant due to the formulation constraints presented by doxycycline. The evidence at trial shows that doxycycline has, at a minimum, a preferential area of absorption, FF ¶¶ 91–95, and doxycycline's absorption window further evidences that, as Lupin's ANDA Product is bioequivalent to Oracea®, it must be functioning like a product that has a 30:10 IR/DR doxycycline ratio, FF ¶¶ 91–95.

Dr. Buckton concedes that doxycycline has a preferential absorption widow in the duodenum. FF ¶ 94. He otherwise largely ignores Dr. Rudnic's testimony on the impact that the absorption window has on drug development and a subject's blood levels. The evidence presented at trial showed that doxycycline has a pronounced absorption window, with absorption of nearly

16

90 percent in the duodenum and distinctly lower absorption rates farther down in the intestinal tract. FF ¶ 94. Dr. Rudnic explained that this pronounced absorption window impacts drug development, particularly in light of the Chang patents' steady-state blood level claim element. FF ¶ 95. Specifically, in order for a product to maintain steady-state blood levels "high enough to be effective for a beneficial effect in the treatment of [rosacea], but not as high as to exert an antibacterial effect"—meaning at the claimed minimum of 0.1 µg/ml and maximum of 1.0 µg/ml—you must design a product that releases the appropriate amount at the appropriate time to account for the pronounced absorption in the duodenum. FF ¶ 95. If the product releases doxycycline too late, it may cause the product to miss the absorption window, resulting in decreased absorption and, therefore, lower steady-state blood levels of doxycycline than those claimed in the patents. FF ¶ 95. As Dr. Rudnic testified, the developers of Oracea® found that to obtain the clinically-relevant steady-state blood levels recited in the claims, the product needed a specific ratio of about 30 mg immediate release and about 10 mg delayed release. FF ¶ 95. As to Lupin's ANDA Product, it is undisputed that it maintains steady-state blood levels of doxycycline as claimed in the patents. FF ¶ 49, 102. Indeed, even at Day 1, as evidenced by Lupin's bioequivalence data, Lupin's ANDA Product achieves remarkably similar *in vivo* blood levels as Oracea®. FF ¶ 53. Accordingly, doxycycline's absorption window is further evidence that Lupin's ANDA Product must function as a product with a 30:10 IR/DR ratio to achieve the required, and claimed, steady-state blood levels.

In the face of this evidence, Lupin now claims that its bioequivalence results do not show that Lupin's ANDA Product tightly matches Oracea®. FF ¶ 49. To make this argument, Dr. Buckton re-plots the data on his own, zoomed-in at a nanogram scale, in an attempt to aggrandize minor differences. FF ¶ 49. If Lupin's bioequivalence data were to show, as Dr. Buckton contends,

such differences between Lupin's ANDA Product and Oracea®, surely the FDA would have taken notice and would not have tentatively approved Lupin's ANDA Product as bioequivalent.  But Lupin cannot dispute its bioequivalence data, which formed the basis for the FDA's tentative approval of its ANDA Product.  FF ⁋ 68.

Lupin adds further confusion by claiming that the '516 patent showed another product with a different composition ratio that is asserted to be bioequivalent to Oracea®.  But the product described in the '516 patent was not determined *by the FDA* to be bioequivalent to Oracea®. FF ⁋ 53 n.3.

### 3.    Lupin designed its ANDA Product to function as 30:10 IR/DR

The individual capsule data from Lupin's *in vitro* testing of its ANDA Product, which show the immediate release of 30 mg doxycycline (*i.e.*, 22 mg from Lupin's IR pellets and 8 mg from Lupin's so-called DR pellets) is dispositive.  *See Recro Gainesville*, 2017 WL 1064883, at *3. And Lupin's bioequivalence data, in the context of doxycycline's absorption window, are further evidence of infringement.  But the Court need not rely solely on these data.  The evidence at trial also showed that Lupin *designed* the so-called DR portion of its ANDA Product to have a weak enteric coat to achieve a 30:10 IR/DR doxycycline ratio upon oral administration of Lupin's ANDA Product, when taken according to Lupin's label.  FF ¶¶ 48, 111–132.  Specifically, Lupin does not dispute—and, in fact, Dr. Buckton agreed—that it selected the lowest possible percent weight gain at its enteric coating stage to pass the pH 1.1 quality control test required by the FDA. FF ¶¶ 130–131.  Nor can Lupin dispute its alternating use of methylene chloride and water in its coating processes.  FF ¶¶ 112–114.  Lupin's deliberate design and manufacturing decisions, as testified to by Dr. Rudnic—an expert in drug development and lead inventor on *seven* commercialized drug products with delayed release components, including six that use Eudragit L30D55—results in a 30:10 IR/DR doxycycline ratio, which infringes the Chang patents.

