**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

GALDERMA LABORATORIES,
L.P. and TCD ROYALTY SUB LP

  Plaintiffs,

  v.

LUPIN INC. and LUPIN LIMITED

  Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 21-cv-01710-SB

**REDACTED -**
**PUBLIC VERSION**

**DEFENDANTS LUPIN INC. AND LUPIN LIMITED'S**
**OPENING POST-TRIAL BRIEF**

OF COUNSEL

William A. Rakoczy
Joseph T. Jaros
Natasha L. White
Katie A. Boda
Adrianne C. Rose
RAKOCZY MOLINO MAZZOCHI
SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60654
(312) 527-2157
wrakoczy@rmmslegal.com
jjaros@rmmslegal.com
nwhite@rmmslegal.com
kboda@rmmslegal.com
arose@rmmslegal.com

John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
PHILLIPS, MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
mch@pmhdelaw.com

Dated: February 2, 2024

*Attorneys for Defendants*
*Lupin Inc. and Lupin Limited*

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

    A.    Lupin's Case—Summary ......................................................................... 1

    B.    Questions to Lupin—Short Answers ....................................................... 2

        1.    How should the Court evaluate Lupin's 18% coating weight? ................. 2

        2.    How does Lupin's 18% coating weight intersect with the IR portion and the 30-minute window? ............................................. 2

        3.    Can the Court rule out Galderma's incomplete coating theory even if Lupin's pH 4.5 rebuttal testing is considered irrelevant? ......................... 2

        4.    Is it possible that the quality or weight of the enteric coating changed between the ANDA exhibit batches and the rebuttal batch? ...................................................................................... 2

        5.    If the Court finds the hot spot explanation unproven, is it still possible to rule that Lupin's Product will not infringe? .............................. 3

        6.    Is there any evidence that Lupin's DR pellets are exposed to pH 11 *in vivo*? .................................................................................................. 3

        7.    For the purpose of evaluating patent infringement, how should the Court address the variability observed in second-stage results? ................. 3

        8.    What inference should the Court draw from the pH 1.1/pH 4.5 results for ORACEA? ........................................................................ 3

        9.    For the purpose of evaluating the doctrine of equivalents, could an 18% coating be considered equivalent to not being coated at all? ............. 4

        10.    Is there any evidence as to how long hot spots persist with—and without—paddles running? ......................................................................... 4

    C.    Questions to Galderma—Short Answers ................................................. 4

        1.    Is there any evidence that about 44% of Lupin's DR beads function as IR beads? ......................................................................................... 4

        2.    How can we infer that 44% of Lupin's DR beads function as immediate release from the pH 1.1/pH 4.5 capsule results? ....................... 4

        3.    If some capsules immediately release 90% while other capsules immediately release 55%, would that be sufficient to prove infringement? ........................................................................................... 5

4.    Is there any evidence that Lupin's capsules contain a non-random distribution of DR beads? ............................................................ 5

5.    Is there any evidence of the mechanism by which modifying the spray rate for the June 2023 samples would systematically change the batch? ..................................................................................... 5

6.    For a fasted stomach, why is pH 4.5 more biorelevant than pH 1.1? ......... 5

7.    Is there any evidence as to how Lupin added pH 11 during the media change for the pH 1.1/pH 4.5 method? ............................................ 5

8.    Is there any dispute that pH 1.1 is an industry standard test to evaluate immediate release? .................................................................. 5

D.    Lupin's Rebuttal—Summary ................................................................. 5

II.    FACTUAL BACKGROUND ..................................................................... 7

III.    ARGUMENT ............................................................................................ 7

A.    Lupin's Case ........................................................................................... 7

1.    The broadest asserted claims cover about 30:10 ....................................... 7

   a.    The range of potential equivalents is limited to 27-33 IR : 9-11 DR ..................................................................................... 7

   b.    Galderma disclaimed a 23.3:16.3 composition ratio. ..................... 8

2.    Lupin's Product is designed, made, tested and accurately labeled as 22:18. ................................................................................. 8

3.    Lupin's Product is intended to function as 22:18 upon administration. ........................................................................................... 9

4.    There is no genuine dispute using the patent test. ................................... 10

   a.    There is no genuine dispute using the *Amneal* and *Sun* tests........ 11

5.    Industry standard comparative testing against ORACEA further proves non-infringement. ........................................................................ 11

   a.    ORACEA is made, tested and accurately labeled as 30:10. ......... 11

   b.    ORACEA functions as 30:10, Lupin's Product does not. ............ 12

6.    Lupin's Product does not literally infringe. .......................................... 13

7.    Lupin's Product is not even close to equivalent. ..................................... 14

8.    The design around function of Lupin's Product proves the absence of specific intent.................................................................................. 14

B.    Questions to Lupin............................................................................................. 14

1.    How should the Court evaluate Lupin's 18% coating weight? ............... 14

2.    How does Lupin's 18% coating weight intersect with the IR portion and the 30-minute window? ......................................................... 14

3.    Can the Court rule out Galderma's incomplete coating theory even if Lupin's pH 4.5 rebuttal testing is considered irrelevant?...................... 15

4.    Is it possible that the quality or weight of the enteric coating changed between the ANDA exhibit batches and the rebuttal batch? ..................................................................................................... 15

5.    If the Court finds the hot spot explanation unproven, is it still possible to rule that Lupin's Product will not infringe? ........................... 16

6.    Is there any evidence that Lupin's DR pellets are exposed to pH 11 *in vivo*?................................................................................................. 16

7.    For the purpose of evaluating patent infringement, how should the Court address the variability observed in second-stage results?............... 16

8.    What inference should the Court draw from the pH 1.1/pH 4.5 results for ORACEA? ............................................................................. 17

9.    For the purpose of evaluating the doctrine of equivalents, could an 18% coating be considered equivalent to not being coated at all? ........... 18

10.    Is there any evidence as to how long hot spots persist with—and without—paddles running?..................................................................... 18

C.    Questions to Galderma..................................................................................... 18

1.    Is there any evidence that about 44% of Lupin's DR beads function as IR beads? ............................................................................................ 18

2.    How can we infer that 44% of Lupin's DR beads function as immediate release from the pH 1.1/pH 4.5 capsule results?..................... 18

3.    If some capsules immediately release 90% while other capsules immediately release 55%, would that be sufficient to prove infringement? ...................................................................................... 19

iv

4.   Is there any evidence that Lupin's capsules contain a non-random distribution of DR beads? .......................................................... 19

5.   Is there any evidence of the mechanism by which modifying the spray rate for the June 2023 samples would systematically change the batch? ...................................................................................... 19

6.   For a fasted stomach, why is pH 4.5 more biorelevant than pH 1.1? ....... 19

7.   Is there any evidence as to how Lupin added pH 11 during the media change for the pH 1.1/pH 4.5 method? ......................................... 19

