# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GALDERMA LABORATORIES, L.P. and TCD ROYALTY SUB LP | ) ) ) | |
| Plaintiffs, | ) ) ) | **REDACTED - PUBLIC VERSION** |
| v. | ) ) ) | C.A. No. 21-cv-01710-SB |
| LUPIN INC. and LUPIN LIMITED | ) ) ) | |
| Defendants. | ) | |

### DEFENDANTS LUPIN INC. AND LUPIN LIMITED'S
### <u>[PROPOSED] FINDINGS OF FACT</u>

OF COUNSEL

William A. Rakoczy
Joseph T. Jaros
Natasha L. White
Katie A. Boda
Adrianne C. Rose
RAKOCZY MOLINO MAZZOCHI
SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60654
(312) 527-2157
wrakoczy@rmmslegal.com
jjaros@rmmslegal.com
nwhite@rmmslegal.com
kboda@rmmslegal.com
arose@rmmslegal.com

Dated: February 2, 2024

John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
PHILLIPS, MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
mch@pmhdelaw.com

*Attorneys for Defendants*
*Lupin Inc. and Lupin Limited*

# TABLE OF CONTENTS

I.     INTRODUCTION .........................................................................................1

II.     PARTIES ....................................................................................................1

III.     PROCEDURAL HISTORY........................................................................2

       A.       Complaint..................................................................................2

       B.       Claim Construction ..................................................................2

       C.       Lupin's Motion to Amend ........................................................2

       D.       Galderma's Motion to Strike Invalidity Proffer.......................2

       E.       Galderma's Motion to Strike Rebuttal Samples and Testing.........................2

       F.       Lupin's *Daubert* Motion to Exclude Blood Level Theory of Composition Ratio.................................................................3

       G.       Lupin's Motion *in Limine* to Exclude Irrelevant Second-Stage Results........3

       H.       Trial.........................................................................................3

IV.     BACKGROUND .........................................................................................3

       A.       Asserted Patents .......................................................................3

       B.       Asserted Claims .......................................................................4

       C.       Prosecution History..................................................................5

V.     WITNESSES...............................................................................................6

       A.       Galderma's Expert ...................................................................6

       B.       Lupin's Experts........................................................................6

       C.       Fact Witnesses .........................................................................6

VI.     PERSON OF ORDINARY SKILL IN THE ART......................................7

VII.     FACTS RELATING TO NON-INFRINGEMENT......................................7

       A.       Description of the Claimed Composition .................................7

       B.       ORACEA ................................................................................9

            1.       Manufacture of ORACEA ..........................................9

2. Testing of ORACEA ....................................................................9

3. Labeling of ORACEA ..................................................................10

C. Lupin's Product ....................................................................................10

1. Manufacture of Lupin's Product .................................................10

2. Testing of Lupin's Product ..........................................................11

    a. Release Testing ................................................................11

    b. Comparative Testing against ORACEA ..............................11

3. Labeling of Lupin's Product .......................................................13

4. Tentative Approval of Lupin's Product .......................................13

5. Lupin's June 2023 Samples ........................................................13

D. Prosecution History Estoppel ..............................................................15

1. Narrowing of Original Claims ....................................................15

2. Disclaimer of 23.3:16.3 ..............................................................15

E. Construction of Claim Phrases ............................................................16

1. "immediate release" ....................................................................16

2. "immediate release (IR) portion" ...............................................16

3. "delayed release (DR) portion" ..................................................17

4. "about" ........................................................................................17

F. Commercial Embodiment .....................................................................17

1. Designed and Made as 30:10 ......................................................17

2. Tested at pH 1.1 at 30, 60 and 120-minute Timepoints as 30:10 ......17

3. Functions as Labeled (30:10) .....................................................18

G. Non-Infringement .................................................................................18

1. Designed and Made as 22:18 ......................................................18

2. Tested at pH 1.1 at 30, 60 and 120-minute Timepoints as 22:18 ......18

3. Functions as Labeled (22:18)...................................................................19

4. Galderma's Infringement Theory ........................................................24

    a. "Subset" of DR Pellets is "Compromised"...........................24

        i. Second-Stage pH 1.1/pH 4.5 Results........................24

        ii. ARL Rebuttal Testing at pH 4.5 .............................27

    b. 8 mg of DR Pellets are "Incompletely Coated" .....................29

        i. "Speckling" .................................................................30

        ii. "Alternating . . . Solvent Systems" ............................31

        iii. SEM Images.................................................................33

        iv. Optical Images ...........................................................34

    c. 10mg of DR Pellets "Maintain Their Integrity Until a Later Time" .......................................................................................35

    d. "Corroborated" by 96-Hour Blood Levels.............................35

        i. *Daubert* ..................................................................35

        ii. 22:18 Blood Levels ....................................................36

        iii. Galderma's 32:4 and 32:6 Compositions...................37

5. Method Claims.....................................................................................38

    a. Treating and Administering ....................................................38

    b. Specific Intent ........................................................................38

VIII. CONCLUSION..........................................................................................41

# TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| 532 patent | DTX-8, United States Patent No. 7,749,532 |
| 740 patent | DTX-9, United States Patent No. 8,206,740 |
| 963 Provisional | U.S. Provisional Patent Application 60/460,963 |
| *Amneal* case | C.A. No. 16-207-LPS (D. Del.) |
| ANDA | Abbreviated New Drug Application |
| asserted claims | claims 1 and 16 of United States Patent No. 7,749,532 and claims 1 and 20 of United States Patent No. 8,206,740 |
| asserted patents | United States Patent Nos. 7,749,532 and 8,206,740 |
| DR | delayed release |
| Dressman | DTX-200, Jennifer B. Dressman et al., *Upper Gastrointestinal (GI) pH in Young, Healthy Men and Women*, 7 PHARMACEUTICAL RESEARCH 756 (1990) |
| FDA | U.S. Food and Drug Administration |
| Galderma | Galderma Laboratories, L.P. and TCD Royalty Sub LP |
| IR | immediate release |
| June 2023 Samples | Lupin's rebuttal batch of 6,000 samples manufactured in May 2023 |
| Kalantzi | PTX-149, Lida Kalantzi et al., *Characterization of the Human Upper Gastrointestinal Contents Under Conditions Simulating Bioavailability/Bioequivalence Studies*, 23 PHARMACEUTICAL RESEARCH 165 (2006) |
| Lupin | Lupin Ltd. and Lupin Inc. |
| Lupin Product | 40 mg doxycycline oral product that is the subject of Lupin Inc.'s ANDA No. 216631 |
| mg | milligram |
| Miller | DTX-313, Dave A. Miller et al., *Evaluation of the USP Dissolution Test Method A for Enteric-coated Articles by Planar Laser-induced Fluorescence*, 330 INT'L J. PHARMACEUTICALS 61 (2007) |
| NDA | New Drug Application |
| POSA | person of ordinary skill in the art |
| rpm | revolutions per minute |
| RSD | relative standard deviation |
| SEM | scanning electron microscope |
| *Sun* case | C.A. No. 16-1003-LPS (D. Del.) |
| *Sun* decision | Memorandum Opinion, *Galderma Labs., L.P. et al. v. Sun Pharm. Indus. et al.*, C.A. No. 16 1003 (D.I.233) (D. Del. Sept. 30, 2019) |
| TCD | TCD Royalty Sub LP |
| USP | United States Pharmacopeia |

# LIST OF EXHIBITS CITED HEREIN

| Exhibit | Appendix Range | Description |
|---|---|---|
| DTX-8 | A474-A488 | 532 patent |
| DTX-9 | A489-A506 | 740 patent |
| DTX-23 | A507 | Lupin Label |
| DTX-24 | A508-A527 | Lupin Prescribing Information |
| DTX-25 | A528-A548 | Lupin COAs |
| DTX-26 | A549-A585 | Lupin Dissolution Method |
| DTX-27 | A586-A590 | FDA Approval |
| DTX-32 | A591-A610 | Griffin Ex. 10 |
| DTX-36 | A611-A621 | ORACEA Manufacturing Process |
| DTX-37 | A622-A644 | ORACEA Background |
| DTX-40 | A645-A662 | ORACEA Method Development |
| DTX-43 | A663-A675 | ORACEA Specifications |
| DTX-44 | A676-A690 | ORACEA Batch Analysis |
| DTX-45 | A691-A705 | ORACEA COAs |
| DTX-46 | A706-A826 | Lupin PDR, Part 1 |
| DTX-47 | A827-A957 | Lupin PDR, Part 2 |
| DTX-48 | A958-A979 | Lupin Composition |
| DTX-49 | A980-A1128 | Lupin QOS |
| DTX-50 | A1129-A1223 | Lupin Method Validation |
| DTX-52 | A1224-A1231 | Lupin Stability Summary |
| DTX-53 | A1232-A1252 | 516 patent |
| DTX-54 | A1253-A1259 | ARL Rep. |
| DTX-55 | A1260-A1277 | Dahm Ex. 4 |
| DTX-56 | A1278-A1287 | September 2008 Reply |
| DTX-57 | A1288-A1319 | 963 Provisional |
| DTX-75 | A1331-A1373 | Lupin Multimedia Rep. |
| DTX-83 | A1375-A1404 | MVA Rep. |
| DTX-85 | A1405-A1408 | June 2023 Samples COA |
| DTX-86 | A1409-A1453 | June 2023 Samples Batch Record |
| DTX-101 | A1454-A1476 | 2023 USP <1092> |
| DTX-109 | A1519-A1529 | Hanson |
| DTX-124 | A1728-A1730 | Lupin Finished Product Specification |
| DTX-141 | A1731-A1983 | ARL Rep. |
| DTX-142 | A1984-A2105 | ARL Transfer Rep. |
| DTX-148 | A2106-A2112 | Exhibit Batch Spreadsheet |
| DTX-150 | A2113-A2136 | Lupin Multimedia Spreadsheet |
| DTX-151 | A2137-A2142 | ARL Data Spreadsheet |
| DTX-182 | A2143-A2160 | Fasted Study Rep. |
| DTX-200 | A2161-A2166 | Dressman |
| DTX-284 | A2167 | Samples to Galderma |
| DTX-313 | A2168-A2179 | Miller |
| DTX-479 | A2275-A2277 | Bioavailability Plots |

| Exhibit | Appendix Range | Description |
|---|---|---|
| DTX-588 | A2278-A2282 | Bioavailability Plots |
| DTX-604 | A2283-A2293 | 8/10/22 Complete Response Letter |
| DTX-605 | A2294-A2345 | RS Method Validation Rep. |
| DTX-606 | A2346-A2361 | Justification of Specifications |
| DTX-607 | A2362-A2404 | Gray CV |
| DTX-611 | A2405-A2425 | Buckton CV |
| DTX-613 | A2426-A2429 | Exhibit Batch Process v. June 2023 Sample Process Chart |
| DTX-614 | A2430 | Industry Standard Method Chart |
| PTX-149 | A2434-A2445 | Kalantzi |
| PTX-163 | A2446-A2462 | FDA Guidance |
| PTX-202 | A2463-A2483 | Pellet Samples |

## I.  INTRODUCTION

1.       Galderma filed this Hatch-Waxman case against Lupin (D.I. 1), alleging infringement of the 532 patent (A474-88 (DTX-8)) and 740 patent (A489-506 (DTX-9)).[1]  At trial, Galderma alleged infringement of claims 1 and 16 of the 532 patent and claims 1 and 20 of the 740 patent.  Lupin denied infringement.

## II.  PARTIES[2]

2.       Plaintiff Galderma Laboratories, L.P. is a privately held partnership registered in the State of Texas, having a principal place of business at 14501 North Freeway, Fort Worth, Texas 76177.  (D.I. 156-1, Statement of Uncontested Facts ¶1).