18

FF ¶¶ 99, 101, 111, 144; *see Galderma Lab'ys,* 411 F. Supp. 3d at 306 (stating while "[i]t is generally true that intent plays no role in assessing direct patent infringement . . . the parties agreed . . . to a construction . . . of 'immediate release' that expressly takes into account an accused infringer's intent.").

Additionally, Lupin does not dispute that Lupin's ANDA Product and Oracea® contain similarly-sized pellets for enteric coating. FF ¶ 38. According to Dr. Rudnic's expert opinion, one would expect, given use of the same coating and the same pellet size, that Lupin's ANDA Product and Oracea® would have the same average percent weight gain at the enteric coating stage. FF ¶ 38. But this is not what the evidence showed. Instead, Mr. Avachat and Dr. Buckton concede that Lupin's ANDA product has an 18 percent average weight gain at the enteric coating stage. FF ¶¶ 33–36, 130–131. Oracea® has a 30 percent average weight gain at the enteric coating stage, nearly double that of Lupin's ANDA Product. FF ¶¶ 37, 115.

The evidence presented at trial also showed that Lupin *specifically* selected for this 18 percent average weight gain. Specifically, Lupin ran quality control testing on the effect of percent weight gain of the enteric coat in dissolution at pH 1.1 and analyzed SEM images of the so-called DR pellets at 17 and 19 percent average weight gains.[7] FF ¶¶ 111–132. In quality control testing, Lupin observed leakage of the so-called DR pellets at pH 1.1 at 16 and 17 percent average weight gains, but did not observe leakage at pH 1.1 at 18 and 19 percent average weight gains. FF ¶¶ 29–30, 131.

Accordingly, as Dr. Rudnic testified at trial, Lupin selected the lowest possible percent weight gain at the enteric coating stage to pass the quality control dissolution testing. FF ¶ 131.

---

[7] According to Dr. Rundic, the SEM images show increased speckling at the 17 percent weight gain as compared to the 19 percent weight gain. FF ¶¶ 129.

Indeed, Dr. Buckton conceded on questioning from the Court that Lupin's percent weight gain is "on the thin end of the ordinary range." FF ⁋ 130. The result of Lupin's deliberate manufacturing decision is that some so-called DR pellets will be coated at less than 18 percent average weight gain and will, accordingly, leak as pH rises above pH 1.1. FF ⁋⁋ 120–132.

Dr. Rudnic further testified that Lupin's decision to use methylene chloride also contributed to the weakness of the enteric coat of its so-called DR pellets. FF ¶¶ 111–114. Specifically, Dr. Rudnic testified at trial that, despite its health and safety risks and increased costs, Lupin intentionally opted to alternate use of methylene chloride and water in its manufacturing processes. FF ¶¶ 23–28, 41–44, 112. This like-on-unlike layering of alternating water and methylene chloride further weakened Lupin's enteric coat by layering an aqueous coat on top of a solvent coat, thus resulting in the coating of layers that do not closely adhere to each other. FF ¶¶ 111–114.

Accordingly, the evidence presented at trial showed that Lupin's ANDA Product was designed to provide the release of a 30 mg IR portion and a 10 mg DR portion as claimed in the Chang patents. Specifically, Lupin designed its ANDA Product to have pellets with a weak enteric coat such that its so-called DR portion would begin to release immediately upon oral administration when taken with water as required by Lupin's FDA-approved label.

### B. Lupin's Defense is a Series of Distractions

At trial, Lupin did not present any credible response to the evidence from its own data in its ANDA, the testimony of its own lead formulator, and the credible testimony of Dr. Rudnic, that show, for the reasons stated above, that Lupin's ANDA Product meets the immediate release and delayed release claim elements of the Chang patents. At bottom, Lupin's entire non-infringement case rests most heavily on a magnified interpretation of *in vitro* dissolution testing at pH 1.1, a debunked "hotspot" phenomenon, and data from a litigation-inspired batch that Lupin uses solely

20

to discredit its own data that Lupin itself certified to both the FDA and this Court was true and accurate and required no correction.