8.   Is there any dispute that pH 1.1 is an industry standard test to evaluate immediate release? .................................................................. 19

D.   Lupin's Rebuttal.............................................................................................. 20

1.   Dr. Rudnic's interpretation of second-stage timepoints is not reliable............................................................................................. 20

a.   There is no evidence that any POSA has ever used 150-, 180-, or 240-minute results to identify immediate release. .......... 21

b.   Galderma abandoned its original "calculation" (5 of 12 capsules = 42% = "about 8 mg"). ................................................. 21

c.   Rebuttal testing disproved Dr. Rudnic's "at pH 4.5" theory. ....... 22

2.   Dr. Rudnic's interpretation of plasma concentrations is not reliable........ 22

a.   Dr. Rudnic's theory fails the *Daubert* test. .................................. 22

b.   The blood levels theory requires a contradiction. ......................... 23

3.   Dr. Rudnic's other theories are speculative, unproven and untested. ........ 23

a.   The fatally flawed bead is a cartoon. ............................................ 23

b.   The imaginary bell curve is a cartoon............................................ 24

c.   The "speckling" theory was abandoned......................................... 24

d.   The "alternating . . . solvent systems" theory is unproven. .......... 24

e.   The "subset" theory remains speculative and untested................. 25

IV.   CONCLUSION................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Sandoz, Inc.*,
    566 F.3d 1282 (Fed. Cir. 2009)..................................................................................... 22

*Amgen Inc. v. Coherus BioSciences Inc.*,
    931 F.3d 1154 (Fed. Cir. 2019)................................................................................ 8, 14

*Bayer AG v. Elan Pharm. Rsch. Corp.*,
    212 F.3d 1241 (Fed. Cir. 2000)..................................................................................... 13

*Brigham & Women's Hosp., Inc. v. Perrigo Co.*,
    761 F. App'x 995 (Fed. Cir. 2019) ................................................................................ 25

*Cohesive Techs., Inc. v. Waters Corp.*,
    543 F.3d 1351 (Fed. Cir. 2008)....................................................................................... 7

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
    192 F.3d 973 (Fed. Cir. 1999)......................................................................................... 8

*Glaxo, Inc. v. Novopharm, Ltd.*,
    110 F.3d 1562 (Fed. Cir. 1997)....................................................................................... 7

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994)............................................................................................ 21

*Reckitt Benckiser LLC v. Aurobindo Pharma Ltd.*,
    239 F. Supp. 3d 822 (D. Del. 2017)............................................................................... 22

*Silvergate Pharms., Inc. v. Bionpharma Inc.*,
    No. 18-1962-LPS, 2021 WL 1751148 (D. Del. Apr. 29, 2021) ......................................... 8

*Trading Techs. Int'l, Inc. v. Open E Cry, LLC*,
    728 F.3d 1309 (Fed. Cir. 2013)..................................................................................... 14

*Warner Chilcott Labs. Ireland Ltd. v. Impax Labs., Inc.*,
    No. 08-6304, 2012 WL 1551709 (D.N.J. Apr. 30, 2012)................................................. 22

**TABLE OF ABBREVIATIONS**

| Abbreviation | Description |
|---|---|
| *Amneal* case | C.A. No. 16-207-LPS (D. Del.) |
| ANDA | Abbreviated New Drug Application |
| asserted claims | claims 1 and 16 of United States Patent No. 7,749,532 and claims 1 and 20 of United States Patent No. 8,206,740 |
| asserted patents | United States Patent Nos. 7,749,532 and 8,206,740 |
| DR | delayed release |
| Dressman | DTX-200, Jennifer B. Dressman et al., *Upper Gastrointestinal (GI) pH in Young, Healthy Men and Women*, 7 PHARMACEUTICAL RESEARCH 756 (1990) |
| FDA | U.S. Food and Drug Administration |
| Galderma | Galderma Laboratories, L.P. and TCD Royalty Sub LP |
| IR | immediate release |
| June 2023 samples | Lupin's rebuttal batch of 6,000 samples manufactured in May 2023 |
| Kalantzi | PTX-149, Lida Kalantzi et al., *Characterization of the Human Upper Gastrointestinal Contents Under Conditions Simulating Bioavailability/Bioequivalence Studies*, 23 PHARMACEUTICAL RESEARCH 165 (2006) |
| Lupin | Lupin Ltd. and Lupin Inc. |
| Lupin's Product | 40 mg doxycycline oral product that is the subject of Lupin Inc.'s ANDA No. 216631 |
| mg | milligram |
| Miller | DTX-313/PTX-223, Dave A. Miller et al., *Evaluation of the USP Dissolution Test Method A for Enteric-coated Articles by Planar Laser-induced Fluorescence*, 330 INT'L J. PHARMACEUTICALS 61 (2007) |
| POSA | person of ordinary skill in the art |
| SEM | scanning electron microscope |
| *Sun* case | C.A. No. 16-1003-LPS (D. Del.) |
| USP | United States Pharmacopeia |

## I.    INTRODUCTION

This introduction provides a summary of four sections in this brief:  (A) Lupin's Case; (B) Questions to Lupin; (C) Questions to Galderma; and (D) Lupin's Rebuttal.  The argument, beginning on page 7, includes more detailed answers and citations to the evidence.

### A.    Lupin's Case—Summary

The evidence at trial showed that the asserted patents teach a POSA precisely how to make, test and describe the claimed composition.  According to those clear and precise teachings, Lupin proved that its composition functions as made: 22 mg immediate release, 18 mg delayed release. Importantly, there is no dispute that, according to the patent Figure 3 test, Lupin's composition does not infringe.

More broadly, there is no dispute that, according to the test conditions and timepoints that Galderma relied on to prove infringement in the *Amneal* and *Sun* cases, Lupin's composition does not infringe.  No dispute.  To be clear, using the industry standard pH 1.1 test and timepoints in the asserted patents, Lupin's composition functions as 22:18, not 30:10.  It's that simple.

There is also no dispute that the broadest asserted patent claims are limited to a range of 27-33:9-11.  Lupin's 22:18 ratio is not even close to those ranges, and, in any event, was both abandoned and disclaimed during patent prosecution.  Thus, Lupin's 22:18 composition is well beyond the reach of any potential application of the doctrine of equivalents.

Finally, there was no credible evidence that Lupin specifically intends its 22:18 composition to function as 30:10, either *in vitro* or *in vivo*.  To the contrary, Lupin proved the design around function of its 22:18 composition with the same pH 1.1 test and timepoints that Galderma used in its own design around patent (covering Galderma's 32:4 and 32:6 compositions). In sum, Lupin's 22:18 composition does not infringe any asserted claim.