3.       TCD is a limited partnership organized and existing under the laws of the State of Delaware, having a registered address at Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.  (D.I. 156-1, Statement of Uncontested Facts ¶2).

4.       Defendant Lupin Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 5801 Pelican Bay Blvd., Suite 500 Naples, Florida 34108.[3]

5.       Defendant Lupin Ltd. is a corporation organized and existing under the laws of India, having a principal place of business at 3rd Floor, Kalpataru Inspire, Off. Western

---

[1] Galderma also asserted infringement of United States Patent Nos. 8,394,405, 8,394,406, 8,470,364, and 8,709,478 in its Complaint (D.I. 1, ¶6), but the claims regarding infringement of these patents were dismissed.  (D.I. 18).

[2] Lupin incorporates by reference the parties' Statement of Uncontested Facts, filed as Exhibit 1 to the Pretrial Order.  (D.I. 156-1).

[3] Lupin Inc.'s principal place of business has changed since the parties filed their statement of uncontested facts.

Expressway Highway, Santacruz (East), Mumbai 400 055, India. (D.I. 156-1, Statement of Uncontested Facts ¶4).

## III. PROCEDURAL HISTORY

### A. Complaint

6. The Complaint was filed on December 3, 2021. (D.I. 1). Lupin answered and submitted counter-claims on February 7, 2022. (D.I. 10).

### B. Claim Construction

7. The Court issued a claim construction opinion on April 7, 2023. (D.I. 108, *Markman* Order).

### C. Lupin's Motion to Amend

8. Lupin filed a motion to amend its answer and counterclaims to allege invalidity for indefiniteness on March 9, 2023. (D.I. 86, 87, 92, 93, 94). The Court denied that motion on March 30, 2023. (D.I. 102).

### D. Galderma's Motion to Strike Invalidity Proffer

9. Galderma filed a motion to strike portions of the rebuttal expert reports of Graham Buckton, Ph.D. and Vivian Gray that included opinions on the purported invalidity of the patents-in-suit. (D.I. 123, 124, 127 (expert reports), 129, 132, 134 (joint letter seeking teleconference))). The Court denied that motion on October 11, 2023. (D.I. 152).

### E. Galderma's Motion to Strike Rebuttal Samples and Testing

10. Galderma filed a motion to strike certain portions of, and exhibits from, the rebuttal expert reports of Graham Buckton, Ph.D. and Vivian Gray pursuant to Fed. R. Civ. P. 16(f) and 37(c)(1). (*See* D.I. 125, 126, 127 (expert reports), 130, 133, and 134 (joint letter seeking teleconference)). The Court denied that motion on October 11, 2023. (D.I. 152).

**F.**  **Lupin's *Daubert* Motion to Exclude Blood Level Theory of Composition Ratio**

11.  Lupin filed a *Daubert* motion to preclude Galderma and Dr. Rudnic from offering any opinion that a person of ordinary skill in the art could infer Lupin's composition ratio from mean plasma concentration data.  (D.I. 153, 155, 157, 162, 163).  The Court reserved ruling until trial.  (D.I. 166).  At trial, Lupin renewed its motion.  (A15, A18, A31 (Tr. 60:9-11, 72:5-6, 124:18-20)).

**G.**  **Lupin's Motion *in Limine* to Exclude Irrelevant Second-Stage Results**

12.  Lupin filed a motion *in limine* to preclude Galderma and Dr. Rudnic from offering any argument or opinion regarding "immediate release" based on dissolution results at the 150-, 180-, and 240-minute timepoints.  (D.I. 156-14).  The Court reserved ruling until trial.  (D.I. 169).  At trial, Lupin renewed its motion.  (A13 (Tr. 49:23-50:4)).

**H.**  **Trial**

13.  A three-day bench trial was held from January 9-11, 2024.  The Court reserved ruling on Lupin's Rule 52(c) motion.  (A69 (Tr. 274:12-23)).

**IV.  BACKGROUND**

**A.**  **Asserted Patents**

14.  TCD is the current owner, and Plaintiff Galderma Laboratories, L.P. is the exclusive licensee, of the asserted patents.  (D.I. 160).

15.  The asserted patents are listed in FDA's Orange Book.  (D.I. 156-1, Statement of Uncontested Facts ¶14).

16.  The 532 patent was filed on April 7, 2004, issued on July 6, 2010, and expires December 19, 2027.  (D.I. 156-1, Statement of Uncontested Facts ¶¶5, 7-8).  The 532 patent claims priority to U.S. Provisional Patent Application No. 60/460,963, filed on April 7, 2003, and U.S.

Provisional Patent Application No. 60/547,964, filed on February 26, 2004. (D.I. 156-1, Statement of Uncontested Facts ¶6).

17. The 740 patent was filed on June 6, 2008, issued on June 26, 2012, and expires December 24, 2025. (D.I. 156-1, Statement of Uncontested Facts ¶¶9, 11-12). The 740 patent claims priority to U.S. Provisional Patent Application No. 60/460,963, filed on April 7, 2003, and U.S. Provisional Patent Application No. 60/547,964, filed on February 26, 2004. (D.I. 156-1, Statement of Uncontested Facts ¶10).

**B.    Asserted Claims**

18. At trial, Galderma asserted composition claims (claim 1 of the 532 patent and claim 1 of the 740 patent) and method claims (claim 16 of the 532 patent and claim 20 of the 740 patent).

19. The asserted claims are set forth below:

| 532 Patent | 740 Patent |
|---|---|
| 1. An oral pharmaceutical composition of doxycycline, which at a once-daily dosage will give steady state blood levels of doxycycline of a minimum of 0.1 μg/ml and a maximum of 1.0 μg/ml, the composition consisting of (i) an immediate release (IR) portion comprising a drug, wherein the drug consists of about 30 mg doxycycline; (ii) a delayed release (DR) portion comprising a drug, wherein the drug consists of about 10 mg doxycycline, in which the DR portion is in the form of pellets coated with at least one enteric polymer; and (iii) one or more pharmaceutically acceptable excipients. | 1. An oral pharmaceutical composition of doxycycline, which at a once-daily dosage will give steady state blood levels of doxycycline of a minimum of 0.1 μg/ml and a maximum of 1.0 μg/ml, the composition consisting of (i) an immediate release (IR) portion comprising 30 mg doxycycline; (ii) a delayed release (DR) portion comprising 10 mg doxycycline; and optionally, (iii) one or more pharmaceutically acceptable excipients. |
| 15. A method for treating rosacea in a mammal in need thereof, comprising administering to the mammal a daily dose of an oral pharmaceutical composition of doxycycline, which at a once-daily dosage will give steady state blood levels of doxycycline of a minimum of 0.1 μg/ml and a maximum of 1.0 μg/ml, the composition consisting of (i) an immediate release (IR) portion comprising a drug, wherein the drug consists of about 30 mg doxycycline; (ii) a delayed release (DR) portion comprising a drug, wherein the drug consists of about 10 mg doxycycline, in which the DR portion is in the form of pellets coated with at least one enteric polymer; and (iii) one or more pharmaceutically acceptable excipients.<br>16. The method of claim 15, wherein the mammal is a human. | 19. A method for treating rosacea in a mammal in need thereof, comprising administering an oral pharmaceutical composition of doxycycline comprising, which at a once-daily dosage will give steady state blood levels of doxycycline of a minimum of 0.1 μg/ml and a maximum of 1.0 μg/ml, the composition consisting of (i) an immediate release (IR) portion comprising 30 mg doxycycline; (ii) a delayed release (DR) portion comprising 10 mg doxycycline; and optionally, (iii) one or more pharmaceutically acceptable excipients.<br>20. The method of claim 19, wherein the mammal is a human. |

(A349 (DDX-5); A486-87 (DTX-8, 532 patent); A505-06 (DTX-9, 740 patent)).

20.     Each of the asserted claims require: a "composition consisting of (i) an immediate release (IR) portion . . . [and] (ii) a delayed release (DR) portion."  (*Id.*).  The 532 patent claims require that the IR portion "consists of about 30 mg doxycycline" and the DR portion "consists of about 10 mg doxycycline."  (A486-87 (DTX-8, 532 patent)).  The 740 patent claims require that the IR portion comprises "30 mg doxycycline" and the DR portion comprises "10 mg doxycycline."  (A505-06 (DTX-9, 740 patent)).

### C.     Prosecution History

21.     The prosecution leading to the 532 and 740 patents can be illustrated and summarized, in part, as follows:



(A1277 (DTX-55, Dahm Ex. 4); A74-75 (Tr. 295:17-298:24 (Dahm) (confirming chart is correct)).

## V. WITNESSES

### A. Galderma's Expert

22. Dr. Edward Rudnic is chief operating officer and head of research and development for Maxwell Biosciences in Austin, Texas. (A13 (Tr. 52:13-15 (Rudnic))). Dr. Rudnic was accepted as an "expert in invention, design, development, testing, manufacturing and commercialization of drug products, including pharmaceutical formulation." (A15 (Tr. 60:4-11 (Rudnic))).

### B. Lupin's Experts

23. Ms. Vivian Gray is president of V.A. Gray Consulting and managing director and research editor of Dissolution Technologies. (A96 (Tr. 379:7-380:2 (Gray)); A2405-25 (DTX-611, Gray CV)). Ms. Gray was accepted as "an expert in dissolution testing and pharmaceutical compositions." (A96 (Tr. 380:8-18 (Gray))).

24. Dr. Graham Buckton is Managing Director of Buckton Consulting and Emeritus Professor of Pharmaceutics, UCL School of Pharmacy, University of London. (A2362-404 (DTX-607, Buckton CV)). Dr. Buckton was accepted as "an expert in formulation development and pharmaceutical composition testing." (A119 (Tr. 473:22-474:8 (Buckton))).

### C. Fact Witnesses

25. Galderma's fact witnesses were corporate witnesses, Mr. Sean Griffin (Vice President, Regulatory Affairs) and Ms. Elizabeth Dham (patent attorney).

26. Lupin's fact witnesses were Makarand Avachat (Executive Vice President of Research and Development), Pramod Dahibhate (Senior Vice President, Regulatory Affairs), and Rajiv Khurana (Assistant Director, Research and Development).

## VI. PERSON OF ORDINARY SKILL IN THE ART

27.    A POSA in the field of the asserted patents as of the priority date, had education and experience in drug delivery and formulation.  In this field, education and experience levels may vary among persons of ordinary skill:  some persons holding a bachelor's degree with many years of experience, and others holding higher degrees but having less work experience.  Through education or experience, a POSA would have knowledge in the skill relating to the use, function, and formulation of pharmaceutical recipients, knowledge and training regarding the equipment processes and techniques used to analyze and test formulation materials, and an understanding of pharmacokinetic principles and how they relate to drug development.  (A120 (Tr. 476:21-477:12 (Buckton))).  This is the same definition applied by the Court in the previous case.  (A351 (DDX-5 (citing *Sun* decision))).

## VII. FACTS RELATING TO NON-INFRINGEMENT

### A.    Description of the Claimed Composition

28.    The asserted patents disclose "a pharmaceutical composition of doxycycline that contains an immediate release (IR) component . . . and a delayed release (DR) component . . . which are combined into one unit for once-daily dosing."  (A481 (DTX-8, 532 patent); A120-21 (Tr. 477:21-478:3 (Buckton) (unrebutted))).  The IR and DR components are described as ratios, such as 75:25, IR:DR.  (*Id.*).  "The ratios refer[] to the dose breakdown between IR and DR" and a ratio of 75:25 corresponds to 30 mg IR and 10 mg DR in a 40 mg capsule.  (*Id.*).  The asserted patents disclose that "[t]he ratio between the immediate release portion, or component, and the delayed-release portion, or component, can be used to adjust the in vitro drug release profile and in vivo blood concentration profile."  (A483 (DTX-8, 532 patent)).