### 1.    Lupin's over-reliance on pH 1.1 dissolution data is misplaced

Lupin's heavy reliance on dissolution data at pH 1.1 is inadequate for several reasons. Dissolution tests at pH 1.1 are quality control tests (not bioequivalence tests) to simulate the harshest acidic environment that could possibly exist in the stomach. FF ¶¶ 71, 84. As this Court correctly identified at trial, showing that an IR portion releases fully at pH 1.1 is "sufficient to [prove] infringe[ment] . . . but it is not necessary . . . if it winds up dissolving at the same rate at a different pH" in which the IR portion would be expected to release. FF ¶ 73. Galderma relied on dissolution tests at pH 1.1 in the *Amneal* and *Sun* cases because those tests were sufficient to prove infringement of a 30 mg IR portion and 10 mg DR portion, full stop. FF ¶ 73.

Lupin's attempt to persuade this Court that testing at pH 1.1 is the ***only*** test that can be used to establish infringement ignores science. pH 1.1 is not a pH in the stomach at any relevant time, and it should therefore be given limited weight as compared to the dissolution data at pH 4.5, proven to exist upon administration of Lupin's ANDA Product. FF ¶¶ 48, 74–79. Lupin provided no evidence at trial suggesting that a pH of 1.1 is a sustained pH in a normal, healthy fasted-state stomach for any period of time. Nor did Lupin provide evidence that pH 1.1 existed in the fasted-state stomach of patients after ingesting its ANDA Product with 240 mLs of water during its bioequivalence studies. *See* FF ¶¶ 74–79. Lupin also provided no evidence that pH 1.1 would exist in the fasted-state stomach of patients taking its ANDA Product with, as its label requires, "adequate amounts of fluid along with the capsules." FF ¶¶ 48, 76. All of the evidence provided at trial points to the contrary.

Furthermore, Lupin's reference to pH 1.1 being the "patent test" is a red herring. If such results at pH 1.1 were necessary to a finding of infringement, that requirement would be

21

incorporated into the claims.  It is not.  In fact, neither the claims nor the Court's construction require any specific *in vitro* dissolution results.  *See* D.I. 108 at 8 ("Lupin's focus on *in vitro* testing is incomplete" because "*in vitro* testing is used to model *in vivo* behavior" and "[t]he patents reflect this understanding," as "the only time '*in vitro*' appears in the specification, '*in vivo*' is in the same sentence").

In as much as Lupin attempts to undermine Dr. Rudnic for taking a "different" path to infringement from that in *Sun* and *Amneal*, he has not.  Consistent in all three matters, Dr. Rudnic has identified *in vitro* dissolution tests during which the accused products were exposed to conditions that conclusively reveal release from their respective "IR portions."  In all three cases, the products have revealed a 30 mg release from those "IR portions."  The only difference here is that Dr. Rudnic needed to look deeper than before because an enteric coat did not play a role in either the *Amneal* or *Sun* cases.

### 2. Lupin's hotspot phenomenon is not scientifically-supported

Neither Lupin nor its experts presented actual evidence at trial to support its position that Lupin's data at pH 4.5 were affected by the so-called hotspot phenomenon.  Instead, Ms. Gray and Dr. Buckton relied on mere conjecture to argue that the variability observed in Lupin's pH 4.5 data must have been impacted by something other than the way Lupin's so-called DR pellets were manufactured.  FF ¶¶ 156–159.  Lupin's experts claimed that this phenomenon makes the data, which Lupin submitted to the FDA, unreliable.  FF ¶¶ 156–159.  Lupin's unsupported theory, belied by Lupin's own actions in submitting without qualification the data to the FDA, should be rejected.  FF ¶¶ 156–159.