1

**B.     Questions to Lupin—Short Answers**

**1.     How should the Court evaluate Lupin's 18% coating weight?**

The Court should evaluate Lupin's 18% enteric coating precisely as a POSA would—using the objective, reproducible, industry standard test described in Figures 1, 2 and 3 of the patents: pH 1.1 at 30, 60 and 120 minutes.

**2.     How does Lupin's 18% coating weight intersect with the IR portion and the 30-minute window?**

There is no evidence of intersection.  Each and every 30-minute test result in the record proves that Lupin's 18% coating does not release doxycycline in a fasted stomach.  If, in fact, Lupin's coating began to fail at Dr. Rudnic's unusually high proposed gastric pH values, Galderma would have disclosed test results at, for example, pH 2.2, pH 3.3 and pH 4.4, showing incremental additional release at the 10-, 20-, and 30-minute timepoints in Figure 1.

**3.     Can the Court rule out Galderma's incomplete coating theory even if Lupin's pH 4.5 rebuttal testing is considered irrelevant?**

Yes.  Galderma's incomplete DR bead coating theory is predicated entirely on irrelevant second-stage 150-, 180-, and 240-minute capsule results that contradict Dr. Rudnic's interpretation of those results.  If, in fact, Lupin's capsules contained two subsets of DR beads—fatally flawed and fully functional—Galderma would have disclosed cross-section images to support its tale of two types of DR beads.  Instead, Dr. Rudnic presented cartoon beads and cartoon bell curves.

**4.     Is it possible that the quality or weight of the enteric coating changed between the ANDA exhibit batches and the rebuttal batch?**

There is no evidence of any material difference in the quality or weight of the enteric coating on the June 2023 samples.  If, in fact, there were any material difference, Galderma would have disclosed comparative analytical testing showing the difference.  Instead, Galderma moved to strike, reserved the right to conduct testing, then failed to disclose any such testing, opting

2

instead for Dr. Rudnic's belated day-of-deposition opinions about batch sizes and potential effects of scaling down certain process parameters.

**5.    If the Court finds the hot spot explanation unproven, is it still possible to rule that Lupin's Product will not infringe?**

Yes, for the reasons above.  Dr. Rudnic's "at pH 4.5" immediate release theory is not only deeply flawed and unreliable, it has been disproven by independent rebuttal testing—*i.e.*, testing actually conducted at pH 4.5.  If, in fact, any batch of Lupin's capsules released "at pH 4.5," Galderma would have disclosed test results at pH 4.5.

**6.    Is there any evidence that Lupin's DR pellets are exposed to pH 11 *in vivo*?**

No, there is no evidence of pH 11 in a fasted stomach, or anywhere else *in vivo*.

**7.    For the purpose of evaluating patent infringement, how should the Court address the variability observed in second-stage results?**

Two ways.  First, a POSA would recognize that the second stage of the Figure 3 test is intended to confirm nearly full release from the DR portion at the higher pH found in the intestines.  For purposes of infringement, there is no need to evaluate variability at 150 minutes (or beyond) because a POSA would rely on the 30-, 60-, and 120-minute timepoints to confirm the amount of the IR portion and calculate the composition ratio of IR to DR.  Second, a POSA would recognize that variability in the second stage may be attributed to measurement error or other factors, likely produced by the addition of higher pH media after the 120-minute timepoint.  Any arguably relevant variability beyond measurement error would provide Dr. Rudnic with reason to evaluate potential sources of variability, not speculate.

**8.    What inference should the Court draw from the pH 1.1/pH 4.5 results for ORACEA?**

None.  Lupin maintains that the 150-, 180-, and 240-minute timepoints in the pH 1.1/pH 4.5 results are irrelevant to the question of infringement.  Setting aside the question of

3

infringement, the Court could infer that the unusual variability in the second-stage results, as a whole, provided Dr. Rudnic with reason to test his theories about both the Lupin Product and ORACEA results, including the "loss" of between about 4% and 13% doxycycline at the 150-minute timepoint in the ORACEA results.

**9.    For the purpose of evaluating the doctrine of equivalents, could an 18% coating be considered equivalent to not being coated at all?**

If there were evidence that an 18% enteric coated bead was somehow so fatally flawed that it immediately released doxycycline, yes, that bead could be considered equivalent to uncoated. But, again, each and every 30-minute test result in the case proves that Lupin's 18% coating does not release doxycycline in a fasted stomach, even if a POSA were to consider Dr. Rudnic's proposed higher pH values.

**10.    Is there any evidence as to how long hot spots persist with—and without—paddles running?**

Yes.  The Miller publication suggests that, with paddles running, hot spots persist for about 5 minutes, depending on various factors.  Without paddles running, if a method were conducted according to USP guidelines, hot spots could persist for about 5 minutes.

**C.    Questions to Galderma—Short Answers**

**1.    Is there any evidence that about 44% of Lupin's DR beads function as IR beads?**

No.  Galderma abandoned its original "calculation" (5 of 12 capsules = 42%) in favor of the 75% "mean" of the bimodal results at 240 minutes, or, possibly, 75% release of a single capsule at 150 minutes.  Neither is evidence of 44% of all DR beads.

**2.    How can we infer that 44% of Lupin's DR beads function as immediate release from the pH 1.1/pH 4.5 capsule results?**

There is no basis to convert or extrapolate the bimodal individual capsule results into 44% of all DR beads inside all capsules.

3.    **If some capsules immediately release 90% while other capsules immediately release 55%, would that be sufficient to prove infringement?**

No.  Two non-infringing capsules cannot be averaged to create an infringing capsule.

4.    **Is there any evidence that Lupin's capsules contain a non-random distribution of DR beads?**

No.  And Dr. Rudnic offered no such opinion.

5.    **Is there any evidence of the mechanism by which modifying the spray rate for the June 2023 samples would systematically change the batch?**

No.  And Dr. Rudnic did not describe any such potential mechanism, or otherwise rebut Mr. Avachat's testimony.

6.    **For a fasted stomach, why is pH 4.5 more biorelevant than pH 1.1?**

It is not.  Neither Dressman nor Kalantzi describe pH 4.5 as more biorelevant.

7.    **Is there any evidence as to how Lupin added pH 11 during the media change for the pH 1.1/pH 4.5 method?**

Mr. Avachat testified, and Dr. Rudnic agreed, that the paddles were not running.  Galderma did not seek discovery of how the pH 11 media was added in the pH 1.1/pH 4.5 method.

8.    **Is there any dispute that pH 1.1 is an industry standard test to evaluate immediate release?**

No.  In fact, even Galderma's design around patent covering its 32:4 and 32:6 doxycycline compositions uses pH 1.1 to confirm the IR portion.