29.    Example 1 describes how to make the IR pellets.  (A485 (DTX-8, 532 patent); A121 (Tr. 478:6-10 (Buckton) (unrebutted))).  Example 1 also describes how to test the IR pellets using

dissolution testing, pointing to Figure 1. (A485 (DTX-8, 532 patent); A121 (Tr. 478:12-16 (Buckton) (unrebutted))). Figure 1 of the asserted patents shows the test results for the IR pellets; the dissolution test was a one-stage dissolution test at pH 1.1 with samples taken at 10, 20, and 30 minutes. (A475 (DTX-8, 532 patent); A121 (Tr. 478:17-479:1 (Buckton)); A42-43 (Tr. 168:15-169:1 (Rudnic))).

30. Example 2 describes how to make the DR pellets. (A485 (DTX-8, 532 patent; A121 (Tr. 480:23-481:17 (Buckton) (unrebutted))). Example 2 also describes how to test the DR pellets using dissolution testing, pointing to Figure 2. (A485 (DTX-8, 532 patent); A121 (Tr. 481:18-21 (Buckton) (unrebutted))). Figure 2 of the asserted patents shows the test results for the DR pellets; the dissolution test was a two-stage dissolution test at pH 1.1 for 2 hours followed by pH 7. (A476 (DTX-8, 532 patent); A121-22 (Tr. 481:22-482:4 (Buckton)); A43 (Tr. 169:2-21 (Rudnic))).

31. Example 3 describes how to make a 30:10 composition by calculating "the fill weight of drug-loaded pellets . . . based on the actual potency of the drug-loaded pellets to deliver" 30 mg of doxycycline and 10 mg of doxycycline. (A485 (DTX-8, 532 patent); *see also* A486 (DTX-8, 532 patent) (Example 7 (same)); A122 (Tr. 482:14-484:6 (Buckton) (unrebutted))). Example 3 also describes how to test the 30:10 composition using dissolution testing, pointing to Figure 3. (A485 (DTX-8, 532 patent); A122 (Tr. 484:14-18 (Buckton) (unrebutted))). Figure 3 of the asserted patents shows the test results for a 30:10 composition; the dissolution test was a two-stage dissolution test at pH 1.1 for 2 hours followed by pH 7. (A477 (DTX-8, 532 patent); A122 (Tr. 484:19-485:12 (Buckton); A43 (Tr. 169:22-172:17 (Rudnic))). Example 3 describes the 75:25 ratio as having a fill weight of "drug-loaded pellets to deliver" 30 mg of doxycycline in

the form of IR pellets and 10 mg of doxycycline in the form of DR pellets.  (A485 (DTX-8, 532 patent); A124 (Tr. 492:12-25 (Buckton))).

**B.      ORACEA**

32.      Plaintiff Galderma holds NDA No. 50-805 on ORACEA Capsules, which was approved by FDA on May 26, 2006.  (D.I. 156-1, Statement of Uncontested Facts ¶16).

**1.      Manufacture of ORACEA**

33.      ORACEA is "produced by individually filling the IR beads (equivalent to a 30-mg dose) and the DR beads (equivalent to a 10-mg dose) into size #2 capsule shells."  (A613 (DTX-36, ORACEA Manufacturing Process); A124 (Tr. 493:1-24 (Buckton) (unrebutted))).

34.      ORACEA's delayed release pellets are coated with EUDRAGIT L30 D55, which is designed to dissolve at pH 5.5.  (A648, A660 (DTX-40, ORACEA Method Development); A28 (Tr. 112:6-18 (Rudnic))).

**2.      Testing of ORACEA**

35.      ORACEA is "tested using USP/NF Apparatus 2 (paddles) at 75 rpm with a volume of 750 mL of dilute HCl, pH 1.1 for 2 hours."  (A640 (DTX-37, ORACEA Background); A648, A660 (DTX-40, ORACEA Method Development); A125 (Tr. 494:9-495:3 (Buckton) (unrebutted))).  "The dissolution media for this first stage of the test simulates gastric conditions, where drug will release from the IR beads.  After 2 hours the media pH is adjusted to pH 6.0 to simulate the change to enteric conditions, where drug will release from the DR beads." (*Id.*).  The testing is done to "ensure that the drug contained in the DR beads is not released in the acidic stomach environment."  (A641 (DTX-37, ORACEA Background); A125 (Tr. 495:11-496:12 (Buckton) (unrebutted))).

### 3. Labeling of ORACEA

36. ORACEA is labeled as containing hard gelatin capsule shells filled with two types of doxycycline beads (30 mg immediate release and 10 mg delayed release). (A597, A610 (DTX-32, Griffin Ex. 10)).

### C. Lupin's Product

37. Lupin Inc. submitted ANDA No. 216631 seeking FDA approval for the commercial manufacture, use, or sale of a 40 mg doxycycline oral product. (D.I. 156-1, Statement of Uncontested Facts ¶17).

38. Lupin produced a total of 360 samples from the Exhibit Batches to Galderma. (A50 (Tr. 200:8-11 (Rudnic)); A2167 (DTX-284, Samples to Galderma)). Neither Galderma nor Dr. Rudnic disclosed any testing on the samples from the Exhibit Batches. (A50-51 (Tr. 200:12-202:10 (Rudnic))).

### 1. Manufacture of Lupin's Product

39. Lupin's Product is manufactured in 5 Stages. (A964-69 (DTX-48, Lupin Composition); A923-24 (DTX-47, Lupin PDR, Part 2); A1056-57 (DTX-49, Lupin QOS); A86 (Tr. 339:2-340:9 (Avachat)); A139-41 (Tr. 551:10-558:17 (Buckton)); A22 (Tr. 88:14-21 (Rudnic))). During Stage III, Lupin divides the seal coated doxycycline pellets; 55% of the seal coated pellets are immediate release, the remaining 45% are enteric coated. (A775 (DTX-46, Lupin PDR, Part 1); A836, A888 (DTX-47, Lupin PDR, Part 2); A126 (Tr. 498:2-22 (Buckton) (unrebutted))). The percentage weight buildup on the enteric coated pellets is 18%. (A824 (DTX-46, Lupin PDR, Part 1); A858, A875 (DTX-47, Lupin PDR, Part 2); A86 (Tr. 340:24-341:5 (Avachat)); A135 (Tr. 537:16-18 (Buckton) (unrebutted))). Mr. Avachat explained that all of Lupin's DR pellets are manufactured in the same manner. (A86 (Tr. 341:6-8 (Avachat))). Stage

IV, the capsule filling stage, is a two-head operation, which ensures that each capsule contains 55% immediate release pellets and 45% enteric coated pellets. (A86 (Tr. 340:20-22 (Avachat))).

40. Lupin's delayed release pellets are coated with EUDRAGIT L30 D55, which is designed to dissolve at pH 5.5. (A985, A1015 (DTX-49, Lupin QOS); A64 (Tr. 254:13-15 (Avachat Dep.)); A28 (Tr. 112:6-18 (Rudnic)); A142 (Tr. 565:7-15 (Buckton))).

### 2. Testing of Lupin's Product

#### a. Release Testing

41. Lupin's Product is tested using a USP II dissolution apparatus with paddles rotating at 75 rpm in pH 1.1 media for 2 hours (with sampling at 30, 60 and 120 minutes) followed by a pH adjustment to 6.0 for 2 hours. (A737 (DTX-46, Lupin PDR, Part 1); A555 (DTX-26, Lupin Dissolution Method); A529-30 (DTX-25, Lupin COAs); A1136 (DTX-50, Lupin Method Validation); A126 (Tr. 499:4-13 (Buckton); A98 (Tr. 387:13-21 (Gray))). During this testing, the paddles are stopped when the pH is adjusted. (A557 (DTX-26, Lupin Dissolution Method); A1143 (DTX-50, Lupin Method Validation); A101 (Tr. 401:25-402:3 (Gray)); A55 (Tr. 219:20-220:7 (Rudnic)). Lupin independently validated its *in vitro* dissolution testing method. (A1196 (DTX-50, Lupin Method Validation); A98 (Tr. 388:4-12 (Gray))). Release testing of Lupin's Exhibit Batches demonstrates that Lupin's Product releases about 55% doxycycline at 30, 60, and 120 minutes in pH 1.1 media. (A529, A536, A543 (DTX-25, Lupin COAs); A1344-46 (DTX-75, Lupin Multimedia Rep.); A1225-26 (DTX-52, Lupin Stability Summary); A96 (Tr. 381:20-25 (Gray)); A126 (Tr. 499:4-501:14 (Buckton)); A46-47 (Tr. 183:24-186:24 (Rudnic))).

#### b. Comparative Testing against ORACEA

42. Lupin performed comparative dissolution testing of Lupin's Exhibit Batches and ORACEA. (A1344-48 (DTX-75, Lupin Multimedia Rep.); A99-100 (Tr. 394:22-395:23 (Gray))). Lupin's Product consistently released around 55% while ORACEA released around 75%, for the

11

30-, 60-, and 120-minute timepoints at pH 1.1, demonstrating that the dissolution profiles are substantially different. (A100 (Tr. 395:5-14 (Gray)); A130 (Tr. 517:14-25 (Buckton))). To illustrate the difference in the immediate release profile between Lupin's Product and ORACEA, Lupin plotted the data for ORACEA (shown in **blue**) compared to Lupin's Product (shown in **green**). (A325 (DDX-4); A1338, 1344-48 (DTX-75, Lupin Multimedia Rep.); A689 (DTX-44, ORACEA Batch Analysis); A99-100 (Tr. 394:22-395:25 (Gray))). The comparison proves Lupin's 22:18 composition is substantially different than a 30:10 composition like ORACEA:



(A325 (DDX-4); A689 (DTX-44, ORACEA Batch Analysis); A692, 96, 703 (DTX-45, ORACEA COAs); A1344-46 (DTX-75, Lupin Multimedia Rep.); A130 (Tr. 517:14-25 (Buckton)); A99-100 (Tr. 394:22-395:25 (Gray))).

### 3. Labeling of Lupin's Product

43. Lupin's Product label states it contains "22 mg immediate release pellets and 18 mg delayed release pellets." (A507 (DTX-23, Lupin Label); A128 (Tr. 506:14-507:1 (Buckton))). The prescribing information for Lupin's Product states it is a 40 mg hard gelatin capsule shell "filled with two types of doxycycline beads (22 mg immediate release Pellets and 18 mg enteric coated pellets)." (A518 (DTX-24, Lupin Prescribing Information); A128 (Tr. 506:4-13 (Buckton))).

### 4. Tentative Approval of Lupin's Product

44. Lupin received tentative approval of its product on November 7, 2022. (A88 (Tr. 347:15-17 (Avachat)); A586-90 (DTX-27, FDA Approval); A33 (130:19-21 (Rudnic)); A131 (Tr. 518:4-10 (Buckton))).

### 5. Lupin's June 2023 Samples

45. Lupin manufactured a batch of 6,000 capsules for rebuttal purposes in this litigation, the June 2023 Samples. (A1405-08 (DTX-85, June 2023 Samples COA); A1409 (DTX-86, June 2023 Samples Batch Record); A164 (Tr. 647:4-6 (Buckton)); A90 (Tr. 357:6-358:5 (Avachat))). At Galderma's request, Lupin produced samples of the June 2023 Samples to Galderma. (A2167 (DTX-284, Samples to Galderma); A50 (Tr. 200:8-11 (Rudnic))).