The evidence at trial discredits Lupin's hotspot phenomenon.  FF ¶¶ 156–159.  As an initial matter, the Dissolution Procedure Development and Validation Chapter of the USP, on which Ms. Gray relied, discusses variability in dissolution data.  FF ¶ 83.  It explains without qualification

that "[t]he two most likely causes of variability [in dissolution data] are the formulation itself (e.g., drug substance, excipients, or manufacturing process) or artifacts associated with the test procedure (e.g., coning, tablets sticking to the vessel wall or basket screen." FF ¶ 83. Lupin does not allege the latter and ignores the former. The chapter also advises that "the source of variability should be investigated, and attempts should be made to reduce variability whenever possible." FF ¶ 83.

Both Ms. Gray and Dr. Buckton conceded that they observed high variability in the *in vitro* dissolution data at pH 4.5 for Lupin's ANDA product. FF ¶¶ 156, 159. Yet, Lupin, after observing the variability in the data, did not, as is directed by the USP, re-run the dissolution test. FF ¶ 159. Instead, as Dr. Buckton conceded at trial, Lupin submitted the data to the FDA and as such certified them to be accurate. FF ¶¶ 15, 16, 64, 65. And Ms. Gray conceded that, to her knowledge, Lupin did not tell the FDA that the variability in its data was unacceptable. FF ¶ 159. Nor could Dr. Buckton point to any section or statement in Lupin's ANDA submission in which the hotspot phenomenon was mentioned or in which Lupin raised concerns about its *in vitro* dissolution test results. FF ¶ 159. Indeed, when presented with those data, Mr. Avachat testified that they were accurate. FF ¶ 64.

Moreover, if the hotspot phenomenon were, in fact, a credible explanation for Lupin's ANDA data, one would expect dissolution data for Lupin's ANDA Product and Oracea® to show similar degrees of variability. As Dr. Buckton conceded, Lupin's ANDA Product and Oracea® were tested using the same conditions. FF ¶ 61. Yet, evidence presented at trial also showed that the variability in data, which Ms. Gray attributed to the hotspot phenomenon for Lupin's ANDA Product, was not observed with Oracea®. FF ¶¶ 61, 152, 156.

23

The hotspot phenomenon is further undermined by Lupin's own *in vivo* data. The high degree of variability seen in Lupin's *in vitro* data is also seen in Lupin's *in vivo* bioequivalence studies at the individual patient level. FF ¶¶ 109, 110. As Dr. Rudnic testified, $C_{max}$ represents the rate of drug absorption and the release of a dosage form. FF ¶ 88. Therefore, as between Lupin's ANDA Product and Oracea®, a POSA would expect that Oracea®—which, according to Lupin, contains a larger 30 mg IR portion—would have a higher $C_{max}$ value and would achieve it faster. But, 23 out of 34 (68%) subjects that were administered Lupin's ANDA Product had a higher $C_{max}$ in Lupin's fasted bioequivalence study as compared to Oracea®. FF ¶¶ 109, 110. Not only do these data help disprove Lupin's idea of a hotspot, they corroborate its ANDA Product's thin and weak enteric coat.

Further, *Miller* concludes that, when the buffer is added rapidly, no hotspot phenomenon is observed. FF ¶ 156. In response to this conclusion, Lupin's experts point to other aspects of *Miller* that they argue support the existence of hotspots, including that *Miller* observed a potential hotspot when the buffer was added slowly along the shaft while the paddles continued stirring the medium. FF ¶¶ 156–157. These are distinctions without substance. The actual evidence is that Lupin had to add the buffer to 12 vials within five minutes, which necessarily means rapid buffer addition. FF ¶ 156. Using these USP-recommend procedures, *Miller* found that no hotspots were generated. FF ¶ 156.

Although Dr. Buckton and Ms. Gray attempt to discredit *Miller* because Dr. Miller kept the paddles rotating during the test while Lupin stopped and removed the paddles, that distinction, in fact, bolsters the conclusion that Lupin's data at pH 4.5 was *not* the result of hotspots. FF ¶ 157. That is, the only instance in which Dr. Miller found a so-called "hotspot" to be possible was when the buffer was added slowly along the shaft. FF ¶ 157. But, because Lupin stopped and removed

24

the paddles, no scenario during which Lupin conducted its tests could have reproduced the scenario in which *Miller* found a transient "hotspot."  FF ¶ 157.

Finally, Ms. Gray conceded that she is aware of no cited literature, other than the sole source on which she relied and the *Miller* paper, which discusses the hotspot phenomenon. FF ¶ 157.  If hotspots were a real concern, however, one would expect the academic and FDA literature to be rife with hotspot references.  Instead, there are only two sources in the record, one that is wholly unsupported and one that concludes hotspots do not exist when USP procedures are followed.