D.    **Lupin's Rebuttal—Summary**

The short answers above show that Galderma's trial infringement theory was not based on any example in the patents; or any reasonable interpretation of relevant and reliable test results; or any generally accepted methodology that could survive POSA scrutiny or the *Daubert* standard.

5

Instead, Galderma's theory is best captured by two cartoons that appeared during Dr. Rudnic's direct examination—the fatally flawed bead, and the imaginary bell curve:





Neither cartoon represents the reality of the rebuttal evidence. As detailed below, the evidence is that the pH 1.1/pH 4.5 second-stage results do not support Dr. Rudnic's proposed "subset" of "leaky" DR beads. The plasma data do not "corroborate" that imaginary "subset." And the "5 of 12 capsules = 42% = about 8 mg" calculation and "not all speckling is talc" opinion have been abandoned.

More broadly, neither Galderma nor Dr. Rudnic could reconcile the fundamental contradiction presented by their trial infringement theory. Galderma's theory requires a tale of two types of DR beads—fatally flawed and fully functional. Yet there was no evidence that any Lupin manufacturing process—at any scale—had ever produced those imaginary polar opposites.

6

## II.    FACTUAL BACKGROUND

Lupin's complete statement of facts is presented in its proposed Findings of Facts, cited as "Lupin FOF" below.

## III.    ARGUMENT

In this Hatch-Waxman case, the question of infringement is a hypothetical one; "[t]he relevant inquiry is whether the patentee has proven by a preponderance of the evidence that the alleged infringer will likely market an infringing product." *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1570 (Fed. Cir. 1997). As explained below, Galderma failed to meet its burden.

### A.    Lupin's Case

#### 1.    The broadest asserted claims cover about 30:10.

The broadest of the asserted claims require that the IR portion "consists of about 30 mg doxycycline" and the DR portion "consists of about 10 mg doxycycline." (Lupin FOF ¶20)

##### a.    The range of potential equivalents is limited to 27-33 IR : 9-11 DR.

The term "about" covers a range of at most 27 mg to 33 mg IR doxycycline and at most 9 to 11 mg DR doxycycline. (Lupin FOF ¶61). Because the asserted claims describe a range of equivalents, the doctrine of equivalents is "unavailable" for the range claims. *See, e.g.*, *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1372 (Fed. Cir. 2008) ("Where, as here, a patentee has brought what would otherwise be equivalents of a limitation into the literal scope of the claim, the doctrine of equivalents is unavailable to further broaden the scope of the claim."). Lupin's 22 mg IR : 18 mg DR ratio is not even close to those ranges. That said, even if the range could be further broadened, prosecution history estoppel still would prevent Galderma from attempting to recapture the ratio in Lupin's Product.

7

### b.    Galderma disclaimed a 23.3:16.3 composition ratio.

The 532 and 740 patents exclude a 22:18 composition. (Lupin FOF ¶¶51-57). During prosecution of the parent application, the examiner rejected the pending claims, requiring an IR portion of "about" 30 mg doxycycline and a DR portion of "about" 10 mg doxycycline, citing to a prior art document that included 23.3 mg IR doxycycline and 16.3 mg DR doxycycline. (*Id.* ¶¶51-54). In response to the rejection, Galderma argued that the claims should be allowed because "[i]n no case would one of ordinary skill in the art reasonably expect variations of 30 percent or greater to be encompassed by the term 'about.'" (*Id.* ¶54).

The arguments Galderma made during prosecution of the parent application apply "with equal force to subsequently issued patents that contain the same claim limitation." *Silvergate Pharms., Inc. v. Bionpharma Inc.*, No. 18-1962-LPS, 2021 WL 1751148, at *26 (D. Del. Apr. 29, 2021) (quoting *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999)). Dr. Buckton confirmed that a POSA would understand that Galderma clearly and unmistakably disclaimed a range of 30% or greater, and specifically disclaimed a ratio of 23.3:16.3. (Lupin FOF ¶55; *Amgen Inc. v. Coherus BioSciences Inc.*, 931 F.3d 1154, 1159 (Fed. Cir. 2019) ("To invoke argument-based estoppel, 'the prosecution history must evince a clear and unmistakable surrender of subject matter.'")). Neither Galderma nor Dr. Rudnic disputed that the claim scope excludes variations of 30% or greater. (Lupin FOF ¶56). Accordingly, the 532 and 740 patents exclude a 22:18 composition.

### 2.    Lupin's Product is designed, made, tested and accurately labeled as 22:18.

The asserted patents describe the claimed composition at a high level, then teach a POSA precisely how to make that composition through detailed examples. (Lupin FOF ¶28). According

8

to the detailed teachings, there is no genuine dispute that Lupin's capsules are made with 55% IR beads and 45% DR beads—*i.e.*, a composition ratio of 22:18. (*Id.* ¶¶39, 66).

Lupin's Product is tested according to the test identified in the asserted patents. (Lupin FOF ¶41). The asserted patent examples also teach a POSA precisely how to confirm that the IR and DR portions of the claimed composition function as intended. (*Id.* ¶¶29-31). Example 1 directs a POSA to the *in vitro* dissolution testing of IR pellets presented in Figure 1. (*Id.* ¶29). Figure 1 shows six samples tested at pH 1.1, with results at 10, 20, and 30 minutes. (*Id.*) Example 2 directs a POSA to the *in vitro* dissolution testing of DR pellets presented in Figure 2. (*Id.* ¶30). Figure 2 shows six samples tested at pH 1.1, with results at 60 and 120 minutes. (*Id.*) And Example 3 directs a POSA to the *in vitro* dissolution testing of six IR/DR combination capsules at pH 1.1, with results at the 60- and 120-minute timepoints. (*Id.* ¶31). There is no dispute that the patent test is the industry standard test. (*Id.* ¶78).

The asserted patents also teach a POSA exactly how to describe the claimed composition, including the IR/DR ratio, using the results from the patent test. (Lupin FOF ¶¶28-31). Lupin specifies and labels its product based on *in vitro* dissolution test results. (*Id.* ¶¶41, 67). Thus, according to the asserted patents' detailed teachings, there is no genuine dispute that Lupin's capsules are correctly described and labeled as 22 mg immediate release, 18 mg delayed release. (*Id.* ¶¶68, 73).