46. Dr. Rudnic provided speculative and conclusory testimony that the June 2023 Samples were not representative of the Exhibit Batches. (A31 (Tr. 122:12-123:22 (Rudnic))). He testified that Lupin did not perform bioequivalence testing on the June 2023 samples and that some of the process parameters, including spray rate and air flow, were changed. (*Id.*). However, Dr. Rudnic did not point to any evidence in the record to support his opinions, and did not perform any testing on the June 2023 Samples. (*Id.*).

47.     Mr. Avachat explained that the June 2023 Samples were made using the same manufacturing stages as the Exhibit Batches, the same ingredients as the Exhibit Batches, and had the same 18% enteric coating weight on the DR beads as the Exhibit Batches. (A90 (Tr. 358:8-18 (Avachat)); A2426-28 (DTX-613 (Exhibit Batch Process v. June 2023 Sample Process Chart)). During the process for manufacturing the June 2023 Samples, Lupin had to adjust some of the process parameters due to the smaller batch size. (A90-91 (Tr. 358:21-359:4 (Avachat))). The scale dependent factors are: atomization, air pressure, air flow, and spray rate. (A91 (Tr. 359:18-22 (Avachat); A851 (DTX-47, Lupin PDR, Part 2))). Mr. Avachat explained that the values for these parameters were within the ranges accepted and recommended by the manufacturer, such that the June 2023 Samples are equivalent to the Exhibit Batches. (A90-91 (Tr. 358:21-359:4 (Avachat))).

48.     According to FDA Guidance, *in vitro* dissolution testing is used to "ensure continuing product quality and performance after certain changes, such as changes in . . . the manufacturing process." (A2449-50 (PTX-163, FDA Guidance); *see also* A104 (Tr. 414:13-17) (Gray))). The June 2023 Samples were tested using the same industry standard two-stage dissolution test used for ORACEA and Lupin's Exhibit Batches. (A1406 (DTX-85, June 2023 Samples COA); A2430 (DTX-614, Industry Standard Method Chart)). The results from the dissolution test show that the June 2023 Samples release 55% doxycycline at pH 1.1. (A1406 (DTX-85, June 2023 Samples COA); A92 (Tr. 366:1-8 (Avachat))). Lupin also had an outside independent laboratory test the June 2023 Samples. (A1736 (DTX-141, ARL Rep.); A1258 (DTX-54, ARL Rep.); A100 (Tr. 397:4-5 (Gray))). Those results also show that the June 2023 Samples release 55% doxycycline at pH 1.1. (*Id.*). Thus, the dissolution testing results establish that the June 2023 Samples contain 22 mg IR beads and 18 mg DR beads, like the Exhibit Batches.

49. Dr. Buckton credibly confirmed that the June 2023 Samples are representative of Lupin's Product. (A134 (Tr. 530:9-13 (Buckton)); *see also* A92 (Tr. 366:9-11 Avachat))).

50. Based on the evidence presented, the Court concludes that the June 2023 samples are representative of the ANDA Exhibit Batches.

**D.     Prosecution History Estoppel**

**1.     Narrowing of Original Claims**

51. The asserted patents claim priority to the 963 Provisional. (D.I. 156-1, Statement of Uncontested Facts ¶¶6, 10).

52. The 963 Provisional was originally filed with the following claims:

> 1.     An oral pharmaceutical composition containing doxycycline, which at a once-daily dosage will give steady state blood levels of doxycycline of a minimum of about 0.1 µg/ml and a maximum of about 1.0 µg/ml.

> 7.     The composition of claim 1, which is a combination of a component containing doxycycline in an immediate release (IR) formulation and a second component containing doxycycline in a delayed release (DR) formulation, wherein the ratio of IR to DR is from about 99:1 to about 70:30.

(A1311 (DTX-57, 963 Provisional); A128 (Tr. 507:13-19 (Buckton))). Dr. Buckton confirmed that Lupin's Product would fall within the scope of claim 1 as originally filed. (A128 (Tr. 507:23-25 (Buckton))).

53. Galderma amended the claims to require "about" 30 mg IR doxycycline and "about" 10 mg DR doxycycline. (A1279 (DTX-56, September 2008 Reply)).

**2.     Disclaimer of 23.3:16.3**

54. The examiner rejected the then-pending claims, which required an IR portion of "about" 30 mg doxycycline and a DR portion of "about" 10 mg doxycycline, citing to a prior art

document that included 23.3 mg of IR doxycycline and 16.3 mg DR doxycycline. (A1285 (DTX-56, September 2008 Reply); A74 (Tr. 294:5-295:16 (Dahm)); A128 (Tr. 508:8-22 (Buckton))). In response to the rejection, Galderma argued that the claims should be allowed because "[i]n no case would one of ordinary skill in the art reasonably expect variations of 30 percent or greater to be encompassed by the term 'about.'" (*Id.*).

57. Dr. Buckton credibly confirmed that a POSA would understand that Galderma clearly and unmistakably disclaimed a range for "about" greater than 30%, *i.e.* more than 23.3 mg for immediate release and 16.3 mg for delayed release. (A128 (Tr. 508:10-509:15 (Buckton))).

56. Dr. Rudnic did not provide any testimony regarding the prosecution history or the disclaimer.

57. The Court concludes Galderma disclaimed a range of 30% or greater, and specifically disclaimed a ratio of 23.3:16.3. 16 is 60% greater than 10.

### E. Construction of Claim Phrases

#### 1. "immediate release"

58. The Court construed "immediate release" to mean "[a] dosage form that is intended to release substantially all of the active ingredient on administration with no enhanced, delayed, or extended release effect, where 'on' includes immediately after, and 'release' is a functional limitation  referring to a release that alters the subject's steady-state blood level of doxycycline." (D.I. 108 at 4).

#### 2. "immediate release (IR) portion"

59. The Court construed "IR portion" to mean "[a] functional limitation meaning 'any part of the claimed composition that releases drug immediately upon administration, with no enhanced, delayed or extended release effect.'" (D.I. 108 at 9).

### 3. "delayed release (DR) portion"

60. The Court construed "DR portion" to mean "[a] functional limitation meaning 'any part of the claimed composition that delays release of a drug until a time other than immediately following oral administration, e.g., through coating, uncoated matrix, or other impediment to delay release.'" (D.I. 108 at 9).

### 4. "about"

61. The term "about" means plus or minus 10% or between 27 to 33 mg IR doxycycline and between 9 and 11 mg DR doxycycline. (A398 (DDX-5 (citing *Sun* decision)); A129 (Tr. 512:5-20 (Buckton)); A21 (Tr. 83:21-84:4 (Rudnic))).

## F. Commercial Embodiment

62. The parties do not dispute that ORACEA is a commercial embodiment of the asserted claims. (A22 (Tr. 85:19-22)).

### 1. Designed and Made as 30:10

63. ORACEA is designed and made as 30:10. (A124 (Tr. 493:18-24 (Buckton))). Dr. Buckton testified that ORACEA capsules are filled with individual IR pellets equivalent to a 30-milligram dose and DR pellets equivalent to a 10-milligram dose, based on the potency and fill ratio. (A124 (Tr. 493:5-13 (Buckton)); A613 (DTX-36, ORACEA Manufacturing Process)).

### 2. Tested at pH 1.1 at 30, 60 and 120-minute Timepoints as 30:10

64. Dr. Buckton and Ms. Gray testified that Galderma tests the ORACEA composition using *in vitro* dissolution at pH 1.1/6.0. (A125 (Tr. 495:13-20 (Buckton)); A623, A641 (DTX-37, ORACEA Background); A2430 (DTX-614, Industry Standard Method Chart); A98 (Tr. 387:13-388:1 (Gray))). Ms. Gray testified that the results for the ORACEA NDA batches show an average release at pH 1.1 of 75% after 120 minutes. (A98 (Tr. 389:21-390:1 (Gray)); A692, A696, A703 (DTX-45, ORACEA COAs); A306, A318 (DDX-4)).

### 3. Functions as Labeled (30:10)

65. Mr. Griffin testified that the ORACEA label is based on the prescribing information and manufacturing process, which includes that ratio of pellets in the actual product. (A70 (Tr. 278:15-19 (Griffin))). Dr. Buckton testified that Galderma ensures ORACEA functions as labeled according to its *in vitro* dissolution specifications at pH 1.1/6.0. (A125 (Tr. 495:21-496:12 (Buckton)); A663 (DTX-43, ORACEA Specifications); A687 (DTX-44, ORACEA Batch Analysis); A597 (DTX-32, Griffin Ex. 10)). Mr. Griffin testified that the line graph and depictions of ORACEA's immediate and delayed release components displayed on the ORACEA website are consistent with the *in vitro* dissolution testing in ORACEA's NDA. (A71 (Tr. 282:5-284:4 (Griffin)); A600, A602, A605 (DTX-32, Griffin Ex. 10)). Galderma labels and markets ORACEA based on *in vitro* dissolution testing. (A597, A600, A602, A605 (DTX-32, Griffin Ex. 10); A44 (Tr. 173:5-174:3 (Rudnic)).

### G. Non-Infringement

#### 1. Designed and Made as 22:18

66. It is undisputed that Lupin's Product was designed and made as a capsule with 22 mg IR doxycycline beads and 18 mg DR doxycycline beads. (A129-30 (Tr. 513:18-514:7 (Buckton)); D.I. 156-2, ¶¶61, 66; A715, A721, A773, A775 (DTX-46, Lupin PDR, Part 1); A836 (DTX-47, Lupin PDR, Part 2); A84-86 (Tr. 332:22-333:9, 337:22-338:9, 340:3-22 (Avachat))).

#### 2. Tested at pH 1.1 at 30, 60 and 120-minute Timepoints as 22:18

67. It is undisputed that at pH 1.1, Lupin's Product releases about 55% doxycycline (22 mg) at pH 1.1 at the 30-, 60-, and 120-minute timepoints. (A47 (Tr. 186:9-187:14 (Rudnic)); A130 (Tr. 517:14-25 (Buckton)); A1338, A1344-46, A1348 (DTX-75, Lupin Multimedia Rep.); A96, A98 (Tr. 381:19-25, 390:5-11 (Gray)); A306, A319 (DDX-4); A532, A539, A546 (DTX-25, Lupin COAs)).

### 3. Functions as Labeled (22:18)

68. Lupin's Product label states it contains "22 mg immediate release pellets and 18 mg delayed release pellets." (A507 (DTX-23, Lupin Label); A128 (Tr. 506:16-507:1 (Buckton))). The prescribing information for Lupin's Product describes it as a 40 mg "hard gelatin capsule shell[] filled with two types of doxycycline beads (22 mg immediate release Pellets and 18 mg enteric coated pellets)." (A518 (DTX-24, Lupin Prescribing Information); A128 (Tr. 506:4-13 (Buckton))).

69. Dr. Buckton testified that the test for the IR portion using the Court's claim construction is the first two hours of the *in vitro* dissolution test at pH 1.1, which confirms the portion that is intended to immediately release in the stomach. (A130 (Tr. 514:11-20 (Buckton))). Dr. Buckton testified that the test for the DR portion is the second stage of the *in vitro* dissolution test at pH 6.0, which confirms the portion that is intended to be released after the immediate release portion in the small intestine. (*Id.* (Tr. 514:21-515:4 (Buckton))).