### 3.    The data from Lupin's litigation-inspired samples are irrelevant

In May 2023, Lupin manufactured a 6000-capsule batch supposedly representative of its ANDA Product.  FF ¶ 133.  This 6000-unit batch was not required by the FDA nor was it submitted to the FDA in support of Lupin's ANDA.  FF ¶¶ 134–136.  That alone is dispositive of this issue. But even if the Court were to consider Lupin's litigation-inspired samples, it is known that they were manufactured differently than the batches submitted with Lupin's ANDA, including being manufactured at different facilities, in different conditions, using different machines.  FF ¶¶ 137–142.  It is also apparent that *post hoc* testing on the litigation-inspired samples is inconsistent with the data Lupin relied on in its ANDA submission to the FDA.  FF ¶ 137.  The obvious and correct conclusion to draw based on manufacturing differences and testing differences between these products is that they are, in fact, different.  FF ¶¶ 137-142.  Accordingly, the *post hoc* testing results are factually questionable and unreliable and should be rejected.[8]

It is a matter of law that the litigation-inspired samples do not control the infringement inquiry.  Rather, what an accused infringer "has asked the FDA to approve as a regulatory matter

---

[8] This, of course, was one reason why Plaintiffs moved to strike the testing results from the litigation batch.  That batch was manufactured and produced well after Plaintiffs had any

is the subject matter that determines whether infringement will occur." *Sunovion*, 731 F.3d at 1278; *see Par Pharm.*, 835 F. App'x at 586.

And Lupin's criticism that Dr. Rudnic failed to conduct his own experiments or testing of Lupin's ANDA Product at pH 4.5 rings hollow. It is well-settled that "[t]here is no 'general rule requiring one who alleges infringement of a claim containing functional limitations to perform actual tests or experiments on the accused product or method.'" *Bristol-Myers Squibb Co.* v. *Aurobindo Phama USA Inc.*, 477 F. Supp. 3d 306, 346 (D. Del. 2020) (quoting *Martek* v. *Biosciences Corp.* 579 F.3d 1363, 1372 (Fed. Cir. 2009)); *see C.R. Bard Inc.* v. *AngioDynamics, Inc.*, 979 F.3d 1372, 1379 (Fed. Cir. 2020) ("[A]lthough [plaintiff] did not conduct its own tests of the [accused product], [plaintiff] was entitled to rely on [defendant's] representations to its customers and to the FDA[.]"). Here, the pH 1.1 to pH 4.5 data that Lupin submitted to the FDA as part of its ANDA submission controls, not samples created after tentative approval solely for the purposes of this litigation and to bolster Lupin's non-infringement defense. *See Sunovion*, 731 F.3d at 1278; *Par Pharm.*, 835 F. App'x at 586.

But even if the Court were to consider the litigation-inspired batches, the evidence establishes that those samples were manufactured differently from the ANDA Product. FF ¶¶ 137–142. The 6000-capsule batch was manufactured at a much smaller scale than the 230,000-capsule exhibit batches provided in Lupin's ANDA. FF ¶ 138. And Mr. Avachat testified that, at a minimum, the atomization, air pressure, air flow, and spray rate were different for the 6000-capsule batch as compared to the larger exhibit batch used for Lupin's ANDA. FF ¶ 140. And the 6000-unit litigation batch performed differently in testing than did Lupin's ANDA batches. FF ¶ 137. Given the differences in manufacturing and the clear differences in testing results, the Court should

opportunity to obtain fact discovery as to its provenance.

26

not credit any testing on the litigation-inspired samples.  Indeed, the litigation batch will not and cannot be sold in the commercial market, FF ¶¶ 142, 143, which also makes it legally irrelevant. *Glaxo, Inc.* v. *Novopharm, Ltd.*, 110 F.3d 1562, 1570 (Fed. Cir. 1997) ("What is likely to be sold, or, preferably, what will be sold, will ultimately determine whether infringement exists.").