### 3. Lupin's Product is intended to function as 22:18 upon administration.

Lupin's Product functions as 22:18. (Lupin FOF ¶¶69-72). According to the asserted patents' detailed teachings, a POSA would use *in vitro* dissolution testing of at least six Lupin capsules at pH 1.1 to evaluate whether Lupin's 22 mg IR portion functions as intended. (*Id.* ¶¶31, 69). To illustrate the results, Lupin plotted the data for twelve Lupin capsules (shown in **green**) on the same scale as the Figure 3 data (shown in **black**). (*Id.* ¶70). The comparison proves Lupin's

9

non-infringement case—*i.e.*, Lupin's 22:18 composition functions as made and intended, releasing no more than about 55% (about 22 mg) at the 1-hour and 2-hour timepoints presented in the asserted patents:



(*Id.*)   More broadly, there is no genuine dispute that Lupin's capsules function, precisely as intended, by releasing no more than about 55% at every pH 1.1 timepoint in the asserted patents. (*Id.* ¶70).

### 4.    There is no genuine dispute using the patent test.

As explained above, according to the patent test, Lupin's Product does not infringe the asserted claims. (Lupin FOF ¶70, 75).  The pH 1.1 results for Lupin's Product show around 55% doxycycline released or about 22 mg, which is substantially different than the around 75% doxycycline released or about 30 mg required by the asserted claims. (*Id.* ¶70).  Neither Galderma

nor Dr. Rudnic dispute that Lupin's Product does not infringe under any pH 1.1 patent test.  (Lupin FOF ¶74).

### a. There is no genuine dispute using the *Amneal* and *Sun* tests.

In the *Amneal* and *Sun* cases, Galderma and Dr. Rudnic relied on pH 1.1 results at 15 and 30 minutes to identify the IR portion of the accused products.  (Lupin FOF ¶79).  The results for Lupin's Product at pH 1.1 for the 15-minute timepoint show that between 45% and 49% doxycycline is released (or between 18 mg and 19.6 mg) and at the 30-minute timepoint, show that between 50% and 53% doxycycline is released (or between 20 mg and 21.2 mg).  (*Id.* ¶¶41 70, 139).  This is substantially different than the 75% doxycycline released (or 30 mg) required by the asserted claims.  (*Id.* ¶70).  Thus, using the *Amneal* and *Sun* tests, Lupin's Product does not infringe the asserted claims.

For the same reasons the patent test was sufficient to prove infringement in *Amneal* and *Sun*, it should be sufficient to prove non-infringement in this case.

### 5. Industry standard comparative testing against ORACEA further proves non-infringement.

ORACEA is a commercial embodiment of the asserted patents.  (Lupin FOF ¶62).

### a. ORACEA is made, tested and accurately labeled as 30:10.

Galderma makes ORACEA with 75% seal coated pellets (equal to 30 mg immediate release) and 25% enteric coated pellets (equal to 10 mg delayed release).  (Lupin FOF ¶¶33, 63).  Galderma tests ORACEA by dissolution apparatus using the industry standard test method at pH 1.1 for 2 hours.  (*Id.* ¶¶35, 64).  Galderma specifies and labels ORACEA based on those *in vitro* dissolution test results.  (*Id.* ¶¶36, 65).

b.       **ORACEA functions as 30:10, Lupin's Product does not.**

As shown in the figure below, Galderma describes the function of ORACEA's IR and DR portions by relying on *in vitro* dissolution testing. (Lupin FOF ¶65). According to the figure, "immediate release occurs at a pH of 1.1" and "delayed release occurs at pH 6.0":



(*Id.*)

The same test should apply to describing the function of the IR portion in Lupin's Product, *i.e.*, pH 1.1 for 2 hours. To illustrate the difference in the immediate release profile between Lupin's Product and ORACEA, Lupin plotted the data for ORACEA samples (shown in **blue**) compared to Lupin's Product (shown in **green**). (*Id.* ¶42). The comparison proves Lupin's 22:18 composition does not function as a 30:10 composition like ORACEA:

12



(*Id.*)

### 6.     Lupin's Product does not literally infringe.

To prove literal infringement, Galderma is required to prove that Lupin's Product contains each and every limitation of the asserted claim exactly. *Bayer AG v. Elan Pharm. Rsch. Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). "If any claim limitation is absent from the [Lupin's Product], there is no literal infringement as a matter of law." *Id*.

The *in vitro* dissolution testing at pH 1.1 proves that Lupin's Product contains 22 mg IR beads and 18 mg DR beads, which is substantially different than the claimed ratio, and does not meet the IR and DR portion limitations of the asserted claims. (Lupin FOF ¶70-75). And, as explained below, Galderma failed to prove that Lupin's Product meets the 30 mg IR portion and 10 mg DR portion limitations required by the asserted claims. (*Id.*) Therefore, as a matter of law, there can be no literal infringement.

13

### 7.    Lupin's Product is not even close to equivalent.

Galderma clearly and unmistakably disclaimed variations of the composition ratio that are 30% or greater, including a 23:16 composition in the prior art—Lupin's composition is even farther outside of this range. *See Amgen*, 931 F.3d at 1159 ("Prosecution history estoppel applies as part of an infringement analysis to prevent a patentee from using the doctrine of equivalents to recapture subject matter surrendered from the literal scope of a claim during prosecution.") (quoting *Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1322 (Fed. Cir. 2013)). Thus, Lupin's Product cannot infringe under the doctrine of equivalents.

### 8.    The design around function of Lupin's Product proves the absence of specific intent.

Lupin was aware of the ORACEA patents and intentionally designed around them, specifically selecting a composition ratio far greater than a 30% variation from ORACEA. (Lupin FOF ¶140). To confirm its design around efforts were successful, Lupin confirmed the 22:18 ratio using the industry standard test described in the patents. (*Id.* ¶¶41, 67, 78). Lupin's efforts to successfully design a non-infringing product prove the absence of specific intent. (*Id.* ¶140).

### B.    Questions to Lupin

### 1.    How should the Court evaluate Lupin's 18% coating weight?

Lupin's 18% enteric coating should be evaluated using the objective, reproducible, industry standard test described in Figures 1, 2 and 3 of the patents: pH 1.1 at 30, 60 and 120 minutes. (Lupin FOF ¶¶29-31, 78).

### 2.    How does Lupin's 18% coating weight intersect with the IR portion and the 30-minute window?

There is no evidence of intersection. Each and every 30-minute test result in the record proves that Lupin's 18% coating does not release doxycycline in a fasted stomach. (Lupin FOF ¶¶70, 67, 48). Galderma did not disclose any testing to show that Lupin's coating fails. (*Id.* ¶38).

14

3. **Can the Court rule out Galderma's incomplete coating theory even if Lupin's pH 4.5 rebuttal testing is considered irrelevant?**

Yes. Galderma's incomplete DR bead coating theory is predicated entirely on irrelevant second-stage 150-, 180-, and 240-minute capsule results that contradict Dr. Rudnic's interpretation of those results. (Lupin FOF ¶¶88-89). If, in fact, Lupin's capsules contained two subsets of DR beads—fatally flawed and fully functional—Galderma would have disclosed cross-section images to support its tale of two types of DR beads. (*Id.* ¶100). Instead, Dr. Rudnic presented cartoon beads and cartoon bell curves. (*Id.* ¶¶87, 100).