70. Dr. Buckton credibly explained that all three Exhibit Batches of Lupin's Product function as a 55% immediate-release product, because none of the Exhibit Batches release more than around 55% doxycycline at the 15-, 30-, 45-, 60-, 90-, or 120-minute timepoints at pH 1.1. (A130 (Tr. 515:18-517:25 (Buckton)); A1338, A1344-46 (DTX-75, Lupin Multimedia Rep.); A96 (Tr. 381:19-25 (Gray)); A2107, A2109, A2111 (DTX-148, Exhibit Batch Spreadsheet).[4] These results establish that Lupin's Product is substantially different than the 75% immediate release in

---

[4] Dr. Rudnic testified that the capsules could remain in the stomach for up to 60 minutes. (A32 (Tr. 127:24-128:4 (Rudnic))). Even if the pellets were to remain in the stomach for 60 minutes, Lupin's Product does not release more than 55% and therefore, does not meet all the limitations of the asserted claims.

the asserted claims. (A130 (Tr. 515:25-516:5 (Buckton)); A98-99 (Tr. 390:24-391:6, 394:12-21 (Gray)); A2107, A2109, A2111 (DTX-148, Exhibit Batch Spreadsheet)).

71. To illustrate the results, Lupin plotted the data for twelve Lupin capsules (shown in **green**) on the same scale as the Figure 3 data (shown in **black**). (A2107, A2109, A2111 (DTX-148, Exhibit Batch Spreadsheet; A98-99 (Tr. 390:24-391:6, 394:12-21 (Gray)); A130 (Tr. 515:18-516:9 (Buckton))). The comparison proves Lupin's 22:18 composition functions as made and intended, releasing no more than about 55% (about 22 mg) at the 1-hour and 2-hour timepoints presented in the asserted patents:



(A2107 (DTX-148, Exhibit Batch Spreadsheet); A130 (Tr. 515:18-516:9 (Buckton)); A98-99 (Tr. 390:24-391:6, 394:12-21 (Gray))).[5]

---

[5] The results in Figure 3 showing release of over 100% are likely due to an analytical error or the

72.     Lupin's Product continues to function throughout its shelf life in the same way. (A126 (Tr. 500:10-20 (Buckton)); A1225-26 (DTX-52, Lupin Stability Summary)).

73.     Thus, Lupin's Product is accurately labelled as a 22:18 composition based on industry standard testing.  (A129 (Tr. 513:4-11 (Buckton))).

74.     Dr. Rudnic did not provide any testimony regarding whether Lupin's Product would infringe using the test in the asserted patents.

75.     Based on the evidence presented, the Court concludes that using the test set forth in the asserted patents, Lupin's Product does not meet the limitations of the asserted claims.

76.     The parties dispute whether the pH 1.1 *in vitro* dissolution testing method is sufficient for evaluating infringement.

77.     *In vitro* dissolution testing is the industry standard test for evaluating drug release. (A96 (Tr. 381:5-17 (Gray)); A122 (Tr. 485:7-12 (Buckton)); A16 61:22-62:2 (Rudnic))).

78.     There is no dispute that the industry standard testing method for doxycycline delayed release capsules is USP 2 paddles, 75 rpm, pH 1.1 for two hours, with sampling at 30, 60, and 120 minutes, followed by pH 6.0 for 2 hours.  (A2430 (DTX-614, Industry Standard Method Chart); A96 (Tr. 381:5-17 (Gray)); A72 (Tr. 286:18-287:18 (Griffin) (Galderma's corporate witness, confirming that the method is "widely accepted to be an appropriate test pH and duration.")); A122 (Tr. 485:7-12 (Buckton))).

79.     In the *Amneal* case, Dr. Rudnic opined that "[a] skilled artisan would recognize . . . physiologically relevant *in vitro* dissolution testing generally subjects the dosage form in uniform exposure by the dissolution medium plus agitation by a paddle or other means to facilitate

---

capsule having more doxycycline than 40 mg.  (A99 (Tr. 391:14-394:6 (Gray)); A140 (Tr. 55420:13-556:7 (Buckton))).

dissolution." (A48 (Tr. 190:14-23 (Rudnic))). Ms. Gray and Dr. Buckton credibly explained that the first stage of the test is intended to mimic the conditions of a fasted stomach and the second stage is intended to mimic the conditions of the small intestine. (A97 (Tr. 383:21-22, 384:19-20 (Gray)); A125 (Tr. 494:19-495:3 (Buckton))).[6] Their testimony was corroborated by Galderma's corporate witness, Mr. Griffin. (A70-71 (Tr. 277:23-284:18 (Griffin)) (confirming Galderma associates dissolution media at pH 1.1 with the conditions of the stomach and pH 6.0 with the intestine)). Dr. Rudnic also admitted on cross-examination that pH 1.1 is intended to mimic the fasted stomach. (A44-45 (Tr. 176:16-177:18 (Rudnic))). This is consistent with the testimony that Dr. Rudnic provided in the previous *Amneal* and *Sun* cases, where Dr. Rudnic relied on 30-minute *in vitro* results at pH 1.1 to evaluate immediate release. (A45, A47-48 (Tr. 177:19-179:22, 188:1-189:4 (Rudnic))). The sampling time at 30 minutes is consistent with expected gastric residence time. (A157 (Tr. 622:8-13 (Buckton))).

80. There is no dispute that the first stage of the test, 120 minutes at pH 1.1, is a stress test for the enteric coating. (A136, A97 (Tr. 539:4-13 (Buckton), Tr. 385:2-13 (Gray)); A45 (Tr. 179:24-180:3 (Rudnic)); A1460 (DTX-101, 2023 USP <1092> ("In the case of enteric-coated dosage forms, the functionality of the coating is usually proven by challenge in an acid medium, followed by a demonstration of dissolution in a higher-pH medium."))).

81. Neither Galderma nor Dr. Rudnic provided any evidence that the pH 1.1 test in the patent is not sufficient to show infringement for any type of formulation, including Lupin's Product.

---

[6] The pH of the gastrointestinal tract progresses from very acidic (pH 1 to 2 for the fasted stomach), increasing to pH 5.5 as you move to the small intestine, and finally reaching a pH of around 7. (A363 (DDX-5, pH of Digestive Tract); A122-24 (Tr. 485:13-490:1 (Buckton))).

82.     Dr. Rudnic admitted on cross-examination that pH 1.1 is the standard well-accepted condition for evaluating immediate release components.  (A44 (Tr. 174:8-11, 175:23-176:15 (Rudnic))).

83.     Dr. Rudnic testified that Lupin's *in vitro* dissolution testing at pH 1.1 followed by pH 4.5 should be considered when evaluating infringement, because pH 4.5 is a more biorelevant pH.  (A18 (Tr. 71:13-15 (Rudnic))).  In support of his opinions, Dr. Rudnic relied upon Kalantzi (A2434-445 (PTX-149)) for his opinion that the pH of a fasted stomach may be as high as 4.5 when a drug product is taken with water.  (A27-28 (Tr. 108:24-109:7 (Rudnic))).

84.     Dr. Rudnic also testified that the pH of a fasted stomach ranges from about 2.2 to about 5, and that pH 1.1 does not exist in the stomach.  (A16-17 (Tr. 64:18-65:1 (Rudnic))).  When asked about the results reported in the Kalantzi, which show a pH range of 1.23 to 7.36 for a fasted stomach, he admitted that he did not believe the pH 1 and pH 7 results reported in Kalantzi.  (A54 (Tr. 216:3-8 (Rudnic)); A2438-39 (PTX-149, Kalanrzi)).  Dr. Rudnic also admitted that at a pH of 7.36 everything in the capsule would release immediately.[7]  (A54 (Tr. 216:6-11 (Rudnic)). Dr. Rudnic further admitted that an article cited in his expert report, Dressman (A2161-66 (DTX-200)), reports the median pH of a fasted stomach as 1.7 (with a range of 1.4 to 2.1), and the median pH of a fed stomach as 5.0 (with a range of 4.3 to 5.4).  (A53-54 (Tr. 209:25-213:11 (Rudnic); A2164-65 (DTX-200, Dressman)).

---

[7] If, as Dr. Rudnic and Galderma assert, the industry standard dissolution test in the asserted patents is insufficient to answer the question of infringement, then the asserted patents would not inform a POSA about the scope of the claimed IR:DR ratio with reasonable certainty because different dissolution methods can produce substantially different results, particularly dissolution methods that utilize different dissolution conditions.  (*See* ¶8; A72 (Tr. 286:11-287:4 (Griffin) (explaining the standard dissolution testing method "ensure[s] consistent testing of various doxycycline products"))).

85. Given Dr. Rudnic's varied and conflicting opinions regarding what he called biorelevant fasted gastric pH and his previous infringement opinions using pH 1.1, the Court finds the patent test is sufficient for determining infringement and non-infringement.

### 4. Galderma's Infringement Theory

86. Galderma presented multiple theories in an effort to establish infringement, each of which requires that a "subset" of Lupin's DR pellets function as IR pellets. (D.I. 156-2, Galderma Statement of Facts ¶¶305, 318; A132 (Tr. 523:16-23 (Buckton))).

### a. "Subset" of DR Pellets is "Compromised"

87. Dr. Rudnic testified that some of Lupin's DR beads are compromised because Lupin uses an 18% weight coating that it applies to a base previously exposed to methylene chloride. (A27 (Tr. 108:2-7 (Rudnic))). To explain his theory Dr. Rudnic relied on a cartoon bead. (A2433 (PDX-2)). Dr. Buckton credibly testified that he saw no evidence of a subset of compromised or weak DR beads showing any indication of immediate release. (A145 (Tr. 575:20-25 (Buckton))).

### i. Second-Stage pH 1.1/pH 4.5 Results

88. Dr. Rudnic relied on the second-stage pH 1.1/pH 4.5 results at 150, 180, and 240 minutes to argue that a portion of Lupin's DR beads fail. (A55 (Tr. 220:13-19 (Rudnic); A1367 (DTX-75, Lupin Multimedia Rep.)). Dr. Buckton credibly explained that the pH 4.5 results are from the second stage of the dissolution test, after two hours at pH 1.1, and thus are not intended to show the IR portion. (A145-46 (Tr. 577:17-579:11 (Buckton))). On cross-examination, Dr. Rudnic admitted that: (1) he is not aware of any peer-reviewed publications using 150-, 180-, or 240-minute results to identify immediate release, (2) he is not aware of anyone else using these time points to identify immediate release outside of this litigation, (3) he has not previously used the second-stage to identify immediate release components in developing other extended release

products, and (4) the error rate for his method is incalculable. (A56 (Tr. 222:11-223:25 (Rudnic)). Thus, the Court finds Dr. Rudnic's reliance on the second-stage pH 4.5 results flawed and unreliable.

89. The second-stage pH 4.5 results for Lupin's Product show that 5 of the 12 capsules release almost all of the doxycycline in 240 minutes, while the remaining 7 capsules release very little additional doxycycline. (A133 (Tr. 526:4-8 (Buckton)); A29 (Tr. 116:11-13 (Rudnic)); A1367 (DTX-75, Lupin Multimedia Rep.)). Initially, Dr. Rudnic testified that the mean of the data, 75%, shows that Lupin's Product immediately releases 30 mg of doxycycline in the stomach. (A29 (Tr. 116:6-17 (Rudnic))). Later, Dr. Rudnic pointed to a single capsule at the 150-minute timepoint to support his theory that 30 mg of Lupin's doxycycline immediately releases at pH 4.5. (A167 (Tr. 660:9-12 (Rudnic))). But, in Dr. Rudnic's own words, "looking at only one [capsule] as being representative of the whole batch is not right." (A52 (Tr. 205:9-10 (Rudnic)); *see also id*. (Tr. 205:13-15 (Rudnic) ("When you look at one tablet out of a quarter of a million, call me old-fashioned, that's not representative."))). The Court gives no weight to Dr. Rudnic's reliance on these second-stage pH 4.5 results as being representative of the IR portion of Lupin's Product.[8]

90. Ms. Gray credibly explained that the second-stage pH 4.5 results for Lupin's Product[9] are highly variable and have an unacceptable percent RSD. (A100 (Tr. 398:10-18

---

[8] Before trial, Dr. Rudnic and Galderma were relying on a calculation using 5 of the 12 capsules to show that about 8 mg of doxycycline from the DR pellets was released from Lupin's capsules. (D.I. 156-2, Galderma Statement of Facts ¶ 108, n.10; *see also id.* ¶¶ 53, 274). However, this theory was abandoned and not presented at trial. (A132 (Tr. 545:3-21 (Buckton))). Galderma and Dr. Rudnic only provided two explanations of how 8 mg or about 44% of the DR pellets are compromised. Neither of those are reliable. (¶¶89-90). Consequently, there is no evidence that 8 mg of Lupin's DR pellets immediately release.