## IV. LUPIN'S ANDA PRODUCT ALSO INFRINGES AS AN EQUIVALENT

For the reasons stated above, Lupin's ANDA Product falls squarely within the literal scope of the asserted claims of the Chang patents.  But, even if the Court disagrees, Lupin's ANDA Product infringes under the doctrine of equivalents because it is at least equivalent to a composition with an IR portion of about 30 mg doxycycline and a DR portion of about 10 mg doxycycline, whether considered under the "insubstantial differences" test or the "function, way, and result" test. *See, e.g.*, *Warner-Jenkinson Co.* v. *Hilton Davis Chem. Co.*, 520 U.S. 17, 39–40 (1997).

To achieve bioequivalence, Lupin designed its ANDA Product not only to be "pharmaceutically equivalent" to Oracea® (30 mg immediate release, 10 mg delayed release), but "equivalent in all aspects."  FF ¶¶ 13, 67.  And Lupin did so using the same, or at least substantially the same, release of about 30 mg doxycycline immediately and about 10 mg as delayed release as claimed in the Chang patents.  FF ¶¶ 161–184.

Lupin's use of two or more items or parts to accomplish what the claimed item or part does is consistent with the law and proves equivalence for purposes of the doctrine of equivalents. *See Intel Corp.* v. *U.S. Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991) ("[I]nfringement under the doctrine of equivalents may be established even though the accused device requires a number of components to perform functions which the patented invention achieves by use of one component.").  This is particularly true for a drug that is administered chronically over time to achieve and maintain steady-state blood levels.  For example, both "steady state blood levels" and

"once-daily" are elements of the asserted claims.  So, looking at the mean data at the biorelevant pH 4.5 over the course of a multi-day regimen is appropriate.

The mean data from Lupin's dissolution study at pH 4.5 prove that, when administered consistent with Lupin's label (*i.e.*, once-daily with adequate amounts of water), Lupin's ANDA Product will result in IR and DR portions that are equivalent to the disputed claim limitations.  As an example of this, the mean data at pH 4.5 is representative of what the release profile will look like for any given patient after taking 12 individual capsules, which, when administered once-daily as instructed, would represent an approximately 2-week period (one capsule per day for 12 days).  *See* FF ¶¶ 144–145, 150–151, 153–155.  Lupin's results show that, 2 hours[9] after first exposure to pH 4.5, the mean release of Lupin's ANDA Product is exactly 30 mg, or 75 percent.  FF ¶ 57.  Thus, when interpreting these data as if at the claimed steady state (~7 days), Lupin's ANDA Product provides a mean amount of 75 percent immediate release doxycycline, and also achieves the claimed blood levels as shown by Lupin's plasma concentration curves.  FF ¶¶ 49–53.  Thus, Lupin's ANDA Product infringes under the doctrine of equivalents because multiple capsules in their exhibit batch achieve a mean of 75 percent release in the IR portion.[10]  The remaining 25 percent must then release at "a time other than immediately following oral administration."  D.I. 108 at 9.

---

[9] *In vitro* dissolution tests are quality control tests that do not account for differences in the volume of gastric fluid, agitation, buffers, and salts that a capsule will be exposed to *in vivo* and therefore they do not correlate 1:1 with dissolution *in vivo*.  FF ¶ 82.  Because gastric conditions can be significantly more harsh than *in vitro* conditions, it is appropriate to consider the integrity of capsules at the 2-hour time point *in vitro*.  FF ¶¶ 82, 84, 86.

[10] Of course, the Court's construction of the term portion also dictates that this element is met literally by Lupin's ANDA product.  *See* Section III(A), *supra*.

This also holds true for Lupin's mean data at pH 4.5 collected at the 1-hour time point. FF ¶¶ 57, 58.  As discussed in Section III(A)(1), *supra*, the 1-hour time point is relevant to quantifying release from the IR portion of the asserted claims.  The mean release at the 1-hour time point after exposure to pH 4.5 in Lupin's *in vitro* dissolution tests is 71 percent, or 28.4 mg. FF ¶¶ 57, 58.  This mean release falls within the permissible bounds of the *Sun* Court's previous construction of the '532 patent claim term "about," which as Judge Stark defined and as Lupin has acknowledged, allows for "10%" variation, in other words, "at most a range of 27 to 33 mg doxycycline." *Galderma Lab'ys*, 411 F. Supp. 3d at 281–82; D.I. 45 at 6 n.4.  Accordingly, this mean is consistent with individual capsules infringing literally and also with Lupin's ANDA Product being substantially similar (insubstantially different) to the claimed product when administered at steady state. *See Warner-Jenkinson*, 520 U.S. at 39–40.