4. **Is it possible that the quality or weight of the enteric coating changed between the ANDA exhibit batches and the rebuttal batch?**

There is no evidence of any material difference in the quality or weight of the enteric coating on the June 2023 samples. (Lupin FOF ¶¶46-50). The June 2023 samples were made using the same manufacturing stages as the ANDA exhibit batches, same ingredients as the ANDA exhibit batches, and had the same 18% coating weight on the DR beads as the ANDA exhibit batches. (*Id.* ¶47).

According to FDA Guidance, *in vitro* dissolution testing is used to "ensure continuing product quality and performance after certain changes, such as changes in . . . the manufacturing process." (Lupin FOF ¶48). The June 2023 samples were tested by Lupin and an independent laboratory using the industry standard two-stage dissolution test. (*Id.*) The results show that the June 2023 samples release 55% doxycycline at pH 1.1, establishing there was no change to quality or weight of the enteric coating. (*Id.*)

If, in fact, there were any material difference, Galderma would have disclosed comparative analytical testing showing any difference. (Lupin FOF ¶46). Instead, Galderma moved to strike, reserved the right to conduct testing, then failed to disclose any such testing, opting instead for

15

Dr. Rudnic's belated day-of-deposition opinions about batch sizes and potential effects of scaling down certain process parameters. (*Id.* ¶10).

### 5. If the Court finds the hot spot explanation unproven, is it still possible to rule that Lupin's Product will not infringe?

Yes. Dr. Rudnic's "at pH 4.5" immediate release theory either improperly relies on the mean of variable data with a bimodal distribution or improperly relies on a single capsule as representative of Lupin's Product performance. (Lupin FOF ¶¶89-90). Both theories rely on non-infringing capsules because the capsules Dr. Rudnic relies upon release almost all their doxycycline. (*Id.*) Further, independent rebuttal testing—*i.e.*, testing actually conducted at pH 4.5—disproved Dr. Rudnic's "at pH 4.5" immediate release theory. (*Id.* ¶95). If, in fact, any batch of Lupin's capsules released "at pH 4.5," Galderma would have disclosed test results at pH 4.5. (*Id.* ¶¶46, 98).

### 6. Is there any evidence that Lupin's DR pellets are exposed to pH 11 *in vivo*?

No, there is no evidence of pH 11 in a fasted stomach, or anywhere else *in vivo*. (Lupin FOF ¶79 n.6).

### 7. For the purpose of evaluating patent infringement, how should the Court address the variability observed in second-stage results?

Two ways. First, a POSA would recognize that the second stage of the Figure 3 test is intended to confirm nearly full release from the DR portion at the higher pH found in the intestines. (Lupin FOF ¶¶31, 69, 71 n.5, 80). For purposes of infringement, there is no need to evaluate variability at 150 minutes (or beyond) because a POSA would rely on the 30-, 60-, and 120-minute timepoints to confirm the amount of the IR portion and calculate the composition ratio of IR to DR. (*Id.* ¶88). Dr. Rudnic admitted that he is not aware of any peer-reviewed publications using second-stage results to identify immediate release, he is not aware of anyone else using these time

16

points to identify immediate release outside of this litigation, and he has not previously used the second-stage to identify immediate release components in developing other extended release products.  (*Id.* ¶¶ 12, 88).

Second, a POSA would recognize that variability in the second stage may be attributed to measurement error or other factors, likely produced by the addition of higher pH media after the 120-minute timepoint.  (*Id.* ¶¶90-97).  Any arguably relevant variability beyond measurement error, such as results with a percent relative standard deviation over 10% for timepoints greater than 10 minutes, would provide Dr. Rudnic with reason to evaluate potential sources of variability, not speculate.  (*Id.* ¶90).

### 8. What inference should the Court draw from the pH 1.1/pH 4.5 results for ORACEA?

None.  Lupin maintains that the 150-, 180-, and 240-minute timepoints in the pH 1.1/pH 4.5 results are irrelevant to the question of infringement.  (Lupin FOF ¶88).  Lupin filed a motion *in limine* to preclude Galderma and Dr. Rudnic from offering any argument or opinion regarding "immediate release" based on dissolution results at the 150-, 180-, and 240-minute timepoints. (*Id.* ¶12).  Lupin renewed its motion at trial.  (*Id.*)  Setting aside the question of infringement, the Court could infer that the unusual variability in the second-stage results, as a whole, provided Dr. Rudnic with reason to test his theories about both the Lupin Product and ORACEA results, including the "loss" of between about 4% and 13% doxycycline at the 150-minute timepoint in the ORACEA results.  (*Id.* ¶90 n.10).  Further, an independent laboratory, ARL, established that the irregularity in the ORACEA second-stage pH 4.5 results were likely due to inadequacies in the testing method because at pH 4.5 without the buffer addition the mean release for ORACEA was 73.7%.  (*Id.* ¶¶95-96).

**9.      For the purpose of evaluating the doctrine of equivalents, could an 18% coating be considered equivalent to not being coated at all?**

If there were evidence that an 18% enteric coated bead was somehow so fatally flawed that it immediately released doxycycline, yes, that bead could be considered equivalent to uncoated. But, again, each and every 30-minute test result in the case proves that Lupin's 18% coating does not release doxycycline in a fasted stomach, even if a POSA were to consider Dr. Rudnic's proposed higher pH values.  (Lupin FOF ¶¶48, 68, 70, 95).

**10.      Is there any evidence as to how long hot spots persist with—and without—paddles running?**

Yes.  The Miller publication suggests that, with paddles running, hot spots persist for about 5 minutes, depending on various factors.  (Lupin FOF ¶92 n.11).  Without paddles running, if a method were conducted according to USP guidelines, hot spots could persist for about 5 minutes. (*Id.* ¶91).

**C.      Questions to Galderma**

**1.      Is there any evidence that about 44% of Lupin's DR beads function as IR beads?**

No.  Galderma abandoned its original "calculation" (5 of 12 capsules = 42%) in favor of the 75% "mean" of the bimodal results at 240 minutes, or, possibly, 75% release of a single capsule at 150 minutes.  (Lupin FOF ¶89).  Neither is evidence of 44% of all DR beads.

**2.      How can we infer that 44% of Lupin's DR beads function as immediate release from the pH 1.1/pH 4.5 capsule results?**

There is no basis to convert or extrapolate the bimodal individual capsule results into 44% of all DR beads inside all capsules.  (Lupin FOF ¶89).