[9] The first-stage results at pH 1.1 have a very low RSD of between 2% and 4%. (A101 (Tr. 400:10-15 (Gray)) (unrebutted); A1367 (DTX-75, Lupin Multimedia Rep.); A2136 (DTX-150, Lupin Multimedia Spreadsheet)).

(Gray)); A1367 (DTX-75, Lupin Multimedia Rep. (Lupin's second-stage pH 4.5 results had an RSD of about 18-22%, well over the accepted RSD of 10%)).[10] The percent RSD is a way of determining the scatter around the mean and tells you how precise the results are. (A100-01 (Tr. 398:19-399:3 (Gray))). Dr. Buckton also testified (unrebutted) that because the results have a bimodal distribution, meaning essentially they either completely release or release very little, it is improper to use the mean. (A132-33 (Tr. 525:25-526:20 (Buckton))). Dr. Buckton's and Ms. Gray's interpretation of these results is consistent with FDA Guidance. (A2457 (PTX-163, FDA Guidance ("To allow use of mean data, the percent coefficient of variation . . . should not be more than 10%))). Dr. Rudnic offered no credible explanation for the variability in the second-stage pH 4.5 results for Lupin's Product.

91. Ms. Gray explained that the variability could be due to hot spots occurring during the buffer addition. (A101 (Tr. 401:16-20 (Gray)); A1527 (DTX-109, Hanson)). The two-stage pH 1.1/pH 4.5 testing method starts with pH 1.1 for two hours, then the paddles are stopped for about 5 minutes, a solution with a pH of 11 is added to raise the pH of the vessel to 4.5, and the paddles are started again. (A101-02 (Tr. 401:21-404:11 (Gray)); A55 (Tr. 219:20-220:7 (Rudnic)); A66 (Tr. 261:12-21 (Avachat Dep.))). During the addition of the pH 11 solution, the DR beads could come into direct contact with the high pH solution causing damage to the enteric coating before the vessel is mixed and stabilizes to a pH of 4.5. (A101 (Tr. 402:10-17 (Gray)); A66 (Tr. 261:22-262:10, 264:11-23 (Avachat Dep.))).

---

[10] The second-stage pH 4.5 data for ORACEA show that ORACEA was releasing less doxycycline than the first stage. (A1367 (DTX-75, Lupin Multimedia Rep.)). This abnormality was due to an error or inadequacy in the testing method. (A99, A105 (Tr. 391:14-394:6, 417:17-23 (Gray)); A29 (Tr. 115:23-116:4 (Rudnic)); A66-67 (Tr. 263:4-12, 264:24-265:16 (Avachat Dep.))).

92.     Dr. Rudnic dismissed that the results for Lupin's Product could be caused by hot spots, calling hot spots a "ghost," "not scientific," and stating that "[n]o one has ever proven that it exists." (A30 (Tr. 118:23-119:2 (Rudnic))). In support of his opinions, he relied upon Miller (A2168-79 (DTX-313)). However, Miller states that "[i]t was demonstrated in the previous sections that a large and sustained hot spot was generated by gradual addition of the buffer medium down the paddle shaft." (A2177 (DTX-313, Miller); A103-04 (Tr. 410:6-412:1 (Gray))).[11] Thus, the article Dr. Rudnic relied upon to suggest that hot spots are "ghosts" and do not exist, expressly acknowledges and proves the existence of hot spots.

### ii.     ARL Rebuttal Testing at pH 4.5

93.     Ms. Gray and Dr. Buckton explained that given the high variability of the second-stage results, Dr. Rudnic should have tested Lupin's Product to evaluate its potential source. (A102-03 (Tr. 406:18-407:2 (Gray)); A133 (Tr. 527:25-528:25 (Buckton))). Dr. Rudnic, however, did not to disclose any such testing because, in his view, he "didn't need to." (A51 (Tr. 202:6-10 (Rudnic))).

94.     Lupin had an independent laboratory, ARL, evaluate whether hot spots may have caused the high variability of the second-stage pH 4.5 results. (A102 (Tr. 407:9-14 (Gray)); A133-34 (Tr. 529:12-530:8 (Buckton))).[12] ARL tested the June 2023 Samples using a one-stage test at pH 4.5. (*Id.*; A2004 (DTX-142, ARL Transfer Rep.)).

---

[11] Ms. Gray explained that the testing in Miller was done with the paddles moving when the higher pH solution was added, unlike the method Lupin uses (paddles are stopped and removed), and hot spots are less likely to form with the paddle moving. (A103-04 (Tr. 410:6-412:1 (Gray)); A2176-77 (DTX-313, Miller) (showing a hot spot present at 4.5 minutes)).

[12] The single-stage pH 4.5 results from ARL have a very low RSD of around 1%. (A103 (Tr. 407:23-408:4 (Gray) (unrebutted)); A1257 (DTX-54, ARL Rep.)).

95. The results from ARL's testing show that at pH 4.5, the June 2023 Samples release around 53-55% doxycycline in 30 minutes, around 55-56% in 60 minutes, and around 55-56% in 120 minutes, with a mean release of 55.4%.  (A103 (Tr. 407:23-408:4 (Gray)); A133-34 (Tr. 529:12-530:8 (Buckton)); A1257 (DTX-54, ARL Rep.; A2139 (DTX-151, ARL Data Spreadsheet)).  The mean release for ORACEA at pH 4.5 was 73.7%.  (A1254 (DTX-54, ARL Rep.)).

96. Ms. Gray credibly explained that those ARL results establish that hot spots are the logical and most likely source of the variability and irregularities in second-stage pH 4.5 results from Lupin's ANDA because, when the step of adding pH 11 is removed, the variability is eliminated.  (A103 (Tr. 407:23-408:4 (Gray))).  Dr. Buckton credibly testified that these results "conclusively show[] that there is no release at pH 4.5, and that the previous test was erroneous based on the addition of the alkaline [solution]."  (A133 (Tr. 529:14-24 (Buckton))).

97. The Court finds that issues when adding the pH 11 buffer were the likely cause of the variability and irregularities in the second-stage pH 4.5 results for ORACEA and Lupin's Product, because without the buffer addition the variability and irregularity in the data are no longer observed.

98. Dr. Rudnic did not disclose any testing on the June 2023 Samples, and did not provide any testimony regarding the results from ARL.  (A50-51 (Tr. 200:1-201:14, 202:6-10 (Rudnic))).  Instead he opined, without any support, that the June 2023 Samples were not representative of the Exhibit Batches.  (A31 (Tr. 122:12-123:22 (Rudnic))).  As explained above, the Court finds that June 2023 Samples are representative of the Exhibit Batches.  (¶¶45-50).

99. Therefore, the Court finds that the ARL results establish that Lupin's DR pellets do not release doxycycline at pH 4.5.

### b. 8 mg of DR Pellets are "Incompletely Coated"

100. Dr. Rudnic testified that 8 mg of Lupin's DR beads are insufficiently coated and will leak because Lupin uses an 18% average enteric coating weight, compared to ORACEA's 30% coating weight. (A25-27 (Tr. 99:24-103:22, 108:1-7 (Rudnic))). Dr. Rudnic used a bell curve cartoon to support his opinions. (A2431 (PDX-2)). However, Dr. Rudnic admitted that he had no evidence that the distribution would be normal or appear as a bell curve. (A26, 27 (Tr. 101:12-18, 105:23-106:3 (Rudnic))). He could only speculate that some beads would have a coating weight buildup of less than 18% and some greater. (A26 (Tr. 100:20-102:5 (Rudnic))). Dr. Rudnic did not perform any testing or cross-section any of Lupin's beads to evaluate his theory. (A51, 56, 61-62 (Tr. 201:6-202:1, 224:12-20, 244:4-245:11 (Rudnic))).

101. Dr. Buckton credibly explained that although an 18% coating weight is on the lower end, there is no evidence that Lupin's DR beads are releasing doxycycline when it should not be released. (A136 (Tr. 538:14-18 (Buckton))). In support of his opinions, Dr. Buckton pointed to Lupin's formulation optimization study which tested various enteric coating weight gains. (A136 (Tr. 538:21-541:18 (Buckton)); A807 (DTX-46 (Lupin PDR, Part 1)). The study used the industry standard test, pH 1.1 at 2 hours, to challenge the enteric coating. (A136 (Tr. 539:4-13 (Buckton)); A98 (Tr. 387:13-388:4 (Gray)); A1460 (DTX-101, 2023 USP <1092>)). Dr. Rudnic agreed that the first stage of the test, 120 minutes at pH 1.1, is meant to challenge the enteric coating. (A45 (Tr.179:24-180:3 (Rudnic))). The results from the study showed that a coating weight of 16% or 17% would have been satisfactory. (A136 (Tr. 540:17-541:5 (Buckton)); A808 (DTX-46 (Lupin PDR, Part 1)). The testing demonstrated that a coating weight buildup of 16% and 17% showed some leakage when tested at pH 1.1 for 2 hours, so Lupin ultimately moved forward with 18% coating weight, which showed no release during the testing. (A136 (Tr. 540:5-13 (Buckton)); A808-09 (DTX-46, Lupin PDR, Part 1)).

102. Mr. Avachat confirmed that Lupin selected an 18% coating weight because it passed the pH 1.1 test at 2 hours without any leakage, and was therefore determined to be a satisfactory coating weight. (A86 (Tr. 341:9-16, 342:3-13 (Avachat))).

103. The asserted patents state the enteric coating can "range of from about 1.0% (w/w) to about 50% (w/w) of the pellet composition" and state that a preferable "range of from about 20 to about 40 percent (w/w)." (A484 (DTX-8, 532 patent)); A59 (Tr. 235:17-236:13 (Rudnic))). Lupin's coating weight falls within the asserted patents' range and there is nothing in the asserted patents saying Lupin's 18% coating weight is too low. (*Id.*; A824 (DTX-46, Lupin PDR, Part 1)). The claims do not require a specific coating weight. (A486-87 (DTX-8, 532 patent)); A505-06 (DTX-9, 740 patent)).

104. The Court finds that Lupin's 18% enteric coating weight, while lower than ORACEA's, is adequate as it passed the industry standard test without leakage.

### i. "Speckling"

105. Leading up to trial, Galderma alleged that "speckling" in Lupin's SEM images were evidence of an incomplete coating and that "not all of the speckling was talc." (D.I. 156-2, Galderma Statement of Facts ¶214). This theory was abandoned and at trial Dr. Rudnic admitted that the "speckling" on the surface of the pellets was in fact talc. (A27 (Tr. 106:5-107:1 (Rudnic))).