It is no mystery, moreover, why Lupin's ANDA Product functions substantially the same way as a 30:10 IR/DR product, notwithstanding that it is superficially labeled as one containing a 22 mg IR portion and an 18 mg DR portion.  Lupin achieved these results in substantially the same way by applying a thin and weak enteric coat—using Lupin's 18 percent weight gain enteric coat applied using unlike layering (methylene chloride and water-based coats)—to ensure that about 8 mg of the so-called DR portion would in fact release immediately, leaving 10 mg doxycycline to release at a time other than immediately following oral administration.  FF ¶¶ 111–132. 18 percent is the lowest possible weight gain at the enteric coat stage without detectable leakage at pH 1.1, and it is materially distinct from that of other commercialized extended-release drugs, including Oracea®.  FF ¶¶ 130–132.  Lupin did this to match the release profile of Oracea®, and it succeeded.  Accordingly, the result is substantially the same:  Lupin's ANDA Production functions as a 30:10 IR/DR product in the body that is bioequivalent to Oracea®.

29

The evidence at trial showed that Lupin's ANDA Product performs substantially the same function, in substantially the same way, and to achieve substantially the same result as a 30:10 IR/DR product.  Plaintiffs have met their burden of proving infringement under the doctrine of equivalents.

## V.        ADMINISTERING LUPIN'S ANDA PRODUCT AS INSTRUCTED INFRINGES

If Lupin's ANDA Product infringes the asserted claims either literally or under the doctrine of equivalents, the indication provided in Lupin's label leaves no doubt that the Chang patents' method of treatment claims are infringed as well.  *See, e.g.*, *Eli Lilly & Co.* v. *Actavis Elizabeth LLC*, 435 F. App'x 917, 926 (Fed. Cir. 2011) ("We have long held that the sale of a product specifically labeled for use in a patented method constitutes inducement to infringe that patent, and usually is also contributory infringement.").

Because Lupin's proposed label provides that its capsules are "indicated for the treatment of only inflammatory lesions (papules and pustules) of rosacea in adult patients," FF ¶ 46, it "instructs users to perform the patented method" and "provide[s] evidence of [Lupin's] affirmative intent to induce infringement."  *AstraZeneca LP* v. *Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010); *see also Forest Lab'ys Holdings Ltd.* v. *Mylan Inc.*, 206 F. Supp. 3d 957, 975 (D. Del. 2016) (finding generic defendants liable for induced infringement because defendants' labels would "inevitably lead some consumers to practice" the claimed method) (quoting *id.*)).  Accordingly, Lupin infringes the Chang patents' method of treatment claims.

## VI.        THE COURT SHOULD FIND FOR PLAINTIFFS

For the reasons set forth above and in Plaintiffs' Proposed Findings of Fact, Plaintiffs respectfully request that the Court find that Lupin has infringed each of the asserted claims of the Chang patents.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

_____
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

OF COUNSEL:

Gerald J. Flattmann, Jr.
Andrew J. Cochran
Margaret A. Barone
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
(212) 701-3000

*Attorneys for Plaintiffs*

February 2, 2024

31

**CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 2, 2024, upon the following in the manner indicated:

| | |
|---|---|
| John C. Phillips, Jr., Esquire<br>Megan C. Haney, Esquire<br>PHILLIPS, MCLAUGHLIN & HALL, P.A.<br>1200 North Broom Street<br>Wilmington, DE 19806<br>*Attorneys for Defendants Lupin Inc.*<br>*and Lupin Limited* | *VIA ELECTRONIC MAIL* |
| William A. Rakoczy, Esquire<br>Joseph T. Jaros, Esquire<br>Natasha L. White, Esquire<br>Adrianne C. Rose, Esquire<br>Katie A. Boda, Esquire<br>RAKOCZY MOLINO MAZZOCHI SIWIK LLP<br>6 West Hubbard Street, Suite 500<br>Chicago, IL 60654<br>*Attorneys for Defendants Lupin Inc.*<br>*and Lupin Limited* | *VIA ELECTRONIC MAIL* |

*/s/ Jeremy A. Tigan*

Jeremy A. Tigan (#5239)