18

3.    **If some capsules immediately release 90% while other capsules immediately release 55%, would that be sufficient to prove infringement?**

No.  Two non-infringing capsules cannot be averaged to create an infringing capsule. (Lupin FOF ¶89).

4.    **Is there any evidence that Lupin's capsules contain a non-random distribution of DR beads?**

No.  And Dr. Rudnic offered no such opinion.  (Lupin FOF ¶100).

5.    **Is there any evidence of the mechanism by which modifying the spray rate for the June 2023 samples would systematically change the batch?**

No.  And Dr. Rudnic did not describe any such potential mechanism, or otherwise rebut Mr. Avachat's testimony.  (Lupin FOF ¶46-47).

6.    **For a fasted stomach, why is pH 4.5 more biorelevant than pH 1.1?**

It is not.  Neither Dressman nor Kalantzi describe pH 4.5 as more biorelevant.  (Lupin FOF ¶84).

7.    **Is there any evidence as to how Lupin added pH 11 during the media change for the pH 1.1/pH 4.5 method?**

Mr. Avachat testified, and Dr. Rudnic agreed, that the paddles were not running.  (Lupin FOF ¶91).  Galderma did not seek discovery of how the pH 11 media was added in the pH 1.1/pH 4.5 method.

8.    **Is there any dispute that pH 1.1 is an industry standard test to evaluate immediate release?**

No.  In fact, even Galderma's design around patent covering its 32:4 and 32:6 doxycycline compositions uses pH 1.1 to confirm the IR portion.  (Lupin FOF ¶127 n.13).

19

### D.    Lupin's Rebuttal

Galderma seeks to contradict the undisputed pH 1.1 results in this Lupin case based on two primary theories.  (Lupin FOF ¶¶88, 120).  First, Dr. Rudnic interprets selected 150-, 180-, and 240-minute results in Lupin's pH 1.1/pH 4.5 multimedia study.  (*Id.* ¶88).  Second, Dr. Rudnic attempts to infer Lupin's composition ratio from plasma concentration data.  (*Id.* ¶120).  Each of those infringement theories relies on the flawed and contradictory assumption that 8 mg of Lupin's DR beads fail completely (functioning as immediate release), while the remaining 10 mg of Lupin's DR beads function as intended.  (*Id.* ¶86).  For the reasons set forth below, each of those theories fail.

### 1.    Dr. Rudnic's interpretation of second-stage timepoints is not reliable.

Without any support, Dr. Rudnic alleged that pH 4.5 is the more "biorelevant" pH for testing for immediate release.  (Lupin FOF ¶83-84).  Dr. Rudnic then relied on second-stage pH 4.5 results at 150-, 180-, and 240-minute timepoints to identify the IR portion of Lupin's Product. (*Id.* ¶89).

Initially, Dr. Rudnic relied on the mean release of 75% at 240 minutes to opine that 30 mg of Lupin's doxycycline immediate releases at pH 4.5.  (Lupin FOF ¶89).  Due to inadequacies in the testing method, the second-stage pH 4.5 results for Lupin's Product are highly variable and exhibit a bimodal distribution, meaning they either completely release or release very little.  (*Id.* ¶¶90-91).  Thus, it is improper to rely on the mean of that data as representative of Lupin's Product performance.  (*Id.* ¶91).

Later, it appeared, Dr. Rudnic pointed to a single capsule at the 150-minute timepoint to support his theory that 30 mg of Lupin's doxycycline immediately releases at pH 4.5.  (*Id.* ¶89).  But, in Dr. Rudnic's own words, "looking at only one [capsule] as being representative of the whole batch is not right."  (A52 (Tr. 205:12-13 (Rudnic)); *see also id.* (Tr. 205:13-15 (Rudnic)

20

("When you look at one [capsule] out of a quarter of a million, call me old-fashioned, that's not representative."))).

Thus, neither of Dr. Rudnic's interpretations of the second-stage pH 4.5 results are reliable for his purpose of determining the IR portion of Lupin's Product.

### a. There is no evidence that any POSA has ever used 150-, 180-, or 240-minute results to identify immediate release.

Further, Galderma offered no evidence that a POSA has ever relied on second-stage time points to identify immediate release. (*Id.* ¶¶12, 88). In fact, Dr. Rudnic admitted that he is not aware of any peer-reviewed publications using 150-, 180-, or 240-minute results to identify immediate release, he is not aware of anyone else using these time points to identify immediate release outside of this litigation, he has not previously used the second-stage to identify immediate release components in developing other extended release products, and the error rate for his method would be incalculable. (*Id.*) By Dr. Rudnic's own admissions, the second-stage timepoints are not "reasonably relied on by experts in the field," including himself, and thus are unreliable. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994) ("[W]hen a trial judge analyzes whether an expert's data is of a type reasonably relied on by experts in the field, he or she should assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert.").

### b. Galderma abandoned its original "calculation" (5 of 12 capsules = 42% = "about 8 mg").

Galderma's Statement of Facts presented a "calculation" based on 5 of 12 capsules that released nearly all 40 mg of doxycycline to establish that "about 8 mg" of Lupin's DR pellets immediately release. (Lupin FOF ¶89 n.8). Presumably realizing the absurdity of relying on capsules that release almost everything to show that 8 mg is released from each individual capsule,

21

Galderma abandoned this calculation.  Consequently, there is no evidence that 8 mg of Lupin's DR pellets immediately release.  (*Id.*)

### c.    Rebuttal testing disproved Dr. Rudnic's "at pH 4.5" theory.

Lupin's experts, Dr. Buckton and Ms. Gray, recognized that the variability in the second-stage pH 4.5 results should have provided Dr. Rudnic with reason to test Lupin's Product to evaluate the potential cause of the variability.  (Lupin FOF ¶93).  Dr. Rudnic, however, failed to disclose any such testing because he "didn't need to."  (A51 (Tr. 202:6-10 (Rudnic))).  Lupin, however, did have its capsules tested by an independent laboratory at pH 4.5.  (Lupin FOF ¶94).  The results established that Lupin's DR beads do not release at pH 4.5. (*Id.* ¶95).  Thus, Lupin disproved Dr. Rudnic's various theories that a subset, specifically about 8 mg, of Lupin's DR beads fail at pH 4.5.

### 2.    Dr. Rudnic's interpretation of plasma concentrations is not reliable.

Dr. Rudnic attempted to "corroborate" his opinions that 8 mg of Lupin's DR beads release at pH 4.5 by visually examining the blood concentration levels from Lupin's bioequivalence study. (Lupin FOF ¶¶120, 124-26).  But "bioequivalence is not the test for infringement."  *Reckitt Benckiser LLC v. Aurobindo Pharma Ltd.*, 239 F. Supp. 3d 822, 833 (D. Del. 2017); *see also Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1298 (Fed. Cir. 2009) (en banc).