106. Dr. Rudnic pointed to SEM images of pellets with a 17% and 19% coating weight from Lupin's development batches to support his infringement theories. (A27 (Tr. 106:5-107:1 (Rudnic)); A2474, A2477 (PTX-202, Pellet Samples)). Dr. Rudnic testified, for the first time, that the talc speckling on the surface of the 17% coating weight pellets created "channels" which would allow the drug to escape. (A27 (Tr. 106:5-107:1 (Rudnic))). Dr. Rudnic said these channels were not present in the 19% coating weight pellets. (*Id.*). Dr. Rudnic did no testing to evaluate his theory. (A56 (Tr. 224:12-20 (Rudnic))). Dr. Buckton credibly testified that all the speckling is

talc, (A137 (Tr. 542:1-21 (Buckton))), and there are no channels or other defects visible in the pellets with an 18% coating weight. (A141 (Tr. 561:16-18 (Buckton)); A1401 (DTX-83, MVA Rep.)).

107. Dr. Rudnic relied on a coating weight of 17% and 19% to support his opinion, neither of which is the 18% coating weight on the DR beads in Lupin's Product. In contrast, Dr. Buckton's opinions relied on pellets with a 18% coating weight, the same coating weight as Lupin's Product. The Court credits Dr. Buckton's testimony and finds no evidence of channels in the 18% coating weight on Lupin's DR beads.

### ii. "Alternating . . . Solvent Systems"

108. Lupin uses methylene chloride (a non-aqueous solvent) in Stages I and III of its manufacturing process and water (an aqueous solvent) in Stages II and IV. (A966-67 (DTX-48, Lupin Composition); A86 (Tr. 342:19-23 (Avachat))). Dr. Rudnic argued that Lupin's use of alternating aqueous and non-aqueous systems somehow impacts the coating on Lupin's DR beads. (A25 (Tr. 97:12-98:10 (Rudnic))).

109. Dr. Buckton credibly explained that alternating solvent systems would not impact the coating in Lupin's Product because the layers dry between coats so the next coat is being applied to the dried polymer coat. (AA139-40, A142 (Tr. 551:10-554:12, 563:1-12 (Buckton))). Mr. Avachat also confirmed that the alternating solvent systems do not impact the coating on Lupin's DR beads and that Lupin has used the same alternating process for other products. (A87 (Tr. 344:12-346:13 (Avachat))).

110. Dr. Rudnic did not explain how or why Lupin's use of alternating aqueous and non-aqueous systems would cause the DR beads to leak. (A25 (Tr. 97:12-98:10 (Rudnic))). All of the testing to challenge the enteric coating at either pH 1.1 or pH 4.5 showed no release from the DR

beads. (¶¶14, 17, 95). Thus, the Court credits Dr. Buckton's and Mr. Avachat's testimony, and finds no evidence that the use of alternating solvent systems causes Lupin's DR beads to leak.

111. Dr. Rudnic also criticized Lupin's use of methylene chloride during its manufacturing process. (A23, A25 (Tr. 91:12-94:15, 97:12-98:10 (Rudnic))). Mr. Avachat explained (unrebutted) that Lupin decided to use methylene chloride during its manufacturing process because it is faster, more efficient, and allows the coating process to be performed at a lower temperature. (A86-87 (Tr. 342:24-343:11 (Avachat))). Dr. Buckton also credibly confirmed that methylene chloride has desirable properties for coating, including a high-surface tension (meaning it sprays well), low polarity (meaning it does not dissolve polar materials), and a faster drying time. (A139 (Tr. 552:10-23 (Buckton))). Mr. Avachat explained (unrebutted) that the methylene chloride used during the manufacturing process is evaporated, collected, and properly disposed of. (A87-88 (Tr. 346:14-347:8 (Avachat))). He confirmed that no methylene chloride is released into the atmosphere and that Lupin would be able to perform its manufacturing process in the United States. (A88 (Tr. 347:6-11 (Avachat))). The Court finds there is no issue with Lupin's use of methylene chloride during its manufacturing process as Lupin is ensuring the methylene chloride is captured and properly disposed of.

112. Mr. Avachat further explained that the FDA permits certain levels of methylene chloride in pharmaceutical products. (A88 (Tr. 347:9-11 (Avachat))). The industry standard permitted daily exposure of methylene chloride for Lupin's Product is 24,000 ppm. (*Id.* (Tr. 348:6-16 (Avachat)); A2356 (DTX-606, Justification of Specifications)). Lupin originally proposed a limit of 3,000 ppm, but after correspondence with FDA, the specified limit for methylene chloride in Lupin's Product is 1,000 ppm. (A88 (Tr. 348:14-350:23 (Avachat)); A2356 (DTX-606, Justification of Specifications); A2286 (DTX-604, 8/10/22 Complete Response Letter); A1729

(DTX-124, Lupin Finished Product Specification)).  Mr. Avachat confirmed that if any batches of Lupin's Products have more than 1,000 ppm, they will not be released or sold.  (A88-90 (Tr. 350:24-353:12, 355:16-25 (Avachat))).  Lupin's testing for methylene chloride has a limit of detection of 90 ppm.  (A89-90 (Tr. 353:15-355:11 (Avachat)); A2307 (DTX-605, RS Method Validation Rep.)).  In each of the Exhibit Batches, there was no methylene chloride detected.  (A90 (Tr. 355:14-357:2 (Avachat)); A530, A537, A544 (DTX-25, Lupin COAs)).  Mr. Avachat confirmed that this meant the methylene chloride in these batches is less than 90 ppm.  (A90 (Tr. 357:3-5 (Avachat))).  FDA tentatively approved Lupin's Product, including the methylene chloride specification, with actual knowledge of Lupin's use of methylene chloride.  (A88 (Tr. 347:15-17 (Avachat)); A586-90 (DTX-27, FDA Approval)); A33 (Tr. 130:19-21 (Rudnic)); A131 (Tr. 518:1-10 (Buckton))).  The Court finds there is no issue with Lupin's use of methylene chloride during its manufacturing process, as the amount allowed in the final product is only 4% of the allowed daily limit, and no methylene chloride has been detected in the Exhibit Batches.

### iii.     SEM Images

113.     Dr. Buckton suggested that the June 2023 Samples be tested to confirm that the speckling on the surface of the pellets was in fact talc.  (A137 (Tr. 542:14-21, 543:11-13 (Buckton))).  An independent laboratory, MVA, used SEM imaging to show the surface of the June 2023 Samples.  (*Id.* (Tr. 543:15-25 (Buckton)); A1375-1404 (DTX-83, MVA Rep.)).  Dr. Buckton testified that a POSA would rely upon the analysis and images from MVA to evaluate enteric coatings.  (A137 (Tr. 544:1-4 (Buckton))).

114.     Dr. Rudnic testified that the effect of Lupin's use of alternating solvent systems can been seen in the SEM images of Lupin's 2023 Samples.  (A25 (Tr. 98:11-99:10 (Rudnic))).  Dr. Rudnic argued that the Lupin DR beads have a gap between the layers because the upper coating is failing to adhere to the layer below.  (*Id.*; A1401 (DTX-83, MVA Rep.)).  Dr. Rudnic

had no issue relying upon images from the June 2023 Samples to support his opinion, but later testified that the June 2023 Samples were not manufactured the same way as the Exhibit Batches. (*Compare* A25 (Tr. 98:11-99:10 (Rudnic)), *with* A31 (Tr. 122:22-123:22 (Rudnic))).  Dr. Rudnic cannot have it both ways, either the samples can be used to support his theory regarding Lupin's coating and were manufactured the same way as the Exhibit Batches, or they were not, and these images cannot be used to support his theory.  The Court will give no credit to Dr. Rudnic's testimony regarding the SEM images from the MVA report.

115.    Dr. Buckton credibly explained that the SEM images from the MVA report for Lupin's Product do not show non-adherence to the layer below, but rather show the layers being applied to form the DR bead and any gaps in the layers were likely due to the testing method, *i.e.*, being cut by razor blade.  (A141-42 (Tr. 559:16-562:19 (Buckton)); A1401 (DTX-83, MVA Rep.)).  Dr. Buckton noted that the ORACEA DR pellet imaged had been broken as opposed to being cut with a razor blade.  (A137-38 (Tr. 544:18-547:24 (Buckton)); A1381, A1388 (DTX-83, MVA Rep.)).

116.    The Court finds no evidence of an incomplete coating on Lupin's DR beads in the SEM images.

### iv.    Optical Images

117.    The MVA report also included optical images of the June 2023 Samples and ORACEA.  (A1380, A1394 (DTX-83, MVA Rep.)).  The optical images for ORACEA show that the pellets are irregular, but there are no observed defects in the enteric coating.  (A137 (Tr. 544:5-17 (Buckton)); A1379-80 (DTX-83, MVA Rep.)).  The optical images for the Lupin beads show that the beads are rounder than ORACEA and shiny.  (A138 (Tr. 548:19-549:2 (Buckton)); A1393-94 (DTX-83, MVA Rep.)).  Dr. Rudnic agreed that a round surface like that of the Lupin bead is ideal for coating and that a shiny coat is an indication of a good coating.  (A22-23, A59-60 (Tr.

88:16-89:9, 236:16-238:12 (Rudnic))). Dr. Buckton credibly explained that there is no evidence that Lupin's enteric coating is defective, weak, or damaged. (A138 (Tr. 548:19-549:2, 549:23-550:11 (Buckton))).

118. The Court finds no evidence of an incomplete coating on Lupin's DR beads in the optical images.

### c. 10mg of DR Pellets "Maintain Their Integrity Until a Later Time"

119. Galderma's infringement theory requires that 10 mg of Lupin's DR beads work as intended. (A34 (Tr. 135:1-5 (Rudnic))). However, as explained below, neither Galderma nor Dr. Rudnic provided a credible explanation for why some DR pellets fail completely, while others work as designed and intended to delay release.

### d. "Corroborated" by 96-Hour Blood Levels

120. Dr. Rudnic relies on the fact the Lupin's Product is bioequivalent to ORACEA to support his infringement opinions. (A27 (Tr. 108:9-23 (Rudnic))). However, bioequivalence is not the test for patent infringement. (A161 (Tr. 636:16-20 (Buckton)); *see also* A726 (DTX-46, Lupin PDR, Part 1) (to be bioequivalent the pharmacokinetic properties for Lupin's Product needed to be within the range of 80-125% compared to ORACEA)).

### i. *Daubert*

121. Lupin filed a *Daubert* motion seeking to exclude Dr. Rudnic from offering any opinion that a POSA could infer Lupin's composition ratio from mean plasma concentration data (¶11). Lupin renewed its motion. (*Id.*). Dr. Rudnic did not cite any authority or publication, or provide any calculations or methodology supporting his suggestion that a POSA would use plasma concentration data to contradict direct evidence of the actual IR:DR ratio in a capsule composition. (A57-58 (Tr. 225:10-226:16, 227:11-232:4 (Rudnic))).

122.     Dr. Buckton credibly confirmed that Dr. Rudnic's interpretation of the data is unreliable; there is no generally accepted method to infer composition ratios from blood concentration levels, and a POSA would not rely upon a visual comparison to infer the ratio in Lupin's Product.  (A142-44 (Tr. 565:18-566:17, 571:25-572:3 (Buckton))).

123.     Dr. Rudnic's absence of authority, publications, calculations, or methods makes his plasma concentration theory of composition ratios both flawed and unreliable for the doxycycline formulations at issue.