### a.    Dr. Rudnic's theory fails the *Daubert* test.

Moreover, as set forth in Lupin's previously filed *Daubert* motion, Dr. Rudnic's novel theory of inferring a composition ratio based on blood levels is unreliable.  (Lupin FOF ¶¶11, 121). Dr. Rudnic's testimony at trial did not establish that his theory has "a grounding in the methods and procedures of science." *Warner Chilcott Labs. Ireland Ltd. v. Impax Labs., Inc.*, No. 08-6304, 2012 WL 1551709, at *24 (D.N.J. Apr. 30, 2012).  Indeed, his testimony during cross-examination confirmed that his theory fails all eight *Daubert* factors.  (Lupin FOF ¶121).  Further, Dr. Buckton

22

confirmed that there is no generally accepted method to infer composition ratios from blood plasma concentration levels, and a POSA would not rely upon a visual comparison to infer the ratio in Lupin's Product. (*Id.* ¶122). Therefore, any testimony that visual examination of blood levels can be used to infer the composition ratio in Lupin's Product is unreliable and should be excluded (or, at the very least, rejected as not credible).

### b.    The blood levels theory requires a contradiction.

Further, Dr. Rudnic's theory requires that 8 mg of Lupin's DR beads fail, immediately and completely by releasing in the stomach, while the remaining 10 mg of DR beads work perfectly and delay release, as designed and intended. (Lupin FOF ¶119). But, all of Lupin's DR beads are made using the same process and same ingredients. (*Id.* ¶39). And, as explained below, Dr. Rudnic only offered speculative, unproven, and untested opinions to attempt to explain how some beads could fail completely while the remainder work perfectly. Thus, there is no evidence to reconcile this contradiction.

### 3.    Dr. Rudnic's other theories are speculative, unproven and untested.

Dr. Rudnic's theories that some of Lupin's DR beads fail because Lupin uses an 18% enteric coating weight and uses an alternating solvent system to coat its beads are speculative, unproven, and untested. (Lupin FOF ¶¶100-01, 106-07, 109-10, 114-15).

### a.    The fatally flawed bead is a cartoon.

To explain his theories, Dr. Rudnic relied on a cartoon bead. (Lupin FOF ¶87). The cartoon shows 8 mg of Lupin's DR beads labeled as an "IR Portion." (*Id.*) However, as explained above, none of Lupin's DR beads release at pH 1.1 or pH 4.5, let alone immediately. (Section III.A.3-4; Section III.D.1.c). Thus, Galderma presented no evidence that *any* of Lupin's DR beads immediately release and meet the IR portion claim limitation, much less exactly 8 mg.

### b.    The imaginary bell curve is a cartoon.

Dr. Rudnic similarly attempted to use a cartoon bell curve to explain his "subset" theory of how Lupin's DR beads could leak.  (Lupin FOF ¶100).   However, when confronted with questions for the basis of the normal distribution depicted by the cartoon, Dr. Rudnic admitted that he had none, and argued that he "didn't have to" do any testing to support his opinions.  (A51 (Tr. 201:12-14 (Rudnic)); Lupin FOF ¶100).  Thus, Dr. Rudnic's speculative and untested theory that Lupin's 18% weight coating is insufficient is not supported by any of the evidence.

### c.    The "speckling" theory was abandoned.

Leading up to trial, Galderma alleged that "speckling" in Lupin's SEM images were evidence of an incomplete coating and "not all of the speckling was talc."  (Lupin FOF ¶105). That theory was abandoned, and at trial Dr. Rudnic admitted that the "speckling" on the surface of the beads was in fact talc.  (*Id.*).  However, he offered a new opinion that the talc on the surface was creating channels which would somehow allow drug to escape only at higher pH.  (*Id.* ¶106). Yet again, Dr. Rudnic did no testing to confirm his trial speculation.  (*Id.*)  Consequently, there is no evidence to support  Dr. Rudnic's latest twist on his "speckling" theory.

### d.    The "alternating . . . solvent systems" theory is unproven.

Dr. Rudnic argued that Lupin's use of alternating solvent systems somehow compromises the coating on Lupin's DR beads.  (Lupin FOF ¶108).  To support his testimony, Dr. Rudnic relies on SEM images of the June 2023 samples that he testified were not manufactured in the same way as the ANDA exhibit batches.  (*Id.* ¶110).  Dr. Rudnic cannot have it both ways, either the samples can be used to support his theory regarding Lupin's coating and were manufactured the same way as the ANDA exhibit Batches, or they were not and these images cannot be used to support his theory.  Setting aside this contradiction, the SEM images merely show the various coating layers on Lupin's Product and do not prove that Lupin's DR beads are incompletely coated.  (*Id.* ¶109).

24

### e.      The "subset" theory remains speculative and untested.

In sum, both of the explanations Dr. Rudnic provided to establish that a "subset" of Lupin's DR beads fail were speculative, untested, unproven, and cannot be relied upon to satisfy Galderma's burden of proof.  *See, e.g.*, *Brigham & Women's Hosp., Inc. v. Perrigo Co.*, 761 F. App'x 995, 1003-04 (Fed. Cir. 2019) ("At most, the study suggests that Pepcid Complete® *might* provide immediate and sustained relief; such speculative data, however, cannot sustain Brigham's burden of proof.") (emphasis original).

## IV.     CONCLUSION

Based on Lupin's proposed Findings of Fact, and for the additional reasons provided above, Lupin respectfully submits that neither Galderma nor Dr. Rudnic have presented any reason to contradict the undisputed, non-infringing pH 1.1 test results with theories that have no basis in the asserted patents, and no proof in reality.  Because there is no genuine dispute about the overwhelming record of pH 1.1 results confirming that Lupin's Product is a 22:18 composition, Lupin respectfully submits that judgment should be entered in its favor.

Dated:  February 2, 2024

PHILLIPS, MCLAUGHLIN & HALL, P.A.

*/s/ John C. Phillips, Jr.*
John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
mch@pmhdelaw.com

*Attorneys for Defendants*

25

## CERTIFICATE OF SERVICE

I, Megan C. Haney, Esquire, hereby certify that on February 2, 2024, a copy of Defendants Lupin Inc. and Lupin Limited's Opening Post-Trial Brief was caused to be served upon the following counsel in the manner indicated below:

**VIA EMAIL**

Jack B. Blumenfeld
Jeremy A. Tigan
Morris Nichols Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1374
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

Gerald J. Flattmann Jr.
Andrew J. Cochran
Cahill Gordon & Reindel LLP
32 Old Slip
New York, NY 10005
gflattmann@cahill.com
acochran@cahill.com

/s/ Megan C. Haney
Megan C. Haney (#5016)

26