### ii.     22:18 Blood Levels

124.     Dr. Rudnic testified that the blood levels from Lupin's *in vivo* bioequivalence testing corroborates his theory that 8 mg of Lupin's DR beads fail.  (A31-32 (Tr. 124:16-126:12 (Rudnic))).  Dr. Rudnic argued that Lupin's *in vitro* testing was done at a "biorelevant" pH, 4.5, comparing the method to Kalantzi and explaining that water would raise the pH of the stomach to 4.5.  (A27-28 (Tr. 108:18-109:24 (Rudnic))).  Dr. Buckton credibly explained that when a person takes a gelatin capsule, like Lupin's Product with water, the capsule will not dissolve because the temperature is too low to dissolve the gelatin; by the time the temperature of the water is increased to a point where the capsule will dissolve the pH of the stomach would have returned to 1.1 or 1.2.  (A124 (Tr. 490:6-492:9 (Buckton))).  As explained above, the Court gives no credit to Dr. Rudnic's biorelevant pH testimony.  (¶¶83-85).

125.     Dr. Rudnic testified that the graphs comparing the blood levels for Lupin's Product to ORACEA have "very similar curves."  (A31-32 (Tr. 124:22-125:11 (Rudnic)); A2158 (DTX-182, Fasted Study Rep.)).  However, when asked about a graph limiting the data to the first four hours, Dr. Rudnic could not explain the differences in the data.  (A58 (Tr. 230:4-232:4 (Rudnic)); A2275 (DTX-479, Bioavailability Plots); A2282 (DTX-588, Bioavailability Plots)).  He also did not know what values a 22:18 composition would produce at any of the time points, but yet was

somehow certain that the values for Lupin's Product were not representative of a 22:18 ratio. (A58-59 (Tr. 232:15-234:24 (Rudnic))). Dr. Rudnic testified that it would take statistical analysis to determine whether any of the timepoints were substantially identical, but admitted that he did not conduct any mathematical comparisons of this plasma concentration data. (A58-59 (Tr. 229:23-230:3, 231:22-23, 233:22-234:1 (Rudnic))). The Court finds no reason why the curve presented for Lupin's Product is not the result of Lupin's 22:18 ratio, and Dr. Rudnic failed to provide any credible reason to the contrary.

126.    Dr. Rudnic's opinions relied on the fact that Lupin's Product is bioequivalent to ORACEA. (A62 (Tr. 246:3-19 (Rudnic))). Dr. Buckton credibly testified that bioequivalence does not mean that the data points are the same or that the absorption phase was the same for the two products, only that the area under the curve (AUC) and the maximum concentration ($C_{max}$) are within 80% to 125% of the reference product. (A161 (Tr. 635:13-24 (Buckton))). Dr. Buckton explained that "bioequivalence and the claim terms are quite different things . . . and [t]he claim terms are much, much wider than the bioequivalence." (*Id.* (Tr. 636:11-20 (Buckton))). The Court credits Dr. Buckton's testimony and concludes that Lupin's Product does not meet all the limitations of the asserted claims merely by being bioequivalent to ORACEA.

### iii.    Galderma's 32:4 and 32:6 Compositions

127.    Dr. Rudnic testified that Lupin's Product had to function as 30:10 in order to be bioequivalent to ORACEA because doxycycline has a narrow absorption window. (A32 (Tr. 127:10-23 (Rudnic))). However, on cross examination, Dr. Rudnic admitted that the 32:4 and 32:6 compositions in Galderma's 516 patent were bioequivalent to ORACEA. (A60-61 (Tr. 239:5-241:4 (Rudnic)); A1239 (DTX-53, 516 patent); *see also* A144 (Tr. 572:17-573:8 (Buckton))

(confirming the 32:4 composition was bioequivalent to ORACEA)).[13] Thus, Dr. Rudnic's infringement theories relying on bioequivalence should not be credited, because based on Galderma's own patent, Lupin's Product does not have to function as 30:10 to be bioequivalent to ORACEA.

### 5. Method Claims

128. Claim 16 of the 532 patent and claim 20 of the 740 patent are method of treatment claims. (A486-87 (DTX-8, 532 patent); A505-06 (DTX-9, 740 patent)).

#### a. Treating and Administering

129. Lupin will not treat patients or will not administer Lupin's Product. (A131 (Tr. 519:16-19 (Buckton))).

#### b. Specific Intent

130. As explained below, there is insufficient evidence to support a finding of specific intent.

131. Dr. Rudnic testified that Lupin intentionally designed its product to immediately release about 8 mg of doxycycline from its DR portion by coating its beads with a "thin and weak enteric coat." (A27, A34 (Tr. 108:2-7, 132:5-16, 133:1-9 (Rudnic))). Dr. Rudnic speculated that Lupin deliberately selected the lowest percent weight gain of enteric coating that would pass quality control testing, while being aware that some pellets would leak. (A26-27 (Tr. 102:17-24, 108:2-7 (Rudnic))). Dr. Rudnic further speculated that Lupin's use of methylene chloride was intentional and that, by layering unlike coatings, Lupin designed a product that will leak upon oral

---

[13] Galderma's 516 patent uses pH 1.1 to confirm the IR portion. (A1249 (DTX-53, 516 patent)); A61 (Tr. 241:17-242:25 (Rudnic)); A96 (Tr. 381:7-74 (Gray)).

administration.  (A24, A27 (Tr. 93:20-95:2, 108:2-7 (Rudnic))).  However, Dr. Rudnic admitted that he had no direct evidence of any such intent.  (A24 (Tr. 94:5-15 (Rudnic))).

132.    Mr. Avachat credibly testified that Lupin did not intend to make a weak coating, as Dr. Rudnic speculated, but used like and unlike layers (aqueous and nonaqueous layers) to optimize the enteric coating process.  (A87 (Tr. 344:12-346:2 (Avachat))).  Lupin performed the enteric coating optimization study to test various enteric coating weight gains and to comply with FDA's requirement to perform a quality by design evaluation.  (A86 (Tr. 342:3-13 (Avachat)); A807-09 (DTX-46, Lupin PDR, Part 1)).  Mr. Avachat credibly confirmed that based on the results of the optimization study, Lupin found an 18% coating weight to be an "absolutely strong coating" and did not believe it should load the patient with unnecessary polymer by selecting a higher coating weight than required to pass the testing.  (A86 (Tr. 341:9-16, 342:3-18 (Avachat))).  Dr. Buckton confirmed that the purpose of the enteric coating optimization study was to design a coating with a "perfectly good, functional, enteric coat that would achieve the goal" of not releasing until it's out to the stomach.  (A136 (Tr. 541:6-18 (Buckton)); A807-09 (DTX-46, Lupin PDR, Part 1)).  Dr. Buckton further confirmed that the results of Lupin's optimization study showed that even a 16% or 17% coating weight would have been acceptable, so Lupin did not select the lowest possible coating weight.  (A136 (Tr. 540:15-541:5 (Buckton)); A808 (DTX-46, Lupin PDR, Part 1)).

133.    Mr. Avachat testified (unrebutted) that Lupin has used the process of layering with aqueous and non-aqueous coatings several times.  (A87 (Tr. 346:5-13 (Avachat))).  Mr. Avachat also testified (unrebutted) that Lupin has developed other products with enteric coating weights of between 15% and 20%, some of which are FDA approved and have been commercialized.  (A86 (Tr. 341:17-342:2 (Avachat))).

134. In contrast to Dr. Rudnic's suspicions and speculation, which lack any direct evidentiary support, Lupin presented testimony from its Executive Vice President of Research and Development and test results to establish that it did not intend to make a weak coating that would selectively leak in the stomach. Therefore, the Court finds that Lupin did not intend to coat its DR beads with a thin or weak coating.

135. Dr. Rudnic also testified that Lupin was "very clever" to describe its product as "18 mg enteric coated pellets" as opposed to "18 mg delayed release pellets" in its prescribing information so as not to be misleading. (A50 (Tr. 198:3-17 (Rudnic)); A518 (DTX-24, Lupin Prescribing Information)).

136. Lupin's prescribing information states the product contains "18 mg enteric coated pellets" and the label states the product contains "18 mg delayed release pellets." (A507 (DTX-23, Lupin Label); A518 (DTX-24, Lupin Prescribing Information)). Mr. Avachat credibly testified that Lupin did not include this language to be "clever" and the terms "enteric coated" and "delayed release" are interchangeable because enteric coating is the means to achieve the delayed release. (A85 (Tr. 336:12-337:14 (Avachat))).

137. The Court finds there was no "clever" intent behind the description of Lupin's Product in its label or prescribing information as Lupin does appear to use the terms interchangeably.

138. Dr. Rudnic testified that Lupin's objective was to develop a product that is equivalent to ORACEA in all aspects. (A27 (Tr. 108:9-16 (Rudnic))). The testimony he relied on from Mr. Avachat's deposition states: "I would simply say that as a part of developing the ANDA, we did whatever is ***required by the regulation*** to -- to be equivalent on all aspects to the ORACEA." (A63 (Tr. 251:4-6 (Avachat dep.) (emphasis added)). Mr. Avachat's deposition

testimony clearly is referring to bioequivalence required by the FDA, and not that Lupin's intent was to copy the substantially different 30:10 ratio of the ORACEA composition.

139. Further, Dr. Rudnic admitted that in the previous *Sun* case, he relied upon *in vitro* pH 1.1 testing at 15 and 30 minutes to conclude that the "*in vitro* dissolution data further illustrate how Sun deliberately designed its NDA product to immediately release a portion of 30 milligrams doxycycline." (A48-49 (Tr. 191:15-24, 193:25-194:13 (Rudnic))). If that same testing were used to prove intent in this case, it would establish that Lupin intended to make its product 22:18, as the results from the *in vitro* dissolution test show that Lupin's Product immediately releases no more than 55% doxycycline. (DTX-75.14-18 (at pH 1.1 Lupin's Product releases between 45% and 49% (between 18 mg and 19.6 mg) doxycycline after 15 minutes and between 50% and 53% doxycycline (between 20 mg and 21.2 mg) after 30 minutes); ¶¶14, 70).

140. Mr. Avachat also testified that Lupin was aware of the ORACEA patents during development and wanted its product to have a different ratio than ORACEA. (A64 (Tr. 256:9-13, 256:18-20 (Avachat dep.)); A84 (Tr. 333:22-334:8 (Avachat))). Dr. Rudnic agreed that designing around a patent is a good thing, but implied that Lupin somehow cheated in designing around ORACEA. (A60 (Tr. 238:13-239:4 (Rudnic))). There is no evidence that Lupin "cheated" during its design around efforts, as the patent test shows; and Lupin's design, manufacturing, and testing efforts negate any speculation about specific intent.

## VIII. CONCLUSION

141. Neither Galderma nor Dr. Rudnic presented any credible reason or theory to contradict the undisputed pH 1.1 test results confirming that Lupin's Product is a 22:18 composition. Therefore, Lupin's Product does not infringe, either literally or by the doctrine of equivalents, because it does not meet all of the limitations of the asserted claims.

Dated:  February 2, 2024

PHILLIPS, MCLAUGHLIN & HALL, P.A.

*/s/ John C. Phillips, Jr.*
John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
mch@pmhdelaw.com

*Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I, Megan C. Haney, Esquire, hereby certify that on February 2, 2024, a copy of Defendants Lupin Inc. and Lupin Limited's [Proposed] Findings of Fact was caused to be served upon the following counsel in the manner indicated below:

<u>**VIA EMAIL**</u>

Jack B. Blumenfeld
Jeremy A. Tigan
Morris Nichols Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1374
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

Gerald J. Flattmann Jr.
Andrew J. Cochran
Cahill Gordon & Reindel LLP
32 Old Slip
New York, NY 10005
gflattmann@cahill.com
acochran@cahill.com

*/s/ Megan C. Haney*
Megan C. Haney (#5016)