IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

— — —

| | | |
|---|---|---|
| GALDERMA LABORATORIES, L.P. and TCD ROYALTY SUB LP | : | Civil Docket 21-CV-1710 |
| | : | |
| | : | Trial Day Four |
| V. | : | Closing Statements |
| | : | |
| LUPIN INC. and LUPIN LIMITED | : | Civil Bench Trial |

---

BEFORE THE HONORABLE STEPHANOS BIBAS

---

James A. Byrne U.S. Courthouse
601 Market Street
Philadelphia, PA 19106
February 22, 2024 at 9:30 a.m.

APPEARANCES:

FOR THE PLAINTIFFS:   JEREMY A. TIGAN, ESQUIRE
                     Morris, Nichols, Arsht & Tunnell LLP
                     1201 North Market Street
                     P.O. Box 1347
                     Wilmington, DE 19899

FOR THE PLAINTIFFS:   GERALD J. FLATTMANN, JR., ESQUIRE
                     ANDREW J. COCHRAN, ESQUIRE
                     Cahill Gordon & Reindel LLP
                     32 Old Slip
                     New York, NY 10005

FOR THE DEFENDANTS:   WILLIAM A. RAKOCZY, ESQUIRE
                     JOSEPH T. JAROS, ESQUIRE
                     KATIE BODA, ESQUIRE
                     ADRIANNE C. ROSE, ESQUIRE
                     Rakoczy Molino Mazzochi Siwik
                     6 West Hubbard Street, Suite 500
                     Chicago, IL 60654

FOR THE DEFENDANTS:   MEGAN C. HANEY, ESQUIRE
                     Phillips, McLaughlin & Hall, P.A.
                     1200 North Broom Street
                     Wilmington, DE 19806

Bobbie J. Shanfelder, RDR, CRR
Official Court Reporter
Bobbie_Shanfelder@paed.uscourts.gov

(February 22, 2024 at 9:30 a.m.)

THE COURT: Good morning. I gather Ms. Haney has another hearing, and she's welcome to leave whenever she needs to.

MS. HANEY: Thank you, Your Honor. Appreciate it.

THE COURT: No offense taken. Just slip out quietly. All right. Anything before we get to -- anything procedural in terms of deadlines or anything else? Because I think this is the last item for you guys; correct?

MR. FLATTMANN: I believe that's correct, Your Honor. I don't think there's anything else on the agenda.

THE COURT: Do you want to proceed with your closing?

MR. FLATTMANN: Yes, Your Honor. With the Court's permission? And we do have some binders of slides that we would like to pass up to the Court.

THE COURT: Please.

MR. FLATTMANN: And to our friends on the other side of the aisle. Your Honor, after the close of evidence, you asked us several questions. And the one that really stuck with me was to go back and seek guidance from the patent specification. And we have done so.

And I think it was incredibly instructive to go back after we've gone through the crucible of trial and looked freshly at the patent specification. And it says very, very clearly at Column 7, Lines 47 to 55, to look at pH 4.5 as a dividing line

for delayed release when you are dealing with enteric coating. And it says that delayed release is something that happens after the stomach at about 2 to 6 hours.

So again, it points us in the right direction in terms of the data that's relevant to the Court at this point. And all this is expressly set out in that section of the patent which we will look at a couple of passages later.

And then we move to the data-driven evidence in this case that's before you. And it shows infringement at the pH 4.5 test both literally and by the doctrine of equivalents. And why is that?

We know we have at least one capsule in that representative batch that was tested that was delivering exactly 75 percent at 30 minutes. We know we have two others that do the same thing between 30 minutes and an hour and 1 and 2 hours.

We know we have 4 capsules in that batch that are right in the middle of the range. That includes 75 percent from 30 minutes to 2 hours. And we have a mean of 75 percent immediate release in the data.

So every patient that's taking this drug chronically is getting an average of 75 percent of immediate release. And that, under the law that we presented to you in the post-trial briefs, is called infringement. That's the law. It's the law under Broadcom. It's the law under Recro. It's the law under the predecessor case to this case, Research Foundation versus Mylan.

Your Honor, in my opening, I submitted to the Court that the evidence at trial would justify a finding of infringement.  And I believe it has.

Plaintiffs and their witness, Dr. Rudnic, embraced the science, the data, and the hard evidence presented in the ANDA.  And Plaintiffs also strictly adhered to the Court's Claim Construction presenting biorelevance data in order to prove that Lupin and its ANDA product was formulated to function in a manner that infringes the patents here.

In contrast, we submit that Lupin and its witnesses ignore the data from Lupin's own ANDA and they ignore the testimony of their own chief formulator, Mr. Avachat, and they ignore that in favor of mere labels calling one thing immediate release and another thing delayed release.

It's sort of 22 to 18 is their mantra, but that ignores what the components actually do and how they actually function in vivo.  The actual amounts of immediate and delayed release in Lupin's ANDA product are the amounts set forth in the claims which further result in the plasma profiles that are required by the claims and which the specification, again, instructs us to look at together in a number of places.

They also essentially have to ignore the Court's Claim Constructions and past constructions of the terms "immediate release" portion and "about" to dismiss the data that we have presented to the Court.  They failed to rebut our proofs from

their own ANDA submissions.

The in vitro data, the in vivo data, the testimony of their chief formulator, they all show that Lupin's ANDA product was designed to be equivalent in all aspects to Oracea.  That was the testimony.  There's no dispute that Oracea is, in fact, covered by the claims of the Chang patents and they are equivalent in all aspects to it.

Now here is what matters in terms of the law.  The law tells us that the infringement inquiry is centered on the data submitted by Lupin to the FDA.  Not anything else.  And those data show there's immediate release from Lupin's capsules in the right amount that establish infringement.

While Lupin's immediate release pellets account for some of what is immediately released from those capsules, they don't account for all of it.  Not at all.

The rest has to come from somewhere.  Lupin's so-called delayed release pellets.  That's where it comes from.  Infringement can't be avoided by these labels.  We have shown by a preponderance of the evidence, more likely than not, that Lupin's ANDA product infringes.  That's all that's required.

Now what matters again are the data that Defendants submitted to the FDA at the time and what they said or didn't say, as the case may be, about how their product functions.  Not what they generate after the litigation started.  That post litigation stuff is untimely.  It's litigation motivated.

I submit it's highly suspect and ultimately irrelevant under the law. And there's precious little evidence of record as to its provenance even, as we learned. It wasn't even tested for bioequivalence as the ANDA product was. And it wasn't submitted to FDA to dispute the data that we actually relied on here.

In the words of Lupin's formulator, Mr. Avachat, what matters is what we file. And that's true under the law that we have submitted in our briefs, Sunovion and other cases.

The data actually filed with the FDA is what governs this Court's determination of whether it's more likely than not that the manufacturer of Lupin's ANDA product results in capsules that infringe the asserted claims.

Again, capsules control. That's what's claimed. Not pellets. And it need not be every single one of Lupin's capsules. It just needs to be one that infringes. Some capsules or even one capsule that infringes, that's good enough under the law.

In fact, Recro. The Recro Gainesville case. The predecessor case here, Research Foundation versus Mylan. They both are good examples and make it clear that if proof exists that the asserted claims are infringed by even a single capsule, that's sufficient for a finding of infringement.

In Mylan, Judge Stark found that the infringement existed where, without rounding, one patient had plasma concentration levels that met the requirements of the asserted

claims.  And with rounding, a total of three did.  I think very instructive as to where we are here.

The evidence at trial shows that Lupin's ANDA product infringes the asserted claims.  First, the Court heard testimony that Lupin designed its ANDA product to be equivalent to Oracea.  Second, the Court was presented with data in Lupin's ANDA that confirms that the product behaves like Oracea and infringes the claims literally.

Third, the Court heard testimony that the mean data in Lupin's ANDA shows that it behaves like Oracea at a steady state which infringes the asserted claims both literally and under the doctrine of equivalents.

And lastly, based on Lupin's prescribing label, in accordance with the governing Claim Constructions here, Lupin's ANDA product infringes the method of treatment claims because if you use it as directed it results in infringement.

Let's briefly touch on the testimony at trial concerning the design of Lupin's ANDA product.  On the first day of trial, Lupin conceded that its ANDA product met nearly all of the elements in the asserted claims.

In other words, Lupin admitted that it designed an oral pharmaceutical composition of doxycycline to be taken once daily to hit the specified blood levels recited in the claims with both IR and DR portions.  And what Lupin contends that they were miraculously able to achieve with this, with an IR/DR formulation

is outside of the claim limitations.  In fact, they couldn't.

Faced with the challenges of creating, in their words, an ANDA product that is pharmaceutically equivalent and equivalent in all aspects, the best they could do was come up with a formulation that was nominally and only nominally in an IR/DR ratio of 22:18.  However, the data associated with that formulation confirmed that it's functionally a 30:10 ratio.

And that was established from Lupin's data.  As explained by Dr. Rudnic, Lupin's ANDA product functions to release about 30 milligrams of doxycycline immediately from a combination of what it calls its immediate release portion and what it calls its delayed release portion.  It immediately releases 22 milligrams from its immediate release portion and immediately releases about 8 milligrams from its so-called delayed release portion.

How do we know that?  Again, it's Lupin's own data.  The in vitro data at 4.5 pH confirmed by Lupin's fasted state bioequivalence data.  And in the case of the former, some of Lupin's individual capsules release near 75 percent of their doxycycline at the biorelevant stomach pH of 4.5, the pH that the patent itself points us to for enteric coating.

The pH of 4.5 is mandated as well under FDA testing protocols.  It's indicative of the pH of the stomach on ingestion of the product with 240 mLs of water as we learned from the testimony.  And it represents the pH of the stomach when Lupin's

product is taken as directed per the label.  And again, the specification says that it's the right pH, too.

So the mean data for all of the tested capsules show infringement both literally and at least under the doctrine of equivalents.  And that's because when taken at steady state as the claims require, the patient gets an average amount of 75 percent immediate release doxycycline while achieving the claimed blood levels.  I will discuss more about doctrine of equivalents a bit later.

As for the *in vivo* data, Dr. Rudnic testified that based on the very narrow absorption window for doxycycline, the *in vitro* test results and additional circumstantial evidence, Lupin's ability to achieve remarkably similar bioequivalence data to a known 30 to 10 product indicates that Lupin's product is also a 30 to 10 product.

Now, this all meshes with yours and your predecessor's Claim Constructions here.  You all construed the terms functionally.  And yes, you even used the words "intend to release".  This was a point of some debate at trial.

The ratio of immediate to delayed is intended.  It's intended to release so as to achieve the claimed blood levels. You heard that from Mr. Avachat.  There was a lot of discussion about intent at trial.  I think the reason it was mentioned is because it is part of the Claim Construction; not because it's associated with any mens rea or culpability.

And I apologize for any inference that that's where we were going with that during the trial. It's really more of a synonym for purposely directed or designed. In this case, I don't think there's any debate that Lupin's ANDA product was purposely designed to release in a way to create the blood levels that are in the claims.

I apologize if I misread the Court. But I thought Your Honor was somewhat dismissive of the bioequivalence data at trial but that's kind of the whole point. The Defendants had to intend or purposely design, let's say, to hit those blood levels by targeting the absorption window with a particular ratio of IR to DR to get the system at exactly the right place. And they did it. They succeeded. They did it in a rather curious way, but they did it.

You asked us to again focus on the patent specification. That's all in the patent specification. Proper ratio equals proper blood levels because of absorption window. And that's, if you go to either patent, it's actually the same cite. Column 8, Lines 9 to 14 or the summary of invention at Column 2, Line 20 to Column 3, Line 3. That's all described and put together in one neat place.

Now, please don't accept Defendants' invitation to error by relying exclusively on the 30-minute time point as a cutoff for the amount of doxycycline that contributes to the IR portion. Now, it is true that in the Sun case, Judge Stark

reviewed release at 30 minutes as relevant to assessing the IR portion, but it's not a strict required cutoff. It's not in the Claim Construction. It's not in the actual construction in your or Judge Stark's constructions in those cases.

The Federal Circuit has been very instructive on this point, and the Court has repeatedly held that claims are not confined to disclose embodiments. The asserted claims in this case can't be confined to how Oracea itself functions.

And although Lupin's ANDA has enough data to show infringement at 30 minutes, there's no 30-minute limitation at all in the claims. There's an immediate release limitation. When the actual Claim Construction is applied, infringement is clear.

It's also important to take into account the 1-hour time point. That's discussed at length in the post-trial briefing. But in short, the experts on both sides agreed that fasted state gastric residence time can extend.

And because the stomach is not an absorptive organ, doxycycline released from the product in the stomach is properly considered immediate release. And in the case of Oracea, that release comes only from the IR pellets.

In the case of Lupin's product, it's coming from both IR and the so-called DR. The 2-hour point is also relevant. And Dr. Rudnic explained that. The gastric conditions can be significantly more harsh than in vitro conditions and it can

accelerate release from an IR portion.

If you are looking at 2 hours in vitro, it can be very similar to a much earlier time in the stomach.  And we point out to the literature, point to the literature that discussed the increased agitation that occurs in the stomach.  He talked about additional buffers and salts that are now accounted for in vitro testing and testified to the relevance of release at the 2-hour point.

And, Your Honor, as I started off this entire closing argument, this is supported by the patent specification.  It tells us that the preferred delayed time for the DR portion is in the range of 2 to 6 hours.  So the 1- and 2-hour time points were contemplated by the inventors as relevant to quantifying the IR portion of the product embodying the claims.

So accordingly, though the 30-minute time point is certainly relevant and it is sufficient here to find infringement, the functional limitations of the claim elements allow consideration of data out to 2 hours certainly.  And that's what we are doing here, and that's why it all works.  That's why it all works.

We look at that data from the ANDA.  And now we look at the bioequivalence data.  And it all holds together just like the specification tells us it should.  When we get 30:10 ratio, we end up with this same release, with this same release causing these blood levels.  It's perfectly consistent in the spec and in

your Claim Construction.

Here is the data.  They can't run from it.  They have pellets that shouldn't release until pH 5.5 or so.  And they are immediately releasing at the biorelevant stomach pH of 4.5.  And that amounts to infringement at the individual capsule level.

Again, what you see and the testimony you heard is that Lupin's ANDA product releases doxycycline within a range that at every time point encompasses a 75 percent release.  And again, the law doesn't require that every capsule infringe.  Even one is enough.

Let's focus in a little more.  30 minutes after these capsules were exposed to pH 4.5.  Sure enough, one of them released about 30 milligrams of doxycycline, capsule 1 there.  Similar data exists at the 1-hour time point after exposure to pH 4.5.

For instance, we know capsule 3 releases 75 percent of doxycycline at some point between 30 minutes and 1 hour and also at the 2-hour mark.  Capsule 8 releases 75 percent of its doxycycline between 1 and 2 hours of exposure to pH 4.5.

And the takeaway here is that it's more likely than not and that's the standard especially in view of the large scale of Lupin manufacturing 230,000 capsules.  Many, many other capsules are behaving in the same way.  Others will release 75 percent of their doxycycline immediately.  That's just math.  If it was even 1 capsule out of 12, we are talking about something like over

19,000 capsules in that batch infringing.

Now, though the direct evidence isn't necessary to prove patent infringement, the data here is to contain that evidence.  Capsule 1 releases 78 percent of its doxycycline at the 30-minute mark.  That's 31 milligrams.  31 milligrams fits within the bounds of the term "about" and how it was construed in the Sun case.

The mean data also supports a finding of direct infringement.  At trial, you heard the testimony from Dr. Rudnic. He pointed out that the average release from Lupin's ANDA product is 75 percent at the end of this test.  So the patients, on average, get 75 percent immediate release.

The in vitro data at pH 4.5 is the most relevant pH to assess infringement of the asserted claims.  As Dr. Rudnic explained at trial and as reported in the Kalantzi article and other literature that was excluded, pH 4.5 is a pH that's present in the stomach in a fasted state immediately upon ingestion of 240 milliliters of water.  And that makes it biorelevant, and that's why it matters.  And that's why the patent says it matters.  And the inventors were aware of this.

In fact, Dr. Rudnic explained how obtaining a pH of 4.5 is simple common sense as well.  Because if you double the volume of a fasted stomach at about pH 2 with normal water -- pH 7 is normal water.  We heard about all sorts of other kinds of water. But I am talking about normal tap water.  These observations are

supported by Kalantzi and suggest that a pH of 4.5 is in the 75th percentile of patients. Again, the inventors knew this. They pointed it out.

With enteric coatings, there should be no substantial release of doxycycline approximately below 4.5. It's right there in the specification.

And the clinical data in Lupin's ANDA were gathered under those same circumstances. 240 mLs. Lupin directed patients to take the product that way.

The testimony of the experts was clear on the importance of the data generated at pH 4.5. Dr. Rudnic explained and I think Dr. Buckton had to concede that drinking water with a pH higher than that of the stomach is going to necessarily raise the pH of the stomach.

When pressed -- I pressed Dr. Buckton. And when he was pressed, he couldn't cite anything, not a single document supporting a pH of 1.1 existing in the fasted state stomach, let alone after administration of water. There was no support there. I submit he was shooting from the hip a little bit.

When we look at the patient blood levels, in Dr. Rudnic's words, they are remarkably similar to the product with a known 30:10 IR/DR composition. In view of the totality of the evidence, this is very telling.

Again, it's the totality of the evidence here. It's not some mysterious theory that Dr. Rudnic came up with where

he's inferring blood levels from ratios.  He's looking at the totality of the evidence, and so are we.  This is not like a Daubert challenge to use of divining rods or invocation of cold fusion or something crazy like that.  This is what experts do.

At trial, Lupin's blood levels in the bioequivalence that they show are particularly relevant, again, due to the absorption constraints presented by doxycycline.  And there was testimony at trial about that.  And even Dr. Buckton admitted that doxycycline, at least, has a preferential area of absorption.  It further shows that Lupin's product must be functioning like a product that has a 30:10 ratio.

Here again, this is just to remind the Court of the evidence at trial.  We see doxycycline's absorption window is quantified.  And there's very little.  And there's a very substantial drop-off in bioavailability after it goes through the duodenum.  It more than halves at that stage.  And as it progresses to the colon, less than 5 percent can be absorbed.

These data are kind of irrefutable in the sense that release has to occur in a very strict window to hit the in vivo blood levels.  It has to be available when it comes out of the stomach.  If it's not, it's not going to work.

Now with that in mind, the evidence also showed that the design of Lupin's ANDA product contributed to its function. It's not -- this is not critical evidence, by the way.  This mechanism stuff.

We found it very interesting and circumstantial to try to find a reason why we are getting these blood levels. Why we are getting the blood levels. Why we are getting the release at 4.5. Can we explain it? We thought that might be persuasive, but it's not critical.

All that matters is what the data actually says. It doesn't matter how you get the data. If you get the data and you submit it to the FDA, that's what counts under the law. Nonetheless, we talked about methylene chloride, this like-on-unlike layering. The fact that the layers weren't adhered to each other. That's like putting latex paint on a wax wall was the expression Dr. Rudnic used. And we think that contributes to this leakiness in the product in the variability in the product.

And we also talked about this percent weight gain issue. The fact that they went to 18 percent which -- and they looked at this at a 1 percent level and said, oh, 17 starts to leak at 1.1, so we can't use that. And use the very lowest amount that they could possibly use.

I think there was some explanation that they didn't want to use any more Eudragit than they had to, but I don't think that makes much sense honestly. They got the lowest weight gain they could possibly use without a detectible leakage at 1.1. But, of course, that doesn't tell us what's going to happen at 4.5.

Again, I am not going to go back to this in any detail. Your Honor heard the testimony about methylene chloride. It's a potentially toxic chemical. There's no particular reason to use it. And instead, they used it twice in their process. Layered it on with and without water. That's just not done in the US these days.

And we also heard that on the other hand Oracea uses a like-on-like purely aqueous solvent system without any added risk for cost. And Dr. Rudnic went through the SEM images where there was a flush and continuous surface in the Oracea product. There were cross-sections that appeared otherwise in the Lupin product.

So Dr. Rudnic also testified about Lupin's choice to apply a minimal amount of Eudragit to create a thin and weak enteric coat across the DR portion. And as he told us, the percent weight gain at the enteric coat stage is an average measure.

And that being the case, it's common sense that not every pellet is going to receive the exact same weight gain during manufacturing. Some pellets will necessarily fall above or below. The exact nature and shape of the distribution is not critical. Doesn't matter. There is one. There's some distribution that directly affects the data.

Your Honor did ask a very interesting question that I don't think I can answer which is, okay, well, if these pellets are coated over some kind of distribution, why are we seeing

variation at the capsule level.  That's an incredibly good question.  I don't think there was any testimony at trial that actually addressed that in any way.

I could speculate, but I don't think it helps the Court.  I speculate that there could be waves in the manufacturing process such that certain pellets are ending up in certain capsules.

Much like we see on Forensic Files or something when they look at the way garbage bags are manufactured and there's a certain crease for 1,000 units and another crease for the next 1,000 units.  But I don't think it matters.  But it was an excellent question, and it had me scratching my head.

You also heard that Dr. Rudnic has commercialized 6 drug products with a delayed release portion all using Eudragit.  And at minimum, each one of those products had 32 percent weight gain or more to function properly.  And he testified to his surprise that Lupin had used an 18 percent weight gain which is really well outside the preferable range.

And Dr. Rudnic also testified that 18 percent weight gain was about the lowest percent weight gain that showed no leakage at the pH 1.1 test.  And you did ask near the close of evidence or during his testimony, I can't recall which, how he could be certain about that point.  And I think he explained.

He said that it was based on the in vitro dissolution test at pH 1.1 and assessing a developmental batch and a scale-up

batch that closely resembled Lupin's final ANDA product and evaluating the impact of additional 1 percent weight gains.  And that's how he was able to determine that this was the lowest that they could use without some leakage.

He went on to explain that in contrast to Lupin's product, Oracea uses this 30 percent weight gain on average.  I think the evidence has shown that that lighter, thinly-applied coating has resulted in the consistent immediate release of doxycycline for a subset of Lupin's so-called DR pellets.  And how it gets there exactly, I can't say.  It may be a little bit of a black box based on the evidence, but we know it happens. The data doesn't lie.

Now, Lupin's defenses to our affirmative case are all unsubstantiated and I think they fail as a matter of law.  First they rely on the in vitro dissolution data that's cherry-picked and kind of self-serving.  And they ignore the pH 4.5 data that was contemporaneously submitted claiming this imaginary hotspot. And third, their litigation-inspired batch is legally irrelevant.

So as an initial matter, pH 1.1 is not a relevant pH that exists in the stomach on or after ingestion of the product. And that tells us that pH 1.1 is not a biorelevant pH.

As Dr. Rudnic testified, 1.1 doesn't really exist in the stomach.  It's the pH of the concentrated acid that's secreted by the cells in your stomach which mixes with the rest of the gastric fluid.

And he told us that it's typical in the empty stomach to have a pH range of 2.2 to 5 at the highest.  And Dr. Buckton, when pressed, couldn't cite anything to the existence of pH 1.1 with water in the stomach.

As identified by the Court and confirmed by Dr. Rudnic, an in vitro test at pH 1.1 doesn't at all answer the question of whether this particular enteric-coated product infringes.  It doesn't account for the full range of pHs that the capsule is going to be exposed to.

Despite what Lupin says, just because the test at pH 1 are disclosed in the patent does not mean they are dispositive.  The law says that patent claims are not limited to examples or tests that are set forth in the patent.  It's just basic patent law.

The claims control.  Court's construction of those claims control.  And that's just not in there.  There's no pH number in the Claim Construction.  There's not even an in vitro test in the Claim Construction.  This is not part of the claim limitation.  It's evidence.

Now let's take a brief look at this imagined hotspot theory, Your Honor.  The hotspot, I submit, in all seriousness, is like Big Foot or the Loch Ness Monster.  It doesn't exist.  If it did, the FDA wouldn't ask for 1.1 to 4.5 pH test at all or at least they would have issued guidance on this.

And the literature would be rife with references to it.

It would be all over the place.  The Miller paper was clear that hotspots are not generated when the buffer media is added rapidly; in other words, when a buffer media is added within 5 minutes which is the standard in Miller.

Ms. Gray conceded it only took a total of 5 minutes to fill the 12 vessels that Lupin tested in its multimedia dissolution study.  And Ms. Gray conceded -- she conceded this because and she testified Lupin used USP Method A to carry out its dissolution test.  And such a rapid buffer is required using Method A whether by 1 technician or 12 technicians.  It has to be done that quickly.  And it's definitive, Your Honor, that the hotspot theory isn't real.  It didn't affect Lupin's test.  And all the surrounding data would support that conclusion.

Start with the remainder of the data in Lupin's multimedia dissolution study.  Despite Lupin's claims that the hotspot theory impacted their product, they provide no explanation for why it didn't affect Oracea at all.  No explanation.

You heard the testimony at trial regarding the mean data from Lupin's bioequivalence studies.  When we look at certain of the individual data, you can see that a number of subjects actually had a higher C-Max that peaked at an earlier time point when taking Lupin's ANDA product.

And Dr. Rudnic testified at trial that C-Max represents the release of the dosage form in the rate of the drug

absorption.  I want to emphasize that.  Release of the dosage form.

Therefore, as between Lupin's ANDA product and Oracea, a person of skill would expect that Oracea which according to Lupin contains a larger IR portion would have a higher C-Max value and that it would achieve it faster.  And that's not the case at all here.

In fact, the data is quite similar to what we see in the in vitro data just discussed.  Lupin's ANDA product in some cases functions to release more quickly than Oracea.

Here are some additional examples of the individual response data.  Again, we see that in a number of patients administered Lupin's ANDA product and countered to Lupin's label claims, there's a faster release compared to Oracea.  Your Honor, there are no hotspots in the body.  I think that tells us what we need to know.

Lastly, Ms. Gray and Dr. Buckton's testimony also support that the hotspot theory is made up.  If this theory truly existed, there would be tons of literature about it, not just one article and one brief uncited mentioned in one handbook.

Ms. Gray is the expert on this, and she wasn't aware of any literature except for the Miller paper and the handbook that referenced it at all.

Miller says it doesn't exist when you do it the way Lupin did.  Both Lupin's experts agreed with me that Lupin did

not attempt to rerun their multimedia dissolution study test when they got the results that were supposedly tainted by this hotspot theory.  Instead, they submitted the data to the FDA without any qualifications whatsoever.  That wouldn't have occurred if Lupin had believed the data was faulty because of analytical procedures or hotspots or something else.

Now, as for Lupin's litigation-inspired batch, you can put aside the Sunovion case or the other cases that make it clear that the Court shouldn't rely on the post-ANDA litigation tests that were submitted, that the ANDA data itself controls.

These contradictory tests come from a batch of product that was generated at a completely different facility, completely different scale with different machines.  Largely unknown conditions.  There's no evidence on this at trial that this was the same.  And admittedly never submitted to FDA.

And they should be viewed as being of unknown provenance and highly suspicious.  They don't control.  They were produced after the close of discovery.  We didn't even have fact discovery on this, and they are relying on this to save their case.  No.  They are stuck with the data they submitted to the FDA.

As Dr. Rudnic explained, these products are not just simply the same.  And this is highlighted by the fact that they are produced under these different conditions.  And when they were testing them under the same conditions at pH 4.5, they

behaved differently.  That tells you everything.  The ANDA tests control.  They show infringement under the caselaw.

The Court stated in the Glaxo Novopharm case, the product that will be sold on the market, the ANDA commercial batch controls whether infringement exists.

Now, Lupin cites to the Merck versus Amneal case in their responsive post-trial brief to justify its reliance on the samples that are outside the ANDA litigation-inspired batch.  But that case is completely distinguishable.

In that case, Amneal had submitted its samples to the FDA and had represented to the FDA that its samples were representative.  And no such representation or submission was made here.  Lupin didn't submit its new samples or data to the FDA.  Merck is just not on point.

Moving on just briefly to the doctrine of equivalents. Lupin's ANDA product also infringes under the doctrine of equivalents because it's at least equivalent to a composition with an IR portion of about 30 milligrams of doxycycline and a DR portion of about 10 milligrams of doxycycline.  Whether the Court considers that under the insubstantial differences test or the function way result test.  And there was evidence on both.

In this case, Lupin's ANDA product is indicated as a once-daily, chronic medication that's meant to achieve and maintain certain steady state blood levels.  Both steady state and once-daily are elements of the asserted claims.  And that's

important.

As a representation of how Lupin's ANDA product behaves under these conditions, we can look to the mean data. And the mean data show what a multiday dosing regimen would look like if you took a standard representative sample of these products and how Lupin's product would behave over time.

And at the very least, we certainly know that a patient dosed with the representative ANDA commercial batch would get an average of 75 percent IR if they took 12 tablets.

The mean data at pH 4.5 show that when administered consistent with the label once-daily with adequate amounts of water, Lupin's ANDA product will result in an IR and DR portion that are equivalent. And as Your Honor can see, the mean data of pH 4.5 shows a 71 percent release at the 1-hour mark and a 75 percent release at the 2-hour mark.

And those data are representative, Your Honor, of what the release profile will look like for any given patient after taking 12 individual capsules which, when administered once daily as instructed, would represent approximately 2 weeks or one capsule per day for a 12-day period. They are going to get a mean release of IR of 75 percent over that period. That's equivalence for a steady state drug for a chronically administered drug.

And as I mentioned earlier, based on Dr. Rudnic's testimony, gastric residence time and the harsh nature of the in

vivo conditions in the stomach also warrant the consideration of these 1- and 2-hour time points.  And this patent tells us that's okay, too.

And here again is the mean data from Lupin's in vitro testing.  And applied on a graph, this is just another representation of the data being discussed at the 2-hour mark. And you will see that Lupin's product releases that mean amount of exactly 75 percent or 30 milligrams at that 1-hour mark.  71 or 28 milligrams at the 1-hour mark.  And that's no coincidence.

If Lupin's ANDA product infringes the asserted claims either literally or under the doctrine of equivalents, then the indication provided in Lupin's label leaves no doubt that the Chang patents method of treatment claims are also infringed.  And that's because if you take the product as directed by the proposed label, one would infringe.

It doesn't matter if the label says 22:18.  What matters is, if a patient actually takes the drug as directed, would they infringe that method claim.  And the answer is, it follows logically, if the capsules infringe, the method of treatment infringes.  That's implicit in the caselaw like Eli Lilly.

There are some variations in the caselaw when we look at non-pharmaceutical products without labels.  And I suggest that those are all distinguishable cases compared to Eli Lilly and AstraZeneca and the cases that we have cited.  This logically

follows as a matter of law.

That's the case here.  The label says the capsule should be indicated for this condition.  They are used for this condition.  Doctors and patients are going to take them for this condition.  If they do, they infringe.

So in summary, Your Honor, we believe, we submit that the evidence conclusively shows that Lupin infringes each of the asserted claims and that the law on this point is very strong and compels such a finding.

Your Honor, we included two additional slides which I think I have touched on most of the points which attempt to address some of the questions that Your Honor asked at the closing.  And we just leave those in there for Your Honor's review and convenience.  I am very happy to address any questions if the Court has any.

THE COURT:  No.  Mr. Rakoczy?

MR. RAKOCZY:  William Rakoczy for Lupin Defendants. May I proceed, Your Honor?

THE COURT:  Yes.  Please.

MR. RAKOCZY:  Your Honor, I don't think we have yet to hear answers to the Court's questions posed after trial, either the questions to Lupin or the questions to Galderma.  So what I'd like to do is make a very brief statement on our affirmative case which I think is simple and straight-forward.

I would then like to skip to the centerpiece of their

case, that multimedia study we have heard so much about.  I don't know if I will mention the methylene chloride or the blood levels sideshow, but I may mention that.  But if I have time, I will go back to some of Your Honor's questions which we structured our brief and our slides around.

Your Honor, our case, as I said, I think, during openings, it's very simple and straight-forward.  We rigorously applied the Court's constructions of IR portion and DR portion.  We have used the test from the patent which happens to be the industry standard test for determining IR which is the pH 1.1 test.  That's the test from the FDA, from the USP.  That's what's used in Oracea.  That's what's in the patent.  That's what's in their 516 design patent from Galderma.

It's astonishing to see a patentee running away from not just a test in their patent but the industry standard test. And I told you in opening there would be no genuine dispute that using that test, Lupin does not infringe because its product functions at 22:18.

After hearing all the evidence, there was still no dispute to that evidence.  Dozens and dozens of in vitro tests both by Lupin and an independent laboratory show the product functions at 22:18.

Now, a comment on this idea of testing.  I am not sure if I have ever seen so much ink spilled in a brief arguing that they don't have an obligation to test anything.  Usually the

patentee is dying to test.  You give them samples.  They can't test enough and they want more.  Here not a single test.

We gave them hundreds of exhibit batch capsules before they expired.  They let them expire without testing.  At least, they never disclosed any testing.  They then asked us for more.  Lupin goes out of its way to make more to make the rebuttal batch.  They go through great expense and time to do it.  And they don't test those, at least nothing they want to show us or disclose to the Court.

We made those at their request.  We made those to rebut their theory.  Now, in a vacuum, if there's some law that says they have to test, Your Honor, under the facts of this case, we suggest they do.  It's their burden to show through credible and reliable evidence that we infringed.

I submit that if you are going to make the centerpiece of your entire case a method using the second-stage at 150 minutes, 180 minutes, and 240 minutes to prove IR, a method their own expert admits has never been used by anyone outside this case that he knows of.  It's not in the literature.  It's not in the patent.

Dr. Rudnic himself said the error rate is incalculable is what he called it.  If you are going to use that kind of method to try to prove infringement, then yes, you need to test.  And we gave them plenty of capsules.  Thousands of beads to test.  And they tested none of them.

Now, this is the patent figure 3 test, and there's no dispute that we don't infringe under that test no matter how you parse this data.

Mr. Jaros, can we go to Slide 16, please?  Let's get this multimedia issue out of the way because this actually will address many of Your Honor's questions.  And I will go back and answer a few of those.  But this is the centerpiece of their entire case.

And again, Number 1, Your Honor, the skilled person would not use this method, whatever it is, to test for immediate release.  Again, Dr. Rudnic on cross-examination admitted this method is pH 1.1 for 2 hours followed by a second-stage of pH 4.5 after throwing in pH 11.  So it's really 3 pHs in the method.  Then he relies on 150 minutes, 180, and 240.

That's not in peer-reviewed literature.  He admitted it.  It's not in the patent obviously.  No one ever used it to his knowledge.  And the error rate is incalculable.  A skilled person would not use that.

Number 2, as Dr. Buckton testified and Ms. Gray testified, the skilled person for IR, they would use the industry standard.  There's no dispute that it's pH 1.1.  Why?  Because as all the experts agreed, pH 1.1 mimics the acidity in the stomach.  Even Dr. Rudnic admitted that on cross-examination.

It's also a stress test for the DR beads.  That's the test the skilled person would use.  It's not as if we are just

picking a patent test that's way out there in the ether.  That's the industry standard test.

One would think that a pH 4.5 -- and I will get to that more in a moment -- or somehow the standard for IR, there would be literature on it.  It would be in a patent somewhere.  It's not because pH 1.1 is the standard.

Number 3, Your Honor, there are no reliable conclusions to be drawn from this data in light of its variability and the anomalies in the data.  As you heard Ms. Gray testify, the relative standard deviations for the Lupin product are 18 to 22 percent.  That's well above the 10 percent threshold that FDA says it has to be to rely on it for anything.

The anomalies in the Oracea data.  You heard about Oracea.  Well, Oracea didn't perform the same.  You can't draw any conclusions from this.  Oracea at 150 minutes, it actually went down 7 percent.  That's not even possible.

So the anomalies in the variability of this data mean two things.  Dr. Rudnic either he could have disregarded it or he could have tested it.  He could have actually tested what it looks like actually at pH 4.5.

Point 4, pH 4.5.  That is not a biorelevant pH.  As Dr. Buckton testified, the relevant pH is of the fasted stomach is 1 to 2.  That's what the literature says.  The Dressman publication says it's a range of 1.4, the two, a meeting of 1.7.  Even the Kalantzi article that Dr. Rudnic relied upon and you saw

on the screen said the generally-accepted fasted pH is 1.7. That's the general pH, not 4.5.

On top of that, this whole glass of water theory in the 4.5, even the Kalantzi authors recognized the incredible variability in their data.  They were sticking nasogastric tubes down people's noses, into their stomach, feeding water in and then taking samples back out.  They were getting a range between 1 to above 7.

Dr. Rudnic doesn't want to rely on the 1.  Obviously that's no good for him.  And he doesn't like the 7 because everything is immediate release in 7.  So he picks 4.5.  That's not a proper conclusion to draw from the variability in that data.

As Dr. Buckton said, it's pH 1 to 7.  We can set that all aside because as Dr. Buckton testified, unrebutted I might add, when you take a capsule, the body is very good with water.  Excuse me.  Is very good at reestablishing its equilibrium.

As he testified, when that capsule with the water gets down to the stomach, by the time the temperature is high enough to dissolve that gelatin capsule and that has to be above 30 C, the stomach would have reestablished its general pH of between 1 and 2.  So those beads are never going to see 4.5 in the stomach. That's not the proper pH to use for an immediate release test anyhow.

Point 5, Your Honor, the false premise that their

entire case is based on using this data and that is that somehow this test is -- I am going to use air quotes -- at pH 4.5 and that 150 minutes is 30 minutes.

As Dr. Buckton testified, I believe Ms. Gray as well, this test is not at pH 4.5.  There's no dispute that these capsules were first hydrated, stressed, vortex for 2 hours at pH 1.1, the industry standard.  Then the paddles were stopped.  At that point, pH 11 was dumped in exposing these beads and damaging the coating after which then the paddles were started back up.

As Dr. Buckton testified, this is not at 4.5.  And 150 minutes is not the same thing as 30 minutes.  As Dr. Buckton and Ms. Gray testified, if you really wanted to know what happened to these beads and these capsules at pH 4.5, they recommended test them in 4.5.  Take both products.  Take Oracea.  Take the Lupin product.  Put it in 4.5 and see what happens.  We did that.  They did not.

We tested both products.  And when we did, actually in 4.5, all of the variability, all of the anomalies resolved. Neither product had DR beads that released at all in 4.5.  None. No rebuttal to that other than just taking shots at the rebuttal batch.

You know what, Your Honor?  If they had a problem with the bona fide of the rebuttal batch, they could have tested it. They could have done comparison testing.  They could have imaged those beads, cross-sectioned them, tested them.  They did nothing

with them.  Instead, we get innuendo.  It's a "special batch".  That's borderline insulting to Lupin.  That's somehow, in my view, suggesting that somehow that batch was rigged.

Your Honor, they went through great expense to make that rebuttal batch to disprove this theory.  If they had a problem with that batch, they could have tested it and determined whether it's the same or not.

Mr. Avachat testified it is.  His testimony is unrebutted.  It was made the same.  Same stages.  Same coating.  Same ingredients.  And the process parameters were scaled up and scaled down within the range.  It's not as if Lupin just made a 230,000 capsule batch out of thin air.

They started with small development batches.  Moved their way up to development batches.  Pilot scale.  Then to the big batch, the exhibit batch.  All they did with this one was use the scale-up and scale-down factors they already had.

There's no evidence in this case that there's any difference between that rebuttal batch and the exhibit batches.  And, in fact, under FDA guidance, Lupin actually tested, tested it because under FDA guidance when you make a new batch and you change anything, you have to test it at pH 1 to see if it performs the same.

Lupin did that, and that rebuttal batch performed exactly the same as the exhibit batches, 55 percent.  22:18.  We had that redone by an independent laboratory 22:18.  We obviously

had it redone in 4.5.  55 percent for the rebuttal batch which is the same release at pH 1.1 for the exhibit batch.  There's no evidence that's any different.  If they wanted to prove otherwise, they had to prove it.  They should have tested it.

Now having said that, Your Honor, if we ignore everything I just said and jump into this data and try to draw conclusions like Dr. Rudnic did, let's look at his three theories.

The first theory I will call the 5 out of 12 theory. Got a lot of play before trial and the facts.  We didn't really hear about it at trial.  It was resurrected in a footnote in their post-trial response brief.  And that's focusing on those 5 capsules in yellow at 240.  And they say, well, 5 of 12.  That's like 42 percent.  42 percent of 18 is 8.  So it seems like that's infringement.

Look what they are relying on, Your Honor.  They are relying on 5 capsules at 240 minutes.  They are all non-infringing.  Those capsules under their theory are releasing everything.  Those are all immediate release.  Those are non-infringing capsules.  That theory at trial then morphed into what I call the 75 percent mean theory which is look at the 240 line, go all the way over and see the 75 percent mean.

As Dr. Buckton testified, you can't rely on that mean. That's a bimodal distribution.  Let's look at what that is doing. You don't have to be a statistics expert to see what's going on.

Dr. Buckton testified you have 5 capsules releasing virtually everything.  You have 7 releasing very little.

Clearly two distributions or groups bimodal.  And in a bimodal distribution, you don't take the mean and say that's reflective of the whole group or data set.  This is the textbook example of why you don't do that because we can see all the individuals, and they are all non-infringing.  All the 90s are non-infringing.  The other 7 are all non-infringing.

You don't take the average of two groups of non-infringing capsules, put them together to make an infringing one.  So that theory is flawed as well.  Again, even if we ignore all the flaws in using this data at all.

The last theory, Your Honor, and this is their newest one.  This is their gotcha theory.  The lone capsule.  This got a lot of play in the briefs.  Not so much play at trial.  Now they look at the 150, capsule 1.  And they say gotcha.  We got one infringing capsule.

And amazingly, I heard it today.  But in the brief now they then do some math.  Little Jiu-Jitsu.  1 out of 12.  They multiply that through the exhibit batch and they say now there are 19,000 infringing capsules according to their argument.  There's zero evidence of that, Your Honor.

Number one, Dr. Rudnic himself admitted you don't take one capsule as representative of the entire batch.  In another case, he said something like, call me old fashioned, but one

tablet is not representative of a quarter million.  I couldn't have said it better myself.

On top of that, this is a dissolution test.  Even Dr. Rudnic said you don't use one capsule.  That's why you do a minimum 6 and better you do 12 because of the variability in the test.  You don't do one capsule and say Aha, this is the proper result.  And that's even if you can throw out everything I said about the unreliability of this data and the fact that no skilled person would ever use this test to measure immediate release.

And on top of that, let's remember what they are saying.  19,000 exhibit batch capsules allegedly infringing.  We gave them all those capsules.  We gave them 360 of those very capsules before they expired during fact discovery.  They could have tested them.  And if this is correct, then they should have found, if I do my math, maybe 30, maybe more in there.

We gave them the exact capsule he is talking about now.  They did nothing with it.  Or if they did, they don't want to disclose it.  I personally think they did test it and they found that it's non-infringement.  That's why we didn't hear about it.  But they could have tested that theory, and they didn't.

So when you wrap it up, Your Honor, I submit this is not what the skilled person would do.  The skilled person wants to know what's immediate release.  They are going to do the industry standard test, the same test in their patent.

I apologize.  I said I would get to the other questions

in here.  One other thing.  The blood level.  I didn't think we would hear about it again, frankly.  I really didn't.  It got some play at trial.  Wasn't getting as much play.  There's a problem with that theory.

The first one is a reliability problem.  Even Dr. Rudnic admitted that he would never infer composition ratios from blood level data alone.  Number two, for good reason, because again he admitted he didn't dispute that there's no peer-reviewed literature using blood level data to infer composition ratios.

Obviously the patent doesn't do that.  He's never done it outside this case.  He's not aware of anyone else doing it.  And he couldn't possibly calculate an error rate for that.  And for good reason.  Why?

When Dr. Buckton plotted that blood level data, not just looking at 96 hours and the bioequivalence goal posts.  Because remember, what's a bioequivalence test doing?  As Dr. Buckton said, it's taking the area under the curve and the C-Max and seeing does the test product hit those 80 to 125 percent goal posts.  You are not aiming for a goal post.  You are seeing, can you get it through.  That's all it is doing.

When he replotted that data during the absorption phase like through 4 hours, 8 hours, Dr. Rudnic had no idea that that data between Lupin and Oracea was substantially identical.  He had no idea.  But more importantly, he doesn't know what the

blood levels look like for a 22:18 product.  He admitted he doesn't know.  If he doesn't know what the blood level data looks like for 22:18, how in the world can he say Lupin is not 22:18. He has no basis to say that.

Last point on blood levels.  We have been beating this horse for a while.  I realize.  The 30:10.  The idea or the notion we have heard that you must be 30:10 to be bioequivalent. The evidence shows that's not accurate.

We know from their own 516 patent that ratios of 32 to 4 and 32 to 6 were both bioequivalent to Oracea.  Those are not even 40 milligram products that are bioequivalent.  Those ratios are not even close to 30:10, and they are still bioequivalent. So Dr. Rudnic has no basis to infer anything from that blood level data.

With that, Your Honor, I can run through some of these fairly quickly.  This is the Court's Question 1.  How should the Court evaluate Lupin's 18 percent coating?  I covered this already, Your Honor.  Use the industry standard test.  The same test in the patent.  The pH 1.1 which is designed to mimic the stomach.

Question Number 2.  The Court asked about the intersection of Lupin's 18 percent coating weight with the IR portion.  Again, there's no evidence of intersection, Your Honor. Lupin's 18 percent coating does not release in a fasted stomach under any test performed.  Not at the pH 1.1 and not actually in

pH 4.5.  And again, I will beat this testing horse again.  If Galderma really thought these capsules and beads failed at 4.5, they had plenty of beads to test and show us.

The Court's Question Number 3.  Can the Court rule out Galderma's incomplete coating theory even if Lupin's rebuttal testing is considered irrelevant?  Obviously we believe the rebuttal testing is relevant.  But even if it weren't, Your Honor, the answer is clearly yes.

As I just mentioned, the incomplete coating theory is based on irrelevant second-stage results.  Second-stage time points that a skilled person would never rely on.  If, in fact, they thought there were two kinds of beads, fatally flawed and fully functional, they would have disclosed testing, cross-sectioned images.

By the way, we did that.  And I apologize.  We did take images of the beads, Oracea and Lupin.  We cross-sectioned them.  Dr. Buckton looked.  He analyzed these.  Found this coating was perfectly good.  Found no problems.  No non-adherence problems.  They did none of this.  They had theories.  They did none of this.

Now, this incomplete coating theory or what I like to also call the methylene chloride sideshow, Your Honor.  The evidence at trial was the FDA approved and permitted the use of methylene chloride.  They have allowed it in plenty of other products.

As Mr. Avachat testified, he used it in plenty of other products, FDA approved and commercialized. They have tight controls and limits. Lupin's product is well below the allowable limits, even at a limit of detection of 90. No methylene chloride is detected in the Lupin product. There's no problems using methylene chloride.

As Dr. Buckton and Mr. Avachat also testified, methylene chloride is a good solvent. It has some really good qualities as a solvent. Highly volatile. Easily evaporates and dries off. It has high surface tension. Great for spraying. It's low polarity so it doesn't dissolve drugs like doxycycline. So doxycycline won't leak into different coats. It's a great solvent.

And as Mr. Avachat testified, he used it, including at 15 to 20 percent thickness, in other products. Dr. Buckton saw no problem with it as well. Matter of fact, he actually analyzed SEM images in cross-sectioning, something that Dr. Rudnic and Galderma never did. And he found no problems with that coating. None whatsoever.

What we did get -- and I was surprised to see it in closing again -- we got the bell curve cartoon. I didn't see the exploding bead cartoon like I did at trial, but we saw a lot of the bell curve. I don't know why they keep showing this. That bell curve is Exhibit A for their lack of testing and the story of their whole case.

Think about it this way, Your Honor.  They had unexpired capsules and beads from the exhibit batch.  Then they got capsules and beads from the rebuttal batch.  If they wanted to create a bell curve, it would have been very easy to do.

They could have taken 100 of those beads.  500.  Even 1,000.  Cross-sectioned them, imaged them, and tested them and figured out is there, in fact, a distribution.  And, if so, what is it.  But they didn't.  It's as if they were purposely putting blinders on not to try to fill in the data on this bell curve.

But even today, that bell curve remains a cartoon. They have no evidence of any distribution of those beads.  The only evidence is that 18 percent coating for Mr. Avachat and Mr. Buckton is a good coating and that it holds up in all of the testing performed at pH 1.1 and at pH 4.5.

Question 4.  Is it possible that the quality or weight of the coating changed between exhibit batches and the rebuttal batch.  Again, the answer is no, Your Honor.  No evidence of that.  I mentioned a little of this already.

As Mr. Avachat testified, same process, same ingredients.  Same 18 percent enteric coating.  And again, it was tested as FDA requires and the results were the same between the batches, 55 percent release.  And as Mr. Avachat testified, again unrebutted, all they did was use the scale-up and the scale-down factors to make an equivalent batch.  That's what he testified to and that is unrebutted.

Dr. Rudnic had nothing to say about that.  And again, if he questions the bona fide of that batch, he could have tested it.  Any number of tests he could have done to see is it a bona fide batch; is it the same.  Mr. Avachat's testimony is the only testimony we have.  Same process.  Equivalent parameters.  He has no reason to believe those batches are different.

Question 5.  If the Court finds the hotspot explanation unproven, the Court asked is it still possible to rule Lupin's product will not infringe.  And again, I have already gone through all of this so I will not belabor it again.  So obviously the answer is yes.

Question 6.  Is there any evidence of the pellets being exposed to pH 11 in vivo?  That answer is simple.  No, there's no evidence of pH 11 in vivo.

Question 7.  The Court asked how should the Court address the variability observed in the second-stage results.  I have addressed this very quickly as well.  Two ways.  Number one, you don't need to address it because no one would use that test.  No skilled person would.

And second, Dr. Rudnic, as I mentioned, had two choices given the variability in the Lupin product and Oracea.  He could have disregarded it or he could have investigated it and tested it.  He did neither.  What he shouldn't have done is put blinders on and just rely on it lock, stock, and two smoking barrels.

A quick point on the hotspot.  Unbelievably, Dr. Rudnic

said it's a ghost.  Not scientific.  Never been proven.  And I think I heard it again, and I don't have the slides in front of me.  But I think I heard that hotspots don't exist.  This is from the Miller publication that Dr. Rudnic relies on.

He actually draws pictures or takes pictures for us in figures 11 and 6 that show a sustained hotspot even at 5 minutes with the paddles spinning.  He then concludes it was demonstrated "a large and sustained hotspot was generated by gradual addition of the buffer medium down the paddle shaft".  That doesn't sound like a ghost.  That doesn't sound like it's not proven.

Miller agrees that hotspots exist.  His study was about how to avoid them.  He was trying to figure out, what do I do to avoid hotspots.  He agrees they exist.  And as Ms. Gray testified in the Lupin method, the paddles are not spinning.  When the paddles aren't spinning, you are more likely to have hotspots.

Easy analogy is coffee.  You put cream in the coffee.  Do nothing to it.  The cream sits there.  It slowly sinks.  Nothing is happening to it.  If you stir it, obviously it will get less concentrated until it gets completely dissolved and stirred in.

This hotspot phenomenon is real, according to their own evidence.  And it's the most logical explanation for what's happening here because there's no dispute from Ms. Gray and Mr. Avachat that that method I mentioned, 2 hours of pH 1.1, then pH 11 which can damage the coating, then pH 4.5.

Question 8 from the Court was what inference to draw from the Oracea data.  I won't belabor this, Your Honor, given the anomalies in that data.  Absolutely none.  Again, I don't think we can reliably say anything about it when at 150 minutes Oracea was going down 7 percent every single capsule.

Clearly there was something wrong going on with that test and in that method.  And you can't draw conclusions from that.  What it should have done was prompted Dr. Rudnic to test it, to investigate it.

When we did, we took the Oracea and the Lupin product, put it in 4.5, all of the variability, all of those anomalies resolved.  And none of the DR beads released in 4.5.  No leakage whatsoever.  And that's the ARL testing.  Again from both Oracea and Lupin.  55 percent and 73 percent.  No DR leakage at 4.5.

Question 9.  For the purpose of evaluating the doctrine of equivalents, could an 18 percent coating be considered equivalent to no coating at all?  Your Honor, in theory, 18 percent enteric coat could be equivalent if it immediately released everything, but then that would be non-infringing.  You would be talking about a completely immediate release capsule. But here every test at 30 minutes pH 1.1 even the legally irrelevant pH 4.5 showed no DR release.

Question 10.  The Court asked, is there evidence how long the hotspots persist with and without paddles running. Miller tells us up to 5.5 minutes with the paddles running.  And

Ms. Gray testified it could be 5 minutes even with the paddles not running.  But they are real.  They are not ghosts.

Your Honor, unless you have any questions, I don't have any more.  Our slides are structured to answer all of the questions like our brief.  Lupin's questions and Galderma's questions.  I'd like to end with just a couple quick points.

One is this policy argument we see now in Galderma's briefing.  Now, I don't believe there's any place for a policy discussion at a trial or after a trial.  Now is the time for proofs.  You either proved your case or you didn't.  We submit they didn't prove it.

But the suggestion that somehow it's bad policy because Lupin went to the time and trouble of making a rebuttal batch that they asked for, that's not bad policy.  That's good litigation.  The bad policy, if we want to talk about policy, is a patent owner that doesn't want to run the test in its own patent, that doesn't want to run the industry standard test.

What is the policy implication of that?  That's destroying the public notice function of this patent.  Skilled persons are supposed to know not just what the claims say.  They are supposed to know how to test it, make it, and figure out what are the bounds.  Can you design around?

The bad policy is Galderma saying don't run that patent test and don't run the industry standard test.  Run a test using pH 4.5 not found anywhere.  They are saying that's what the

skilled person is supposed to take from this?  That's the bad policy, Your Honor.

The policy should be, we should be entitled to run the test in their patent, the industry standard test.  And there is no genuine dispute running that test we do not infringe.  It is a 22:18 product.  It is not even close to 30:10 either literally or under any reasonable scope of equivalence.  We submit a judgment of non-infringement should be entered for Lupin.  Thank you, Judge.

THE COURT:  Wonderful.  Is there anything else?

MR. FLATTMANN:  Just briefly, Your Honor.

THE COURT:  Please.

MR. FLATTMANN:  They ran the test.  Not us.  And they submitted it to the FDA.  And we relied on it.  And the law says that that is perfectly fine.  We have data that they gave to the FDA, and now they want to say that either their product was defective or the test was defective.  But the fact remains they gave it to the FDA and put it in their submission.

They never told the FDA there was anything wrong with it.  And they want us to test and prove and show whether or not their test that they submitted to the FDA was valid.  That's not the law.  We have cited the Bristol Myers case, C.R. Bard case.  All standing for the fact that if the evidence is there and you submitted it to the FDA, the Plaintiff is allowed to rely on it.  That's what we are doing here.

And as far as the 4.5 being somehow foreign to the patent, I think we disproved that.  It's right in the patent.  It says you can test at 1.1.  You can test at 4.5 to look at DR.  It's right there, Your Honor.  And they don't address that at all.  That it's right smack in the middle of the patent.

So yes, we are entitled to rely on that.  We didn't need to conduct any other test.  And the law says that we don't have to to meet our burden.  We meet our burden with their data.  Thanks.

THE COURT:  Wonderful.  I want to thank you all.  I think this case has been very well litigated, and I commend both sides both for the amount of preparation and diligence you have put in.  I shouldn't say both.  Multiple.  Preparation of diligence.  There's the keen analysis and there's also a very professional cooperation between both sides.  I think you served your clients admirably.  This case is not being lost based on any kind of anything that should have been done differently on that.

I also think it is very much to your credit that both sides, after quite reasonably exploring a bunch of issues, have ultimately converged on what the heart of the case is.  The whole calc speckling has fallen away.  The methylene Eudragit, the layering, it's a sideshow.

And I think that Plaintiff is quite right that intended in the patent can be understood as purposely designed.  So that yeah, it has to be a design choice but ultimately we are asking

what is the design that results in this.  This is not a subjective mens rea analysis.  And that's quite appropriate for the way I ultimately have to analyze this.

So it really comes down to what do I credit and what do I infer.  Now the parties presented starkly different evidence, and I do think stomach acid is pH 1.1.  Now pills are taken with water, and we are talking ordinary tap water pH 7.

If someone follows the FDA to the letter and drinks 240 milliliters, okay, then for a few minutes you get something that's halfway in between.  I also know, as I think anyone who has kids knows, that the chance that someone is actually ingesting 8 ounces of water every single time a pill is taken, it's less than optimal in practice.

And many people don't take 8 mLs.  But even on that, the length of time that a liquid stays in the stomach is substantially less than the length of time that a solid stays in the stomach.

And we had testimony on small particle sizes versus large particle sizes.  Solids.  It's not staying in the stomach that long.  So I think the reasonable understanding is the pH of the stomach winds up being in the neighborhood of 2, maybe 3.  We are talking fasted stomach here.  At least for a length of time.

I don't credit that it stays around 4.5 for any length of time for your average or typical subjects.  There are some pH freaks out there, maybe, who have very high ones.  We had the

distribution of 25th and 75th percentile but I have to be looking at kind of the broad middle of test subjects here.

So we have the situation in which the patent is a method of practicing something that is intended that is purposely designed to achieve an immediate release in vivo. And then we are inferring things from what happens in vitro. The patent claims are not structured in terms of what ultimately happens with absorption.

Now, under the doctrine of equivalents, I think I can treat absorption as the result. But we still have to practice the same way under that in order to get to that result.

And the way it's being practiced is something that is about 22 milligrams of immediate release and about 22 milligrams of delayed release. And then there's a set of things about absorption where everyone agrees it's not absorbed in the stomach but by the time it gets to the duodenum, it's going to be absorbed. And the absorption is mostly going to happen in the duodenum. Most of it.

So the two basic problems I see here are, number one, that I find Dr. Rudnic not credible. I found him to be combative. I found him to be over claiming. I found that his broad assertions were not backed up by evidence. And I found Dr. Buckton pretty consistently credible.

And the second thing is Plaintiffs are correct that all I have to do is find one capsule infringes. And Plaintiffs are

also correct that there is no obligation on Plaintiffs to test. However, if Plaintiffs are not going to test, then Plaintiffs have to have some solid other evidence in the record on which they are relying.  And Plaintiffs are relying on the ANDA evidence specifically at pH 4.5.  And I find there are a couple possible ways to read this.

Now, Plaintiffs want me to read it as if what is in the ANDA 4.5 pH data for Oracea and for the test product.  These are all basically very accurate reads on what happens in the stomach. And their explanation is, well, because the individual beads have variability.

There's no explanation about how individual bead variability leads to broad variation in capsules when each capsule has a few hundred something in the ballpark.  There was no exact testimony on this.  But any variability in the beads then translating into capsule variability.

Like the only way I infer that is if I treat the results in the ANDA as largely probative of what goes on in the stomach.  And I don't.  And the reason is, well, first of all, we have the Galderma product displaying something that is mathematically impossible which is that the amount of product goes down over time.  Right?  So that's clue number one that there's a testing artifact problem going on here.

And clue number two, we have this weird bimodal distribution going on in the test product.  And I fully credit

Dr. Buckton. When you see something weird going on, there's a good reason to believe that's an artifact of the way the solution is being added, the test is being constructed, et cetera.

And based on that, it seems to me that the party with the burden of proof has not discharged its burden of proof to show that this is data I should rely on as something probative of what happens in the real world as opposed to caused by testing artifact.

Now, I don't think I am going quite as far to say that, well, I should ignore results at 180, 210, and 240 minutes. But I do think it is substantially less probative and it's also true that really like the 1.1 versus 4.5 is like there's additional stressing going on in the capsules in the stomach and why didn't we go straight to 4.5.

I am not going to close my eyes to that evidence. Plaintiff is right. But I do think there are inferential steps involved here. And the further we get past 150, the less we can tell from it.

And I think the fact that 7 of the 12 capsules obey basically what an IR/DR ratio is supposed to look like even granting Plaintiffs asking me to treat, okay, 1.1, 4.5, maybe a positor would do that.

But even if I take that on the better reading for Plaintiffs of let's keep it in 1.1 for 2. Let's stir it around. Let's add the fluids. The other stuff that Defendants logically

contest.  Even then, we only have 5 capsules behaving in the way. And there's one particular capsule.  And I repeat.  If I credit that one capsule, in fact, infringed, I would rule for Plaintiffs.  But I don't credit that.  I think that the plausible reading here is something wonky is going on in the testing procedure.

Now Plaintiffs weren't obligated to conduct their own tests, but they didn't.  And not having done that, then they have to convince me that this batch is, in fact, a good basis for inferring what goes on in the stomach as opposed to something weird happened with 5 capsules and something weird happened with the other test, the percentage going down.

And especially given Dr. Rudnic's kind of partisan overstatement and his combativeness on cross and his lack of support to back up a number of his very strong assertions, I just don't think Plaintiffs have satisfied their burden of proof.

So we will have a written decision that explains that in more detail in the next couple of weeks.  But I thank you all for litigating this case very well.  And I am satisfied that I have a grasp on all the evidence.

And I am very satisfied that the parties have done their level best with what is in the record to make the best possible cases for their sides.  And this case is being decided ultimately on what the evidence shows, doesn't show, or fails to prove given what's in the record.  Thank you all.  Court stands

adjourned.

(Closing statements concluded at 10:58 a.m.)


C E R T I F I C A T I O N


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Bobbie J. Shanfelder

Bobbie J. Shanfelder, RDR, CRR

Official Court Reporter

Date:  February 23, 2024

## /

**/s** [1] - 752:10

## 1

**1** [22] - 700:15, 709:12, 710:13, 710:17, 710:19, 710:25, 711:4, 714:17, 717:2, 718:10, 719:10, 724:2, 728:9, 729:23, 730:8, 730:9, 730:14, 730:21, 732:21, 734:16, 734:19, 737:16
**1,000** [3] - 716:10, 716:11, 740:6
**1-hour** [5] - 708:14, 710:14, 723:14, 724:8, 724:9
**1.1** [28] - 712:17, 714:18, 714:23, 716:21, 716:25, 717:19, 717:21, 717:22, 718:3, 718:6, 718:23, 726:10, 728:12, 728:21, 728:22, 729:6, 731:7, 733:2, 737:19, 737:25, 740:14, 742:24, 743:21, 746:3, 747:6, 750:12, 750:21, 750:24
**1.4** [1] - 729:24
**1.7** [2] - 729:24, 730:1
**10** [5] - 706:14, 706:15, 722:19, 729:11, 743:23
**100** [1] - 740:5
**10005** [1] - 698:17
**10:58** [1] - 752:2
**11** [6] - 728:13, 731:8, 741:13, 741:14, 742:6, 742:25
**12** [10] - 710:25, 719:6, 719:10, 723:9, 723:18, 733:9, 733:13, 734:19, 735:5, 750:19
**12-day** [1] - 723:20
**1200** [1] - 698:23
**1201** [1] - 698:13
**125** [1] - 736:19
**1347** [1] - 698:13
**14** [1] - 707:19
**15** [1] - 739:15
**150** [8] - 727:16,

728:14, 729:15, 731:3, 731:10, 734:16, 743:4, 750:17
**16** [1] - 728:4
**17** [1] - 714:17
**18** [13] - 701:15, 714:16, 716:17, 716:19, 729:10, 733:14, 737:17, 737:22, 737:24, 740:12, 740:20, 743:16, 743:17
**180** [3] - 727:17, 728:14, 750:10
**19,000** [3] - 711:1, 734:21, 735:11
**19106** [1] - 698:9
**19806** [1] - 698:23
**19899** [1] - 698:14

## 2

**2** [19] - 700:3, 700:15, 700:18, 707:20, 709:2, 709:12, 709:18, 710:19, 711:23, 723:19, 728:12, 728:19, 729:23, 730:22, 731:6, 737:21, 742:24, 747:21, 750:24
**2-hour** [7] - 708:23, 709:7, 709:12, 710:18, 723:15, 724:2, 724:6
**2.2** [1] - 718:2
**20** [2] - 707:20, 739:15
**2024** [3] - 698:10, 699:1, 752:13
**21-CV-1710** [1] - 698:3
**210** [1] - 750:10
**22** [7] - 698:10, 699:1, 701:15, 705:13, 729:10, 748:13
**22:18** [10] - 705:6, 724:16, 726:18, 726:22, 732:24, 732:25, 737:1, 737:3, 745:6
**23** [1] - 752:13
**230,000** [2] - 710:22, 732:12
**240** [10] - 705:24, 711:18, 712:8, 727:17, 728:14, 733:13, 733:17, 733:21, 747:8, 750:10

**25th** [1] - 748:1
**28** [1] - 724:9

## 3

**3** [8] - 707:20, 710:16, 728:1, 728:13, 729:7, 738:4, 747:21
**30** [19] - 700:14, 700:15, 700:17, 705:10, 706:14, 706:15, 708:1, 708:10, 710:11, 710:13, 710:17, 717:6, 722:18, 724:8, 730:20, 731:3, 731:11, 735:15, 743:21
**30-minute** [4] - 707:23, 708:10, 709:15, 711:5
**30:10** [8] - 705:7, 709:23, 712:22, 713:11, 737:6, 737:7, 737:12, 745:6
**31** [2] - 711:5
**32** [4] - 698:16, 716:15, 737:9, 737:10
**360** [1] - 735:12

## 4

**4** [5] - 700:16, 729:21, 736:23, 737:10, 740:15
**4.5** [56] - 699:25, 700:9, 705:17, 705:20, 705:22, 710:4, 710:12, 710:15, 710:19, 711:13, 711:16, 711:21, 712:1, 712:5, 712:11, 714:4, 714:25, 717:16, 718:23, 721:25, 723:10, 723:14, 728:12, 729:3, 729:20, 729:21, 730:2, 730:4, 730:11, 730:22, 731:2, 731:5, 731:10, 731:13, 731:14, 731:15, 731:18, 731:19, 733:1, 738:1, 738:2, 740:14, 742:25, 743:11, 743:12, 743:14, 743:22, 744:25, 746:1,

746:3, 747:23, 749:5, 749:8, 750:12, 750:14, 750:21
**40** [1] - 737:11
**42** [2] - 733:14
**47** [1] - 699:25

## 5

**5** [15] - 713:17, 718:2, 719:3, 719:5, 730:25, 733:9, 733:12, 733:13, 733:17, 734:1, 741:7, 742:6, 744:1, 751:1, 751:11
**5.5** [2] - 710:3, 743:25
**500** [2] - 698:20, 740:5
**516** [2] - 726:13, 737:9
**55** [5] - 699:25, 732:24, 733:1, 740:22, 743:14

## 6

**6** [8] - 698:20, 700:3, 709:12, 716:13, 735:5, 737:10, 741:12, 742:6
**601** [1] - 698:9
**60654** [1] - 698:21

## 7

**7** [13] - 699:25, 711:23, 729:16, 730:8, 730:10, 730:11, 730:14, 734:2, 734:8, 741:15, 743:5, 747:7, 750:19
**71** [2] - 723:14, 724:8
**73** [1] - 743:14
**75** [18] - 700:14, 700:17, 700:18, 700:21, 705:19, 706:6, 710:8, 710:16, 710:18, 710:23, 711:11, 711:12, 723:9, 723:14, 723:21, 724:8, 733:21, 733:22
**75th** [2] - 712:1, 748:1
**78** [1] - 711:4

## 8

**8** [8] - 705:14, 707:19, 710:18, 733:14, 736:23, 743:1,

747:12, 747:14
**80** [1] - 736:19

## 9

**9** [2] - 707:19, 743:15
**90** [1] - 739:4
**90s** [1] - 734:7
**96** [1] - 736:16
**9:30** [2] - 698:10, 699:1

## A

**a.m** [3] - 698:10, 699:1, 752:2
**ability** [1] - 706:13
**able** [2] - 704:25, 717:3
**above-entitled** [1] - 752:8
**absolutely** [1] - 743:3
**absorbed** [3] - 713:17, 748:15, 748:17
**absorption** [12] - 706:11, 707:11, 707:17, 713:7, 713:10, 713:13, 720:1, 736:22, 748:8, 748:10, 748:15, 748:17
**absorptive** [1] - 708:18
**accelerate** [1] - 709:1
**accept** [1] - 707:22
**accepted** [1] - 730:1
**accordance** [1] - 704:14
**according** [3] - 720:4, 734:21, 742:21
**accordingly** [1] - 709:15
**account** [4] - 702:13, 702:15, 708:14, 718:8
**accounted** [1] - 709:6
**accurate** [2] - 737:8, 749:9
**achieve** [6] - 704:25, 706:13, 706:21, 720:6, 722:23, 748:5
**achieving** [1] - 706:7
**acid** [2] - 717:23, 747:6
**acidity** [1] - 728:22
**actual** [3] - 701:17, 708:3, 708:12
**add** [2] - 730:16, 750:25
**added** [4] - 715:8,

719:2, 719:3, 750:3
**addition** [1] - 742:8
**additional** [6] - 706:12, 709:6, 717:2, 720:11, 725:10, 750:12
**address** [6] - 725:12, 725:14, 728:6, 741:16, 741:18, 746:4
**addressed** [2] - 716:3, 741:17
**adequate** [1] - 723:11
**adhered** [2] - 701:6, 714:11
**adherence** [1] - 738:18
**adjourned** [1] - 752:1
**administered** [4] - 720:13, 723:10, 723:18, 723:23
**administration** [1] - 712:18
**admirably** [1] - 746:16
**admits** [1] - 727:18
**admitted** [9] - 704:21, 713:8, 728:11, 728:15, 728:23, 734:23, 736:6, 736:8, 737:1
**admittedly** [1] - 721:15
**ADRIANNE** [1] - 698:19
**affect** [2] - 719:12, 719:17
**affects** [1] - 715:22
**agenda** [1] - 699:11
**agitation** [1] - 709:5
**agreed** [3] - 708:16, 720:25, 728:22
**agrees** [3] - 742:11, 742:13, 748:15
**Aha** [1] - 735:6
**aiming** [1] - 736:20
**air** [2] - 731:2, 732:12
**aisle** [1] - 699:18
**allegedly** [1] - 735:11
**allow** [1] - 709:18
**allowable** [1] - 739:3
**allowed** [2] - 738:24, 745:24
**alone** [2] - 712:18, 736:7
**amazingly** [1] - 734:18
**Amneal** [2] - 722:6, 722:10
**amount** [8] - 702:12, 706:6, 707:24, 714:19, 715:13,

724:7, 746:12, 749:21
**amounts** [4] - 701:17, 701:18, 710:5, 723:11
**analogy** [1] - 742:16
**analysis** [2] - 746:14, 747:2
**analytical** [1] - 721:5
**analyze** [1] - 747:3
**analyzed** [2] - 738:17, 739:16
**ANDA** [44] - 701:5, 701:8, 701:11, 701:18, 702:1, 702:3, 702:20, 703:4, 703:11, 704:3, 704:5, 704:6, 704:10, 704:15, 704:18, 704:19, 705:3, 705:9, 707:4, 708:9, 709:21, 710:7, 711:10, 712:7, 713:23, 717:1, 719:23, 720:3, 720:9, 720:13, 721:9, 721:10, 722:1, 722:4, 722:8, 722:16, 722:22, 723:2, 723:8, 723:12, 724:10, 749:4, 749:8, 749:18
**ANDREW** [1] - 698:15
**anomalies** [6] - 729:9, 729:13, 729:17, 731:18, 743:3, 743:11
**answer** [9] - 715:24, 718:6, 724:18, 728:7, 738:8, 740:17, 741:11, 741:13, 744:4
**answers** [1] - 725:21
**anyhow** [1] - 730:24
**apologize** [4] - 707:1, 707:7, 735:25, 738:15
**APPEARANCES** [1] - 698:11
**appeared** [1] - 715:11
**applied** [4] - 708:12, 717:7, 724:5, 726:8
**apply** [1] - 715:13
**appreciate** [1] - 699:5
**appropriate** [1] - 747:2
**approved** [2] - 738:23, 739:2
**aqueous** [1] - 715:8

**area** [2] - 713:9, 736:18
**arguing** [1] - 726:24
**argument** [3] - 709:10, 734:21, 744:7
**ARL** [1] - 743:13
**Arsht** [1] - 698:12
**article** [3] - 711:15, 720:20, 729:25
**artifact** [3] - 749:23, 750:2, 750:8
**aside** [2] - 721:8, 730:15
**aspects** [3] - 702:4, 702:7, 705:4
**asserted** [11] - 703:12, 703:21, 703:25, 704:4, 704:11, 704:20, 708:7, 711:14, 722:25, 724:10, 725:8
**assertions** [2] - 748:22, 751:15
**assess** [1] - 711:14
**assessing** [2] - 708:1, 716:25
**associated** [2] - 705:6, 706:25
**astonishing** [1] - 726:14
**AstraZeneca** [1] - 724:25
**attempt** [2] - 721:1, 725:11
**authors** [1] - 730:4
**avachat** [1] - 706:22
**Avachat** [10] - 701:12, 703:6, 732:8, 739:1, 739:7, 739:14, 740:12, 740:19, 740:22, 742:24
**Avachat's** [1] - 741:4
**available** [1] - 713:20
**average** [9] - 700:21, 706:6, 711:10, 711:12, 715:15, 717:6, 723:9, 734:9, 747:24
**avoid** [2] - 742:12, 742:13
**avoided** [1] - 702:18
**aware** [3] - 711:20, 720:21, 736:12

**B**

**backed** [1] - 748:22
**bad** [5] - 744:12, 744:14, 744:15, 744:23, 745:1

**bags** [1] - 716:9
**ballpark** [1] - 749:14
**bard** [1] - 745:22
**barrels** [1] - 741:24
**based** [9] - 704:13, 706:11, 716:24, 717:11, 723:24, 731:1, 738:10, 746:16, 750:4
**basic** [2] - 718:13, 748:19
**basis** [3] - 737:4, 737:13, 751:9
**batch** [37] - 700:13, 700:16, 711:1, 716:25, 717:1, 717:18, 721:7, 721:11, 722:5, 722:8, 723:8, 727:3, 727:7, 731:21, 731:23, 732:3, 732:5, 732:6, 732:12, 732:15, 732:18, 732:20, 732:23, 733:1, 733:2, 734:20, 734:24, 735:11, 740:2, 740:3, 740:17, 740:24, 741:2, 741:4, 744:13, 751:9
**batch"** [1] - 732:1
**batches** [7] - 732:13, 732:14, 732:18, 732:24, 740:16, 740:22, 741:6
**bead** [2] - 739:22, 749:12
**beads** [18] - 727:24, 728:24, 730:22, 731:8, 731:13, 731:19, 731:25, 738:2, 738:3, 738:12, 738:16, 740:2, 740:3, 740:5, 740:11, 743:12, 749:10, 749:15
**beat** [1] - 738:1
**beating** [1] - 737:5
**BEFORE** [1] - 698:7
**behave** [1] - 723:6
**behaved** [1] - 722:1
**behaves** [3] - 704:7, 704:10, 723:2
**behaving** [2] - 710:23, 751:1
**belabor** [2] - 741:10, 743:2
**bell** [6] - 739:21, 739:23, 739:24,

740:4, 740:9, 740:10
**below** [3] - 712:5, 715:20, 739:3
**Bench** [1] - 698:5
**best** [3] - 705:4, 751:22
**better** [3] - 735:2, 735:5, 750:23
**between** [12] - 700:15, 710:17, 710:19, 720:3, 730:7, 730:21, 732:18, 736:24, 740:16, 740:21, 746:15, 747:10
**BIBAS** [1] - 698:7
**big** [1] - 732:15
**Big** [1] - 718:22
**bimodal** [4] - 733:24, 734:3, 734:4, 749:24
**binders** [1] - 699:14
**bioavailability** [1] - 713:15
**bioequivalence** [9] - 703:4, 705:18, 706:13, 707:8, 709:22, 713:5, 719:20, 736:16, 736:17
**bioequivalent** [4] - 737:7, 737:10, 737:11, 737:12
**biorelevance** [1] - 701:7
**biorelevant** [5] - 705:20, 710:4, 711:18, 717:21, 729:21
**bit** [3] - 706:9, 712:19, 717:10
**black** [1] - 717:11
**blinders** [2] - 740:9, 741:23
**blood** [23] - 704:23, 706:8, 706:21, 707:5, 707:10, 707:17, 709:25, 712:20, 713:1, 713:5, 713:20, 714:2, 714:3, 722:24, 726:2, 736:1, 736:7, 736:9, 736:15, 737:1, 737:2, 737:5, 737:13
**Bobbie** [3] - 698:24, 752:10, 752:11
**Bobbie_Shanfelder @paed.uscourts. gov** [1] - 698:25
**BODA** [1] - 698:19

**body** [2] - 720:15, 730:16
**bona** [3] - 731:23, 741:2, 741:3
**borderline** [1] - 732:2
**bounds** [2] - 711:6, 744:22
**Box** [1] - 698:13
**box** [1] - 717:11
**brief** [9] - 718:20, 720:20, 722:7, 725:23, 726:5, 726:24, 733:12, 734:18, 744:5
**briefing** [2] - 708:16, 744:8
**briefly** [3] - 704:17, 722:15, 745:11
**briefs** [3] - 700:22, 703:8, 734:15
**Bristol** [1] - 745:22
**broad** [3] - 748:2, 748:22, 749:13
**Broadcom** [1] - 700:24
**Broom** [1] - 698:23
**Buckton** [21] - 712:12, 712:15, 713:8, 718:2, 728:19, 729:22, 730:14, 730:15, 731:4, 731:10, 731:11, 733:23, 734:1, 736:15, 736:18, 738:17, 739:7, 739:15, 740:13, 748:23, 750:1
**Buckton's** [1] - 720:17
**buffer** [4] - 719:2, 719:3, 719:9, 742:9
**buffers** [1] - 709:6
**bunch** [1] - 746:19
**burden** [6] - 727:13, 746:8, 750:5, 751:16
**Byrne** [1] - 698:8

**C**

**C-Max** [4] - 719:22, 719:24, 720:5, 736:19
**C.R** [1] - 745:22
**Cahill** [1] - 698:16
**calc** [1] - 746:21
**calculate** [1] - 736:13
**capsule** [32] - 700:12, 703:16, 703:21, 710:5, 710:9, 710:13, 710:16, 710:18, 710:25,

711:4, 716:1, 718:8, 723:20, 725:2, 730:16, 730:18, 730:20, 732:12, 734:14, 734:16, 734:17, 734:24, 735:4, 735:6, 735:16, 743:5, 743:20, 748:25, 749:14, 749:16, 751:2, 751:3
**capsules** [38] - 700:16, 702:11, 702:14, 703:11, 703:13, 703:15, 705:19, 706:3, 710:12, 710:22, 711:1, 716:7, 723:18, 724:19, 727:3, 727:24, 731:6, 731:13, 733:13, 733:17, 733:18, 733:20, 734:1, 734:10, 734:21, 735:11, 735:12, 735:13, 738:2, 740:2, 740:3, 749:13, 750:13, 750:19, 751:1, 751:11
**carry** [1] - 719:8
**cartoon** [3] - 739:21, 739:22, 740:10
**case** [44] - 700:9, 700:25, 702:23, 703:18, 703:19, 705:18, 707:3, 707:25, 708:8, 708:20, 708:22, 711:7, 715:17, 717:13, 720:7, 721:8, 721:20, 722:3, 722:6, 722:9, 722:10, 722:22, 725:2, 725:23, 726:1, 726:6, 727:12, 727:16, 727:18, 728:8, 731:1, 732:17, 734:25, 736:12, 739:25, 744:10, 745:22, 746:11, 746:16, 746:20, 751:19, 751:23
**caselaw** [3] - 722:2, 724:20, 724:22
**cases** [7] - 703:8, 708:4, 720:10, 721:8, 724:24, 724:25, 751:23

**caused** [1] - 750:7
**causing** [1] - 709:24
**cells** [1] - 717:24
**centered** [1] - 702:9
**centerpiece** [3] - 725:25, 727:15, 728:7
**certain** [6] - 716:6, 716:7, 716:10, 716:23, 719:21, 722:24
**certainly** [3] - 709:16, 709:18, 723:7
**certify** [1] - 752:7
**cetera** [1] - 750:3
**challenge** [1] - 713:3
**challenges** [1] - 705:2
**chance** [1] - 747:11
**Chang** [2] - 702:6, 724:13
**change** [1] - 732:21
**changed** [1] - 740:16
**chemical** [1] - 715:3
**cherry** [1] - 717:15
**cherry-picked** [1] - 717:15
**Chicago** [1] - 698:21
**chief** [2] - 701:12, 702:3
**chloride** [8] - 714:9, 715:2, 726:2, 738:22, 738:24, 739:5, 739:6, 739:8
**choice** [2] - 715:12, 746:25
**choices** [1] - 741:20
**chronic** [1] - 722:23
**chronically** [2] - 700:20, 723:22
**Circuit** [1] - 708:5
**circumstances** [1] - 712:8
**circumstantial** [2] - 706:12, 714:1
**cite** [3] - 707:19, 712:16, 718:3
**cited** [2] - 724:25, 745:22
**cites** [1] - 722:6
**Civil** [2] - 698:3, 698:5
**Claim** [10] - 701:6, 701:22, 704:14, 706:17, 706:24, 708:3, 708:12, 710:1, 718:17, 718:18
**claim** [4] - 705:1, 709:17, 718:18, 724:18
**claimed** [3] - 703:13,

706:7, 706:21
**claiming** [2] - 717:17, 748:21
**claims** [30] - 701:18, 701:20, 702:6, 703:12, 703:21, 704:1, 704:4, 704:8, 704:11, 704:15, 704:20, 704:23, 706:6, 707:6, 708:6, 708:7, 708:11, 709:14, 711:14, 718:12, 718:15, 718:16, 719:15, 720:14, 722:25, 724:10, 724:13, 725:8, 744:20, 748:7
**clear** [5] - 703:20, 708:13, 712:10, 719:1, 721:8
**clearly** [4] - 699:24, 734:3, 738:8, 743:6
**clients** [1] - 746:16
**clinical** [1] - 712:7
**close** [6] - 699:18, 716:21, 721:18, 737:12, 745:6, 750:15
**closely** [1] - 717:1
**Closing** [2] - 698:4, 752:2
**closing** [4] - 699:12, 709:9, 725:13, 739:21
**clue** [2] - 749:22, 749:24
**coat** [3] - 715:14, 715:15, 743:18
**coated** [2] - 715:25, 718:7
**coating** [20] - 700:1, 705:21, 717:8, 731:9, 732:9, 737:17, 737:22, 737:24, 738:5, 738:9, 738:17, 738:21, 739:18, 740:12, 740:13, 740:16, 740:20, 742:25, 743:16, 743:17
**coatings** [1] - 712:4
**coats** [1] - 739:12
**COCHRAN** [1] - 698:15
**coffee** [2] - 742:16
**coincidence** [1] - 724:9
**cold** [1] - 713:3
**colon** [1] - 713:17

**column** [1] - 707:19
**Column** [3] - 699:25, 707:20
**combative** [1] - 748:21
**combativeness** [1] - 751:14
**combination** [1] - 705:11
**coming** [1] - 708:22
**commend** [1] - 746:11
**comment** [1] - 726:23
**commercial** [2] - 722:4, 723:8
**commercialized** [2] - 716:13, 739:2
**common** [2] - 711:22, 715:17
**compared** [2] - 720:14, 724:24
**comparison** [1] - 731:24
**compels** [1] - 725:9
**completely** [5] - 721:12, 722:9, 742:19, 743:20
**components** [1] - 701:16
**composition** [5] - 704:22, 712:22, 722:17, 736:6, 736:10
**concede** [1] - 712:12
**conceded** [4] - 704:19, 719:5, 719:7
**concentrated** [2] - 717:23, 742:19
**concentration** [1] - 703:25
**concerning** [1] - 704:18
**concluded** [1] - 752:2
**concludes** [1] - 742:7
**conclusion** [2] - 719:13, 730:12
**conclusions** [4] - 729:7, 729:15, 733:7, 743:7
**conclusively** [1] - 725:7
**condition** [3] - 725:3, 725:4, 725:5
**conditions** [7] - 708:24, 708:25, 721:14, 721:24, 721:25, 723:3, 724:1
**conduct** [2] - 746:7, 751:7
**confined** [2] - 708:7, 708:8

**confirmed** [3] - 705:7, 705:17, 718:5
**confirms** [1] - 704:7
**consideration** [2] - 709:18, 724:1
**considered** [3] - 708:20, 738:6, 743:16
**considers** [1] - 722:20
**consistent** [3] - 709:25, 717:8, 723:11
**consistently** [1] - 748:23
**constraints** [1] - 713:7
**constructed** [1] - 750:3
**Construction** [7] - 701:7, 706:24, 708:3, 708:12, 710:1, 718:17, 718:18
**construction** [2] - 708:3, 718:15
**Constructions** [3] - 701:23, 704:14, 706:17
**constructions** [3] - 701:23, 708:4, 726:8
**construed** [2] - 706:17, 711:6
**contain** [1] - 711:3
**contains** [1] - 720:5
**contemplated** [1] - 709:13
**contemporaneously** [1] - 717:17
**contends** [1] - 704:24
**contest** [1] - 751:1
**continuous** [1] - 715:10
**contradictory** [1] - 721:11
**contrast** [2] - 701:10, 717:5
**contributed** [1] - 713:23
**contributes** [2] - 707:24, 714:13
**control** [5] - 703:13, 718:15, 718:16, 721:17, 722:2
**controls** [3] - 721:10, 722:5, 739:3
**convenience** [1] - 725:14
**converged** [1] - 746:20
**convince** [1] - 751:9
**cooperation** [1] -

746:15
**correct** [6] - 699:9, 699:10, 735:14, 748:24, 749:1, 752:7
**cost** [1] - 715:9
**countered** [1] - 720:13
**counts** [1] - 714:8
**couple** [4] - 700:7, 744:6, 749:5, 751:18
**course** [1] - 714:24
**Court** [29] - 698:25, 699:15, 700:5, 701:1, 701:25, 704:4, 704:6, 704:9, 707:7, 708:6, 713:12, 716:5, 718:5, 721:9, 722:3, 722:19, 725:15, 727:9, 737:17, 737:21, 738:4, 741:7, 741:8, 741:15, 743:1, 743:23, 751:25, 752:12
**COURT** [10] - 698:1, 699:2, 699:6, 699:12, 699:16, 725:16, 725:19, 745:10, 745:12, 746:10
**Court's** [9] - 699:13, 701:6, 701:22, 703:10, 718:15, 725:21, 726:8, 737:16, 738:4
**Courthouse** [1] - 698:8
**covered** [2] - 702:6, 737:17
**crazy** [1] - 713:4
**cream** [2] - 742:16, 742:17
**crease** [2] - 716:10
**create** [3] - 707:5, 715:13, 740:4
**creating** [1] - 705:2
**credible** [3] - 727:13, 748:20, 748:23
**credit** [6] - 746:18, 747:4, 747:23, 749:25, 751:2, 751:4
**critical** [3] - 713:24, 714:5, 715:21
**cross** [9] - 715:11, 728:11, 728:23, 731:25, 738:14, 738:16, 739:17, 740:6, 751:14
**cross-examination** [2] - 728:11, 728:23

**cross-sectioned** [4] - 731:25, 738:14, 738:16, 740:6
**cross-sectioning** [1] - 739:17
**cross-sections** [1] - 715:11
**CRR** [2] - 698:24, 752:11
**crucible** [1] - 699:23
**culpability** [1] - 706:25
**curious** [1] - 707:13
**curve** [7] - 736:18, 739:21, 739:23, 739:24, 740:4, 740:9, 740:10
**cutoff** [2] - 707:24, 708:2

# D

**daily** [5] - 704:22, 722:23, 722:25, 723:11, 723:18
**damage** [1] - 742:25
**damaging** [1] - 731:8
**data** [89] - 700:5, 700:8, 700:19, 701:5, 701:7, 701:11, 701:24, 702:2, 702:9, 702:11, 702:21, 703:5, 703:9, 704:6, 704:9, 705:6, 705:8, 705:16, 705:17, 705:18, 706:3, 706:10, 706:13, 707:8, 708:9, 709:18, 709:21, 709:22, 710:2, 710:14, 711:3, 711:8, 711:13, 712:7, 712:11, 713:18, 714:6, 714:7, 715:22, 717:12, 717:15, 717:16, 719:13, 719:14, 719:20, 719:21, 720:8, 720:9, 720:12, 721:3, 721:5, 721:10, 721:20, 722:13, 723:3, 723:4, 723:10, 723:13, 723:16, 724:4, 724:6, 728:3, 729:8, 729:9, 729:13, 729:17, 730:5, 730:13,

731:1, 733:6, 734:5, 734:12, 735:8, 736:7, 736:9, 736:15, 736:22, 736:24, 737:2, 737:14, 740:9, 743:2, 743:3, 745:15, 746:8, 749:8, 750:6
**data-driven** [1] - 700:8
**Date** [1] - 752:13
**Daubert** [1] - 713:3
**days** [1] - 715:6
**DE** [2] - 698:14, 698:23
**deadlines** [1] - 699:8
**dealing** [1] - 700:1
**debate** [2] - 706:19, 707:4
**decided** [1] - 751:23
**decision** [1] - 751:17
**defective** [2] - 745:17
**DEFENDANTS** [2] - 698:18, 698:22
**Defendants** [4] - 702:21, 707:9, 725:17, 750:25
**Defendants'** [1] - 707:22
**defenses** [1] - 717:13
**definitive** [1] - 719:11
**DELAWARE** [1] - 698:1
**delayed** [11] - 700:1, 700:2, 701:14, 701:17, 702:17, 705:12, 705:15, 706:20, 709:11, 716:14, 748:14
**delivering** [1] - 700:13
**demonstrated** [1] - 742:7
**described** [1] - 707:20
**design** [7] - 704:18, 707:10, 713:23, 726:13, 744:22, 746:25, 747:1
**designed** [8] - 702:4, 704:5, 704:21, 707:3, 707:5, 737:19, 746:24, 748:5
**despite** [2] - 718:10, 719:15
**destroying** [1] - 744:19
**detail** [2] - 715:1, 751:18
**detected** [1] - 739:5
**detectible** [1] - 714:23

**detection** [1] - 739:4
**determination** [1] - 703:10
**determine** [1] - 717:3
**determined** [1] - 732:6
**determining** [1] - 726:10
**development** [2] - 732:13, 732:14
**developmental** [1] - 716:25
**deviations** [1] - 729:10
**difference** [1] - 732:18
**differences** [1] - 722:20
**different** [8] - 721:12, 721:13, 721:24, 733:3, 739:12, 741:6, 747:5
**differently** [2] - 722:1, 746:17
**diligence** [2] - 746:12, 746:14
**direct** [2] - 711:2, 711:8
**directed** [6] - 704:16, 706:1, 707:3, 712:8, 724:14, 724:17
**direction** [1] - 700:4
**directly** [1] - 715:22
**discharged** [1] - 750:5
**disclose** [3] - 708:7, 727:9, 735:18
**disclosed** [3] - 718:11, 727:5, 738:13
**discovery** [3] - 721:18, 721:19, 735:13
**discuss** [1] - 706:8
**discussed** [4] - 708:15, 709:4, 720:9, 724:6
**discussion** [2] - 706:22, 744:9
**dismiss** [1] - 701:24
**dismissive** [1] - 707:8
**displaying** [1] - 749:20
**dispositive** [1] - 718:11
**disprove** [1] - 732:5
**disproved** [1] - 746:2
**dispute** [10] - 702:5, 703:5, 726:16, 726:20, 728:2, 728:21, 731:5, 736:8, 742:23, 745:5
**disregarded** [2] -

729:18, 741:22
**dissolution** [7] - 716:24, 717:15, 719:7, 719:9, 719:15, 721:1, 735:3
**dissolve** [2] - 730:20, 739:11
**dissolved** [1] - 742:19
**distinguishable** [2] - 722:9, 724:24
**distribution** [9] - 715:20, 715:22, 715:25, 733:24, 734:4, 740:7, 740:11, 748:1, 749:25
**distributions** [1] - 734:3
**DISTRICT** [2] - 698:1, 698:1
**dividing** [1] - 699:25
**divining** [1] - 713:3
**Docket** [1] - 698:3
**doctors** [1] - 725:4
**doctrine** [9] - 700:10, 704:12, 706:4, 706:8, 722:15, 722:16, 724:11, 743:15, 748:9
**document** [1] - 712:16
**done** [11] - 699:21, 715:5, 719:11, 731:24, 736:11, 741:3, 741:23, 743:8, 746:17, 751:8, 751:21
**dosage** [2] - 719:25, 720:1
**dosed** [1] - 723:8
**dosing** [1] - 723:4
**double** [1] - 711:22
**doubt** [1] - 724:12
**down** [11] - 729:16, 730:6, 730:19, 732:11, 732:16, 740:23, 742:9, 743:5, 747:4, 749:22, 751:12
**doxycycline** [21] - 704:22, 705:10, 705:20, 706:7, 706:11, 707:24, 708:19, 710:7, 710:13, 710:17, 710:19, 710:24, 711:4, 712:5, 713:7, 713:9, 717:9, 722:18, 722:19, 739:11, 739:12
**doxycycline's** [1] -

713:13
**dozens** [2] - 726:20
**Dr** [61] - 701:4, 705:9, 706:10, 708:24, 711:9, 711:14, 711:21, 712:11, 712:12, 712:15, 712:21, 712:25, 713:8, 714:12, 715:9, 715:12, 716:13, 716:19, 717:22, 718:2, 718:5, 719:24, 720:17, 721:22, 723:24, 727:21, 728:11, 728:19, 728:23, 729:18, 729:22, 729:25, 730:9, 730:14, 730:15, 731:4, 731:10, 731:11, 733:7, 733:23, 734:1, 734:23, 735:4, 736:6, 736:15, 736:18, 736:23, 737:13, 738:17, 739:7, 739:15, 739:17, 741:1, 741:20, 741:25, 742:4, 743:8, 748:20, 748:23, 750:1, 751:13
**DR** [15] - 704:24, 707:12, 708:23, 709:11, 715:14, 717:9, 722:18, 723:12, 726:8, 728:24, 731:19, 743:12, 743:14, 743:22, 746:3
**draw** [5] - 729:14, 730:12, 733:6, 743:1, 743:7
**drawn** [1] - 729:8
**draws** [1] - 742:5
**Dressman** [1] - 729:23
**dries** [1] - 739:10
**drinking** [1] - 712:12
**drinks** [1] - 747:8
**driven** [1] - 700:8
**drop** [1] - 713:15
**drop-off** [1] - 713:15
**drug** [6] - 700:20, 716:14, 719:25, 723:22, 723:23, 724:17
**drugs** [1] - 739:11
**due** [1] - 713:6
**dumped** [1] - 731:8

**duodenum** [3] - 713:16, 748:16, 748:18
**during** [6] - 707:2, 715:19, 716:22, 726:6, 735:13, 736:22
**dying** [1] - 727:1

## E

**easily** [1] - 739:9
**easy** [2] - 740:4, 742:16
**either** [7] - 707:18, 724:11, 725:21, 729:18, 744:10, 745:6, 745:16
**elements** [3] - 704:20, 709:17, 722:25
**Eli** [2] - 724:20, 724:24
**embodiments** [1] - 708:7
**embodying** [1] - 709:14
**embraced** [1] - 701:4
**emphasize** [1] - 720:1
**empty** [1] - 718:1
**encompasses** [1] - 710:8
**end** [3] - 709:24, 711:11, 744:6
**ending** [1] - 716:6
**entered** [1] - 745:8
**enteric** [8] - 700:1, 705:21, 712:4, 715:14, 715:15, 718:7, 740:20, 743:18
**enteric-coated** [1] - 718:7
**entire** [5] - 709:9, 727:16, 728:8, 731:1, 734:24
**entitled** [3] - 745:3, 746:6, 752:8
**equals** [1] - 707:17
**equilibrium** [1] - 730:17
**equivalence** [2] - 723:22, 745:7
**equivalent** [11] - 702:4, 702:7, 704:5, 705:3, 705:4, 722:17, 723:13, 740:24, 741:5, 743:17, 743:18
**equivalents** [9] - 700:10, 704:12, 706:5, 706:8,

722:15, 722:17, 724:11, 743:16, 748:9
**error** [4] - 707:23, 727:21, 728:17, 736:13
**especially** [2] - 710:21, 751:13
**ESQUIRE** [8] - 698:12, 698:15, 698:15, 698:18, 698:18, 698:19, 698:19, 698:22
**essentially** [1] - 701:22
**establish** [1] - 702:12
**established** [1] - 705:8
**et** [1] - 750:3
**ether** [1] - 729:1
**Eudragit** [4] - 714:21, 715:13, 716:14, 746:21
**evaluate** [1] - 737:17
**evaluating** [2] - 717:2, 743:15
**evaporates** [1] - 739:9
**evidence** [47] - 699:18, 700:8, 701:2, 701:5, 702:19, 703:2, 704:3, 706:12, 711:2, 711:4, 712:23, 712:24, 713:2, 713:13, 713:22, 713:24, 716:22, 717:7, 717:11, 718:19, 721:14, 722:21, 725:7, 726:19, 726:20, 727:14, 732:17, 733:3, 734:22, 737:8, 737:23, 738:23, 740:11, 740:12, 740:17, 741:12, 741:14, 742:22, 743:23, 745:23, 747:5, 748:22, 749:3, 749:5, 750:15, 751:20, 751:24
**exact** [4] - 715:18, 715:20, 735:16, 749:15
**exactly** [5] - 700:13, 707:12, 717:10, 724:8, 732:24
**examination** [2] - 728:11, 728:23

**example** [1] - 734:6
**examples** [3] - 703:20, 718:12, 720:11
**excellent** [1] - 716:12
**except** [1] - 720:22
**excluded** [1] - 711:16
**exclusively** [1] - 707:23
**excuse** [1] - 730:17
**Exhibit** [1] - 739:24
**exhibit** [9] - 727:3, 732:15, 732:18, 732:24, 733:2, 734:20, 735:11, 740:2, 740:16
**exist** [6] - 717:22, 718:22, 720:24, 742:3, 742:11, 742:13
**existed** [2] - 703:24, 720:19
**existence** [1] - 718:3
**existing** [1] - 712:17
**exists** [4] - 703:20, 710:14, 717:20, 722:5
**expect** [1] - 720:4
**expense** [2] - 727:7, 732:4
**expert** [3] - 720:21, 727:18, 733:25
**experts** [5] - 708:16, 712:10, 713:4, 720:25, 728:22
**expire** [1] - 727:4
**expired** [2] - 727:4, 735:13
**explain** [2] - 714:4, 717:5
**explained** [7] - 705:9, 708:24, 711:15, 711:21, 712:11, 716:23, 721:22
**explains** [1] - 751:17
**explanation** [7] - 714:20, 719:17, 719:18, 741:7, 742:22, 749:10, 749:12
**exploding** [1] - 739:22
**exploring** [1] - 746:19
**exposed** [3] - 710:12, 718:9, 741:13
**exposing** [1] - 731:8
**exposure** [2] - 710:14, 710:19
**expression** [1] - 714:12
**expressly** [1] - 700:6
**extend** [1] - 708:17

**F**

**eyes** [1] - 750:15

**faced** [1] - 705:2
**facility** [1] - 721:12
**fact** [20] - 702:5, 703:18, 705:1, 711:21, 714:10, 714:16, 720:8, 721:18, 721:23, 732:19, 735:8, 735:13, 738:11, 739:16, 740:7, 745:17, 745:23, 750:19, 751:3, 751:9
**factors** [2] - 732:16, 740:24
**facts** [2] - 727:12, 733:10
**fail** [1] - 717:14
**failed** [2] - 701:25, 738:2
**fails** [1] - 751:24
**fairly** [1] - 737:16
**fall** [1] - 715:19
**fallen** [1] - 746:21
**false** [1] - 730:25
**far** [2] - 746:1, 750:9
**fashioned** [1] - 734:25
**fasted** [9] - 705:17, 708:17, 711:17, 711:23, 712:17, 729:22, 730:1, 737:24, 747:22
**faster** [2] - 720:6, 720:14
**fatally** [1] - 738:12
**faulty** [1] - 721:5
**favor** [1] - 701:13
**FDA** [27] - 702:10, 702:22, 703:5, 703:9, 705:22, 714:8, 718:23, 721:3, 721:15, 721:21, 722:11, 722:14, 726:11, 729:11, 732:19, 732:20, 738:23, 739:2, 740:21, 745:14, 745:16, 745:18, 745:19, 745:21, 745:24, 747:8
**February** [3] - 698:10, 699:1, 752:13
**Federal** [1] - 708:5
**feeding** [1] - 730:6
**few** [3] - 728:7, 747:9, 749:14

**fide** [3] - 731:23, 741:2, 741:4
**figure** [3] - 728:1, 742:12, 744:21
**figured** [1] - 740:7
**figures** [1] - 742:6
**file** [1] - 703:7
**filed** [1] - 703:9
**Files** [1] - 716:8
**fill** [2] - 719:6, 740:9
**final** [1] - 717:1
**fine** [1] - 745:15
**first** [7] - 704:4, 704:18, 717:14, 731:6, 733:9, 736:5, 749:19
**fits** [1] - 711:5
**FLATTMANN** [6] - 698:15, 699:10, 699:13, 699:17, 745:11, 745:13
**flawed** [2] - 734:11, 738:12
**flaws** [1] - 734:12
**fluid** [1] - 717:25
**fluids** [1] - 750:25
**flush** [1] - 715:10
**focus** [2] - 707:15, 710:11
**focusing** [1] - 733:12
**followed** [1] - 728:12
**follows** [3] - 724:19, 725:1, 747:8
**Foot** [1] - 718:22
**footnote** [1] - 733:11
**FOR** [4] - 698:12, 698:15, 698:18, 698:22
**foregoing** [1] - 752:7
**foreign** [1] - 746:1
**Forensic** [1] - 716:8
**form** [2] - 719:25, 720:2
**former** [1] - 705:18
**formulated** [1] - 701:8
**formulation** [3] - 704:25, 705:5, 705:7
**formulator** [3] - 701:12, 702:3, 703:6
**forth** [2] - 701:18, 718:13
**forward** [2] - 725:24, 726:7
**Foundation** [2] - 700:25, 703:19
**Four** [1] - 698:4
**frankly** [1] - 736:2
**freaks** [1] - 747:25
**freshly** [1] - 699:23

**friends** [1] - 699:17
**front** [1] - 742:2
**full** [1] - 718:8
**fully** [2] - 738:13, 749:25
**function** [6] - 701:8, 701:16, 713:23, 716:16, 722:21, 744:19
**functional** [2] - 709:17, 738:13
**functionally** [2] - 705:7, 706:18
**functioning** [1] - 713:11
**functions** [6] - 702:23, 705:9, 708:8, 720:10, 726:18, 726:22
**fusion** [1] - 713:4

**G**

**gain** [9] - 714:15, 714:22, 715:15, 715:18, 716:16, 716:17, 716:20, 717:6
**Gainesville** [1] - 703:18
**gains** [1] - 717:2
**Galderma** [6] - 725:22, 726:13, 738:2, 739:18, 744:23, 749:20
**GALDERMA** [1] - 698:3
**Galderma's** [3] - 738:5, 744:5, 744:7
**garbage** [1] - 716:9
**gastric** [4] - 708:17, 708:24, 717:25, 723:25
**gather** [1] - 699:2
**gathered** [1] - 712:7
**gelatin** [1] - 730:20
**general** [2] - 730:2, 730:21
**generally** [1] - 730:1
**generally-accepted** [1] - 730:1
**generate** [1] - 702:24
**generated** [4] - 712:11, 719:2, 721:12, 742:8
**genuine** [2] - 726:16, 745:5
**GERALD** [1] - 698:15
**ghost** [2] - 742:1, 742:10

**ghosts** [1] - 744:2
**given** [5] - 723:17, 741:21, 743:2, 751:13, 751:25
**glass** [1] - 730:3
**Glaxo** [1] - 722:3
**goal** [3] - 736:16, 736:20
**Gordon** [1] - 698:16
**gotcha** [2] - 734:14, 734:16
**governing** [1] - 704:14
**governs** [1] - 703:9
**gradual** [1] - 742:8
**granting** [1] - 750:21
**graph** [1] - 724:5
**grasp** [1] - 751:20
**gray** [1] - 742:23
**Gray** [10] - 719:5, 719:7, 720:17, 720:21, 728:19, 729:9, 731:4, 731:12, 742:13, 744:1
**great** [4] - 727:7, 732:4, 739:10, 739:12
**group** [1] - 734:5
**groups** [2] - 734:3, 734:9
**guidance** [4] - 699:20, 718:24, 732:19, 732:20
**guys** [1] - 699:9

**H**

**halfway** [1] - 747:10
**Hall** [1] - 698:22
**halves** [1] - 713:16
**hand** [1] - 715:7
**handbook** [2] - 720:20, 720:22
**HANEY** [2] - 698:22, 699:5
**Haney** [1] - 699:2
**happy** [1] - 725:14
**hard** [1] - 701:5
**harsh** [2] - 708:25, 723:25
**head** [1] - 716:12
**hear** [4] - 725:21, 733:11, 735:19, 736:2
**heard** [17] - 704:4, 704:9, 706:22, 710:6, 711:9, 711:24, 715:2, 715:7, 716:13, 719:19, 726:1,

729:9, 729:13, 734:18, 737:7, 742:2, 742:3
**hearing** [2] - 699:3, 726:19
**heart** [1] - 746:20
**held** [1] - 708:6
**helps** [1] - 716:4
**high** [3] - 730:19, 739:10, 747:25
**higher** [3] - 712:13, 719:22, 720:5
**highest** [1] - 718:2
**highlighted** [1] - 721:23
**highly** [3] - 703:1, 721:17, 739:9
**himself** [2] - 727:21, 734:23
**hip** [1] - 712:19
**hit** [4] - 704:23, 707:10, 713:19, 736:19
**holds** [2] - 709:22, 740:13
**honestly** [1] - 714:22
**Honor** [44] - 699:5, 699:10, 699:13, 699:18, 701:1, 707:8, 709:9, 715:2, 715:23, 718:21, 719:11, 720:14, 723:13, 723:16, 725:6, 725:10, 725:12, 725:18, 725:20, 726:6, 727:12, 728:9, 729:7, 730:25, 731:22, 732:4, 733:5, 733:16, 734:13, 734:22, 735:21, 737:15, 737:18, 737:23, 738:8, 738:22, 740:1, 740:17, 743:2, 743:17, 744:3, 745:2, 745:11, 746:4
**Honor's** [3] - 725:13, 726:4, 728:6
**HONORABLE** [1] - 698:7
**horse** [2] - 737:6, 738:1
**hotspot** [12] - 717:17, 718:20, 718:21, 719:12, 719:16, 720:18, 721:2, 741:7, 741:25, 742:6, 742:8, 742:21

**hotspots** [8] - 719:2, 720:15, 721:6, 742:3, 742:11, 742:13, 742:15, 743:24
**hour** [2] - 700:15, 710:17
**hours** [13] - 700:3, 700:15, 700:18, 709:2, 709:12, 709:18, 710:19, 728:12, 731:6, 736:16, 736:23, 742:24
**Hubbard** [1] - 698:20
**hundred** [1] - 749:14
**hundreds** [1] - 727:3
**hydrated** [1] - 731:6

## I

**idea** [4] - 726:23, 736:23, 736:25, 737:6
**identical** [1] - 736:24
**identified** [1] - 718:5
**ignore** [8] - 701:11, 701:13, 701:22, 717:16, 733:5, 734:11, 750:10
**ignores** [1] - 701:15
**IL** [1] - 698:21
**imaged** [2] - 731:24, 740:6
**images** [4] - 715:9, 738:14, 738:16, 739:17
**imaginary** [1] - 717:17
**imagined** [1] - 718:20
**immediate** [24] - 700:18, 700:21, 701:13, 701:17, 701:23, 702:11, 702:13, 705:11, 705:13, 706:7, 706:20, 708:11, 708:20, 711:12, 717:8, 728:10, 730:11, 730:23, 733:19, 735:9, 735:23, 743:20, 748:5, 748:13
**immediately** [8] - 702:14, 705:10, 705:12, 705:14, 710:4, 710:24, 711:17, 743:18
**impact** [1] - 717:2
**impacted** [1] - 719:16
**implication** [1] -

744:18
**implicit** [1] - 724:20
**importance** [1] - 712:11
**important** [2] - 708:14, 723:1
**importantly** [1] - 736:25
**impossible** [1] - 749:21
**IN** [1] - 698:1
**INC** [1] - 698:5
**incalculable** [2] - 727:21, 728:17
**included** [1] - 725:10
**includes** [1] - 700:17
**including** [1] - 739:14
**incomplete** [3] - 738:5, 738:9, 738:21
**increased** [1] - 709:5
**incredible** [1] - 730:4
**incredibly** [2] - 699:22, 716:1
**independent** [2] - 726:21, 732:25
**indicated** [2] - 722:22, 725:3
**indicates** [1] - 706:14
**indication** [1] - 724:12
**indicative** [1] - 705:23
**individual** [7] - 705:19, 710:5, 719:21, 720:11, 723:18, 749:10, 749:12
**individuals** [1] - 734:7
**industry** [10] - 726:10, 726:15, 728:20, 729:2, 731:7, 735:24, 737:18, 744:17, 744:24, 745:4
**infer** [5] - 736:6, 736:9, 737:13, 747:5, 749:17
**inference** [2] - 707:1, 743:1
**inferential** [1] - 750:16
**inferring** [3] - 713:1, 748:6, 751:10
**infringe** [10] - 703:12, 710:9, 724:15, 724:18, 724:19, 725:5, 726:17, 728:2, 741:9, 745:5
**infringed** [4] - 703:21, 724:13, 727:14, 751:3
**infringement** [23] - 700:9, 700:23,

701:3, 702:9, 702:12, 702:18, 703:22, 703:23, 704:16, 706:4, 708:10, 708:12, 709:17, 710:5, 711:3, 711:9, 711:14, 722:2, 722:5, 727:23, 733:15, 735:19, 745:8
**infringes** [14] - 701:9, 702:20, 703:15, 703:16, 704:4, 704:7, 704:11, 704:15, 718:7, 722:16, 724:10, 724:20, 725:7, 748:25
**infringing** [12] - 711:1, 733:18, 733:20, 734:7, 734:8, 734:10, 734:17, 734:21, 735:11, 743:19
**ingesting** [1] - 747:12
**ingestion** [3] - 705:23, 711:17, 717:20
**ingredients** [2] - 732:10, 740:20
**initial** [1] - 717:19
**ink** [1] - 726:24
**innuendo** [1] - 732:1
**inquiry** [1] - 702:9
**inspired** [3] - 717:18, 721:7, 722:8
**instance** [1] - 710:16
**instead** [3] - 715:4, 721:3, 732:1
**instructed** [1] - 723:19
**instructive** [3] - 699:22, 704:2, 708:5
**instructs** [1] - 701:20
**insubstantial** [1] - 722:20
**insulting** [1] - 732:2
**intend** [2] - 706:18, 707:9
**intended** [4] - 706:20, 706:21, 746:23, 748:4
**intent** [1] - 706:23
**interesting** [2] - 714:1, 715:23
**intersection** [2] - 737:22, 737:23
**invention** [1] - 707:19
**inventors** [3] - 709:13, 711:20, 712:2
**investigate** [1] - 743:9

**investigated** [1] - 741:22
**invitation** [1] - 707:22
**invocation** [1] - 713:3
**involved** [1] - 750:17
**IR** [19] - 704:24, 707:11, 707:24, 708:1, 708:21, 708:23, 709:1, 709:13, 720:5, 722:18, 723:9, 723:12, 723:21, 726:8, 726:10, 727:17, 728:20, 729:4, 737:22
**IR/DR** [4] - 704:25, 705:6, 712:22, 750:20
**irrefutable** [1] - 713:18
**irrelevant** [5] - 703:1, 717:18, 738:6, 738:10, 743:22
**issue** [2] - 714:16, 728:5
**issued** [1] - 718:24
**issues** [1] - 746:19
**item** [1] - 699:9
**itself** [3] - 705:21, 708:8, 721:10

## J

**James** [1] - 698:8
**JAROS** [1] - 698:18
**Jaros** [1] - 728:4
**JEREMY** [1] - 698:12
**Jitsu** [1] - 734:19
**Jiu** [1] - 734:19
**Jiu-Jitsu** [1] - 734:19
**JOSEPH** [1] - 698:18
**JR** [1] - 698:15
**Judge** [4] - 703:23, 707:25, 708:4, 745:9
**judgment** [1] - 745:7
**jump** [1] - 733:6
**justify** [2] - 701:2, 722:7

## K

**Kalantzi** [4] - 711:15, 712:1, 729:25, 730:4
**KATIE** [1] - 698:19
**keen** [1] - 746:14
**keep** [2] - 739:23, 750:24
**kids** [1] - 747:11
**kind** [8] - 707:9, 713:18, 715:25, 717:16, 727:22,

746:17, 748:2, 751:13
**kinds** [2] - 711:24, 738:12
**knowledge** [1] - 728:17
**known** [2] - 706:14, 712:22
**knows** [2] - 727:19, 747:11

## L

**L.P** [1] - 698:3
**label** [8] - 704:13, 706:1, 720:13, 723:11, 724:12, 724:15, 724:16, 725:2
**labels** [3] - 701:13, 702:18, 724:23
**LABORATORIES** [1] - 698:3
**laboratory** [2] - 726:21, 732:25
**lack** [2] - 739:24, 751:14
**large** [3] - 710:21, 742:8, 747:19
**largely** [2] - 721:13, 749:18
**larger** [1] - 720:5
**last** [3] - 699:9, 734:13, 737:5
**lastly** [2] - 704:13, 720:17
**latex** [1] - 714:11
**law** [21] - 700:22, 700:23, 700:24, 702:8, 703:2, 703:7, 703:17, 710:9, 714:8, 717:14, 718:12, 718:14, 725:1, 725:8, 727:11, 745:14, 745:22, 746:7
**Layered** [1] - 715:4
**layering** [2] - 714:10, 746:22
**layers** [1] - 714:10
**leads** [1] - 749:13
**leak** [2] - 714:18, 739:12
**leakage** [5] - 714:23, 716:21, 717:4, 743:12, 743:14
**leakiness** [1] - 714:13
**learned** [2] - 703:3, 705:24
**least** [9] - 700:12,

706:4, 713:9, 718:24, 722:17, 723:7, 727:4, 727:8, 747:22
**leave** [2] - 699:3, 725:13
**leaves** [1] - 724:12
**legally** [2] - 717:18, 743:21
**length** [5] - 708:15, 747:15, 747:16, 747:22, 747:23
**less** [6] - 713:17, 742:19, 747:13, 747:16, 750:11, 750:17
**letter** [1] - 747:8
**level** [10] - 710:5, 714:17, 716:1, 736:1, 736:7, 736:9, 736:15, 737:2, 737:14, 751:22
**levels** [18] - 703:25, 704:23, 706:8, 706:21, 707:5, 707:10, 707:17, 709:25, 712:20, 713:1, 713:5, 713:20, 714:2, 714:3, 722:24, 726:2, 737:1, 737:5
**lie** [1] - 717:12
**light** [1] - 729:8
**lighter** [1] - 717:7
**like-on-like** [1] - 715:8
**like-on-unlike** [1] - 714:10
**likely** [4] - 702:19, 703:10, 710:20, 742:15
**Lilly** [2] - 724:21, 724:24
**limit** [1] - 739:4
**limitation** [3] - 708:10, 708:11, 718:19
**limitations** [2] - 705:1, 709:17
**limited** [1] - 718:12
**LIMITED** [1] - 698:5
**limits** [2] - 739:3, 739:4
**line** [2] - 699:25, 733:22
**Line** [2] - 707:20
**Lines** [2] - 699:25, 707:19
**liquid** [1] - 747:15
**literally** [6] - 700:10, 704:8, 704:11, 706:4, 724:11, 745:6

**literature** [11] - 709:4, 711:16, 718:25, 720:19, 720:22, 727:19, 728:15, 729:5, 729:23, 736:9
**litigated** [1] - 746:11
**litigating** [1] - 751:19
**litigation** [8] - 702:24, 702:25, 717:18, 721:7, 721:9, 722:8, 744:15
**litigation-inspired** [3] - 717:18, 721:7, 722:8
**LLP** [2] - 698:12, 698:16
**Loch** [1] - 718:22
**lock** [1] - 741:24
**logical** [1] - 742:22
**logically** [3] - 724:19, 724:25, 750:25
**lone** [1] - 734:14
**look** [21] - 699:25, 700:7, 701:21, 709:21, 712:20, 716:9, 718:20, 719:20, 723:3, 723:4, 723:17, 724:22, 733:7, 733:16, 733:21, 733:24, 734:16, 737:1, 746:3, 750:20
**looked** [3] - 699:23, 714:17, 738:17
**looking** [4] - 709:2, 713:1, 736:16, 748:1
**looks** [2] - 729:20, 737:2
**lost** [1] - 746:16
**low** [1] - 739:11
**lowest** [4] - 714:18, 714:22, 716:20, 717:3
**LP** [1] - 698:3
**Lupin** [42] - 701:8, 701:10, 702:10, 704:5, 704:19, 704:21, 704:24, 710:22, 712:8, 715:11, 716:17, 718:10, 719:6, 719:8, 720:5, 720:25, 721:4, 722:6, 722:13, 725:7, 725:17, 725:22, 726:17, 726:21, 727:6, 729:10, 731:14, 732:2, 732:11, 732:19, 732:23,

736:24, 737:3, 738:16, 739:5, 741:21, 742:14, 743:10, 743:14, 744:13, 745:8
**LUPIN** [2] - 698:5
**Lupin's** [65] - 701:11, 701:18, 702:3, 702:11, 702:13, 702:16, 702:20, 703:6, 703:11, 703:14, 704:3, 704:6, 704:10, 704:13, 704:14, 704:18, 705:8, 705:9, 705:16, 705:17, 705:19, 705:25, 706:13, 706:14, 707:4, 708:9, 708:22, 710:7, 711:10, 712:7, 713:5, 713:10, 713:23, 715:12, 717:1, 717:5, 717:9, 717:13, 719:12, 719:14, 719:15, 719:20, 719:23, 720:3, 720:9, 720:13, 720:25, 721:7, 722:16, 722:22, 723:2, 723:6, 723:12, 724:4, 724:7, 724:10, 724:12, 737:17, 737:22, 737:24, 738:5, 739:3, 741:8, 744:5

## M

**machines** [1] - 721:13
**maintain** [1] - 722:24
**mandated** [1] - 705:22
**manner** [1] - 701:8
**mantra** [1] - 701:15
**manufactured** [1] - 716:9
**manufacturer** [1] - 703:11
**manufacturing** [3] - 710:22, 715:19, 716:6
**mark** [7] - 710:18, 711:5, 723:14, 723:15, 724:6, 724:8, 724:9
**Market** [2] - 698:9, 698:13
**market** [1] - 722:4

**math** [3] - 710:24, 734:19, 735:15
**mathematically** [1] - 749:21
**matter** [9] - 714:7, 715:21, 717:14, 717:19, 724:16, 725:1, 728:2, 739:16, 752:8
**matters** [8] - 702:8, 702:21, 703:7, 711:19, 711:20, 714:6, 716:11, 724:17
**Max** [4] - 719:22, 719:24, 720:5, 736:19
**Mazzochi** [1] - 698:20
**McLaughlin** [1] - 698:22
**mean** [18] - 700:18, 704:9, 706:3, 711:8, 718:11, 719:19, 723:3, 723:4, 723:10, 723:13, 723:21, 724:4, 724:7, 729:17, 733:21, 733:22, 733:23, 734:4
**meant** [1] - 722:23
**measure** [2] - 715:16, 735:9
**mechanism** [1] - 713:25
**media** [2] - 719:2, 719:3
**medication** [1] - 722:23
**medium** [1] - 742:9
**meet** [2] - 746:8
**meeting** [1] - 729:24
**MEGAN** [1] - 698:22
**mens** [2] - 706:25, 747:2
**mention** [2] - 726:2, 726:3
**mentioned** [7] - 706:23, 720:20, 723:24, 738:9, 740:18, 741:20, 742:24
**Merck** [2] - 722:6, 722:14
**mere** [1] - 701:13
**meshes** [1] - 706:16
**met** [2] - 703:25, 704:19
**Method** [2] - 719:8, 719:10
**method** [14] - 704:15,

724:13, 724:18, 724:19, 727:16, 727:17, 727:23, 728:10, 728:12, 728:13, 742:14, 742:24, 743:7, 748:4
**methylene** [9] - 714:9, 715:2, 726:2, 738:22, 738:24, 739:4, 739:6, 739:8, 746:21
**middle** [3] - 700:17, 746:5, 748:2
**might** [2] - 714:4, 730:15
**Miller** [7] - 719:1, 719:4, 720:22, 720:24, 742:4, 742:11, 743:25
**milligram** [1] - 737:11
**milligrams** [12] - 705:10, 705:13, 705:14, 710:13, 711:5, 722:18, 722:19, 724:8, 724:9, 748:13
**milliliters** [2] - 711:18, 747:9
**million** [1] - 735:1
**mimic** [1] - 737:19
**mimics** [1] - 728:22
**mind** [1] - 713:22
**minimal** [1] - 715:13
**minimum** [2] - 716:15, 735:5
**minutes** [26] - 700:14, 700:15, 700:18, 708:1, 708:10, 710:11, 710:17, 719:4, 719:5, 727:17, 728:14, 729:15, 731:3, 731:11, 733:17, 742:6, 743:4, 743:21, 743:25, 744:1, 747:9, 750:10
**miraculously** [1] - 704:25
**misread** [1] - 707:7
**mixes** [1] - 717:24
**mLs** [3] - 705:24, 712:8, 747:14
**Molino** [1] - 698:20
**moment** [1] - 729:4
**Monster** [1] - 718:22
**morning** [1] - 699:2
**morphed** [1] - 733:20
**Morris** [1] - 698:12
**most** [4] - 711:13, 725:11, 742:22,

748:18
**mostly** [1] - 748:17
**motivated** [1] - 702:25
**move** [1] - 700:8
**moved** [1] - 732:13
**moving** [1] - 722:15
**MR** [7] - 699:10, 699:13, 699:17, 725:17, 725:20, 745:11, 745:13
**MS** [1] - 699:5
**multiday** [1] - 723:4
**multimedia** [5] - 719:6, 719:15, 721:1, 726:1, 728:5
**multiple** [1] - 746:13
**multiply** [1] - 734:20
**must** [2] - 713:10, 737:7
**Myers** [1] - 745:22
**Mylan** [3] - 700:25, 703:19, 703:23
**mysterious** [1] - 712:25

## N

**narrow** [1] - 706:11
**nasogastric** [1] - 730:5
**nature** [2] - 715:20, 723:25
**near** [2] - 705:19, 716:21
**nearly** [1] - 704:19
**neat** [1] - 707:21
**necessarily** [2] - 712:13, 715:19
**necessary** [1] - 711:2
**need** [5] - 703:14, 720:16, 727:23, 741:18, 746:7
**needs** [2] - 699:3, 703:15
**neighborhood** [1] - 747:21
**Ness** [1] - 718:22
**never** [10] - 721:15, 727:5, 727:18, 730:22, 736:6, 736:11, 738:11, 739:18, 742:1, 745:19
**New** [1] - 698:17
**new** [2] - 722:13, 732:20
**newest** [1] - 734:13
**next** [2] - 716:10, 751:18
**Nichols** [1] - 698:12

**nominally** [2] - 705:5
**non** [11] - 724:23, 733:18, 733:20, 734:7, 734:8, 734:10, 735:19, 738:18, 743:19, 745:8
**non-adherence** [1] - 738:18
**non-infringement** [2] - 735:19, 745:8
**non-infringing** [7] - 733:18, 733:20, 734:7, 734:8, 734:10, 743:19
**non-pharmaceutical** [1] - 724:23
**none** [7] - 727:25, 731:19, 738:19, 739:19, 743:3, 743:12
**nonetheless** [1] - 714:9
**normal** [3] - 711:23, 711:24, 711:25
**North** [2] - 698:13, 698:23
**noses** [1] - 730:6
**nothing** [6] - 727:8, 731:25, 735:17, 741:1, 742:17, 742:18
**notice** [1] - 744:19
**notion** [1] - 737:7
**Novopharm** [1] - 722:3
**number** [13] - 701:21, 718:17, 719:21, 720:12, 728:19, 729:7, 734:23, 736:7, 741:3, 748:19, 749:22, 749:24, 751:15
**Number** [4] - 728:9, 737:21, 738:4, 741:17
**NY** [1] - 698:17

## O

**obey** [1] - 750:19
**obligated** [1] - 751:7
**obligation** [2] - 726:25, 749:1
**observations** [1] - 711:25
**observed** [1] - 741:16
**obtaining** [1] - 711:21
**obviously** [7] - 728:16, 730:9,

732:25, 736:11, 738:6, 741:10, 742:18
**occur** [1] - 713:19
**occurred** [1] - 721:4
**occurs** [1] - 709:5
**OF** [1] - 698:1
**offense** [1] - 699:6
**Official** [2] - 698:25, 752:12
**old** [1] - 734:25
**Old** [1] - 698:16
**once** [5] - 704:22, 722:23, 722:25, 723:11, 723:18
**once-daily** [3] - 722:23, 722:25, 723:11
**one** [38] - 699:19, 700:12, 701:13, 703:14, 703:15, 703:16, 703:24, 707:21, 710:9, 710:12, 715:21, 716:15, 720:19, 720:20, 723:19, 724:15, 728:16, 729:3, 732:15, 734:11, 734:14, 734:16, 734:23, 734:24, 734:25, 735:4, 735:6, 736:1, 736:5, 741:17, 741:18, 744:7, 748:19, 748:25, 749:22, 751:2, 751:3
**ones** [1] - 747:25
**opening** [2] - 701:1, 726:16
**openings** [1] - 726:7
**opposed** [2] - 750:7, 751:10
**optimal** [1] - 747:13
**Oracea** [30] - 702:4, 702:5, 704:5, 704:7, 704:10, 708:8, 708:20, 715:7, 715:10, 717:6, 719:17, 720:3, 720:4, 720:10, 720:14, 726:12, 729:13, 729:14, 729:15, 731:14, 736:24, 737:10, 738:16, 741:21, 743:2, 743:5, 743:10, 743:13, 749:8
**oral** [1] - 704:21
**order** [2] - 701:7,

748:11
**ordinary** [1] - 747:7
**organ** [1] - 708:18
**otherwise** [2] - 715:11, 733:4
**ounces** [1] - 747:12
**outside** [5] - 705:1, 716:18, 722:8, 727:18, 736:12
**overstatement** [1] - 751:14
**own** [9] - 701:11, 701:12, 702:1, 705:16, 727:18, 737:9, 742:21, 744:16, 751:7
**owner** [1] - 744:16

## P

**P.A** [1] - 698:22
**P.O** [1] - 698:13
**PA** [1] - 698:9
**paddle** [1] - 742:9
**paddles** [8] - 731:7, 731:9, 742:7, 742:14, 742:15, 743:24, 743:25, 744:1
**paint** [1] - 714:11
**paper** [2] - 719:1, 720:22
**parameters** [2] - 732:10, 741:5
**parse** [1] - 728:3
**part** [2] - 706:24, 718:18
**particle** [2] - 747:18, 747:19
**particular** [4] - 707:11, 715:3, 718:7, 751:2
**particularly** [1] - 713:6
**parties** [2] - 747:5, 751:21
**partisan** [1] - 751:13
**party** [1] - 750:4
**pass** [1] - 699:15
**passages** [1] - 700:7
**past** [2] - 701:23, 750:17
**patent** [39] - 699:20, 699:24, 700:6, 705:21, 707:15, 707:16, 707:18, 709:10, 711:3, 711:19, 718:11, 718:12, 718:13, 724:2, 726:9, 726:12, 726:13, 726:15, 727:20,

728:1, 728:16, 729:1, 729:5, 735:24, 736:11, 737:9, 737:19, 744:16, 744:17, 744:19, 744:23, 745:4, 746:2, 746:5, 746:24, 748:3, 748:6
**patentee** [2] - 726:14, 727:1
**patents** [3] - 701:9, 702:6, 724:13
**patient** [7] - 700:20, 703:24, 706:6, 712:20, 723:7, 723:17, 724:17
**patients** [5] - 711:11, 712:2, 712:9, 720:12, 725:4
**peaked** [1] - 719:22
**peer** [2] - 728:15, 736:9
**peer-reviewed** [2] - 728:15, 736:9
**pellet** [1] - 715:18
**pellets** [10] - 702:13, 702:17, 703:14, 708:21, 710:3, 715:19, 715:24, 716:6, 717:9, 741:12
**people** [1] - 747:14
**people's** [1] - 730:6
**per** [2] - 706:1, 723:20
**percent** [51] - 700:14, 700:17, 700:18, 700:21, 705:19, 706:7, 710:8, 710:16, 710:18, 710:23, 711:4, 711:11, 711:12, 713:17, 714:15, 714:16, 714:17, 715:15, 716:15, 716:17, 716:19, 716:20, 717:2, 717:6, 723:9, 723:14, 723:15, 723:21, 724:8, 729:11, 729:16, 732:24, 733:1, 733:14, 733:21, 733:22, 736:20, 737:17, 737:22, 737:24, 739:15, 740:12, 740:20, 740:22, 743:5, 743:14, 743:16, 743:18
**percentage** [1] - 751:12

**percentile** [2] - 712:2, 748:1
**perfectly** [3] - 709:25, 738:18, 745:15
**perform** [1] - 729:14
**performed** [3] - 732:23, 737:25, 740:14
**performs** [1] - 732:22
**period** [2] - 723:20, 723:21
**permission** [1] - 699:14
**permitted** [1] - 738:23
**persist** [1] - 743:24
**person** [11] - 720:4, 728:9, 728:18, 728:20, 728:25, 735:9, 735:22, 738:11, 741:19, 745:1
**personally** [1] - 735:18
**persons** [1] - 744:20
**persuasive** [1] - 714:4
**pH** [86] - 699:25, 700:9, 705:17, 705:20, 705:22, 705:23, 705:25, 706:2, 710:3, 710:4, 710:12, 710:14, 710:19, 711:13, 711:16, 711:21, 711:23, 712:1, 712:11, 712:13, 712:14, 712:17, 716:21, 716:25, 717:16, 717:19, 717:21, 717:23, 718:2, 718:3, 718:6, 718:10, 718:16, 718:23, 721:25, 723:10, 723:14, 726:10, 728:12, 728:13, 728:21, 728:22, 729:3, 729:6, 729:20, 729:21, 729:22, 730:1, 730:2, 730:14, 730:21, 730:23, 731:2, 731:5, 731:6, 731:8, 731:13, 732:21, 733:2, 737:19, 737:25, 738:1, 740:14, 741:13, 741:14, 742:24, 742:25, 743:21, 743:22, 744:25, 747:6, 747:7,

747:20, 747:24, 749:5, 749:8
**pharmaceutical** [2] - 704:22, 724:23
**pharmaceutically** [1] - 705:3
**phase** [1] - 736:22
**phenomenon** [1] - 742:21
**Philadelphia** [1] - 698:9
**Phillips** [1] - 698:22
**pHs** [2] - 718:8, 728:13
**picked** [1] - 717:15
**picking** [1] - 729:1
**picks** [1] - 730:11
**pictures** [2] - 742:5
**pill** [1] - 747:12
**pills** [1] - 747:6
**pilot** [1] - 732:14
**place** [4] - 707:12, 707:21, 719:1, 744:8
**places** [1] - 701:21
**Plaintiff** [3] - 745:24, 746:23, 750:16
**PLAINTIFFS** [2] - 698:12, 698:15
**Plaintiffs** [14] - 701:4, 701:6, 748:24, 748:25, 749:1, 749:2, 749:4, 749:7, 750:21, 750:24, 751:4, 751:7, 751:16
**plasma** [2] - 701:19, 703:24
**plausible** [1] - 751:4
**play** [5] - 733:10, 734:15, 736:3
**plenty** [4] - 727:24, 738:3, 738:24, 739:1
**plotted** [1] - 736:15
**point** [23] - 700:5, 706:19, 707:9, 707:23, 708:6, 708:15, 708:23, 709:3, 709:4, 709:8, 709:15, 710:8, 710:14, 710:17, 716:23, 719:23, 722:14, 725:8, 729:21, 730:25, 731:8, 737:5, 741:25
**pointed** [2] - 711:10, 712:3
**points** [7] - 700:4, 705:21, 709:12, 724:2, 725:11, 738:11, 744:6
**polarity** [1] - 739:11

**policy** [10] - 744:7, 744:8, 744:12, 744:14, 744:15, 744:18, 744:23, 745:2, 745:3
**portion** [19] - 701:24, 705:11, 705:12, 705:13, 705:15, 707:25, 708:2, 709:1, 709:11, 709:14, 715:14, 716:14, 720:5, 722:18, 722:19, 723:12, 726:8, 737:23
**portions** [1] - 704:24
**posed** [1] - 725:21
**positor** [1] - 750:22
**possible** [5] - 729:16, 740:15, 741:8, 749:6, 751:23
**possibly** [3] - 714:19, 714:23, 736:13
**post** [7] - 700:22, 702:24, 708:15, 721:9, 722:7, 733:12, 736:20
**post-ANDA** [1] - 721:9
**post-trial** [4] - 700:22, 708:15, 722:7, 733:12
**posts** [2] - 736:16, 736:20
**potentially** [1] - 715:3
**practice** [2] - 747:13, 748:10
**practiced** [1] - 748:12
**practicing** [1] - 748:4
**precious** [1] - 703:2
**predecessor** [2] - 700:25, 703:19
**predecessor's** [1] - 706:16
**preferable** [1] - 716:18
**preferential** [1] - 713:9
**preferred** [1] - 709:11
**premise** [1] - 730:25
**preparation** [2] - 746:12, 746:13
**preponderance** [1] - 702:19
**prescribing** [1] - 704:13
**present** [1] - 711:16
**presented** [6] - 700:22, 701:5, 701:25, 704:6, 713:7, 747:5
**presenting** [1] - 701:7
**pressed** [4] - 712:15,

712:16, 718:3
**pretty** [1] - 748:23
**probative** [3] - 749:18, 750:6, 750:11
**problem** [6] - 731:22, 732:6, 736:4, 736:5, 739:16, 749:23
**problems** [5] - 738:18, 739:5, 739:18, 748:19
**procedural** [1] - 699:7
**procedure** [1] - 751:6
**procedures** [1] - 721:5
**proceed** [2] - 699:12, 725:18
**proceedings** [1] - 752:8
**process** [5] - 715:4, 716:6, 732:10, 740:19, 741:5
**produced** [2] - 721:18, 721:24
**product** [72] - 701:8, 701:18, 702:3, 702:20, 702:23, 703:4, 703:11, 704:3, 704:5, 704:7, 704:15, 704:18, 704:19, 705:3, 705:9, 705:24, 706:1, 706:14, 706:15, 707:4, 708:19, 708:22, 709:14, 710:7, 711:10, 712:9, 712:21, 713:10, 713:11, 713:23, 714:13, 714:14, 715:10, 715:11, 717:1, 717:6, 717:20, 718:7, 719:16, 719:23, 720:3, 720:9, 720:13, 721:11, 722:4, 722:16, 722:22, 723:2, 723:6, 723:12, 724:7, 724:10, 724:14, 726:17, 726:21, 729:10, 731:15, 731:19, 736:19, 737:1, 739:3, 739:5, 741:9, 741:21, 743:10, 745:6, 745:16, 749:8, 749:20, 749:21, 749:25
**products** [11] - 716:14, 716:15, 721:22, 723:5,

724:23, 731:14, 731:17, 737:11, 738:25, 739:2, 739:15
**professional** [1] - 746:15
**profile** [1] - 723:17
**profiles** [1] - 701:19
**progresses** [1] - 713:17
**prompted** [1] - 743:8
**proof** [4] - 703:20, 750:5, 751:16
**proofs** [2] - 701:25, 744:10
**proper** [5] - 707:16, 707:17, 730:12, 730:23, 735:6
**properly** [2] - 708:19, 716:16
**proposed** [1] - 724:15
**protocols** [1] - 705:23
**prove** [9] - 701:7, 711:3, 727:17, 727:23, 733:3, 733:4, 744:11, 745:20, 751:25
**proved** [1] - 744:10
**proven** [2] - 742:1, 742:10
**provenance** [2] - 703:3, 721:17
**provide** [1] - 719:16
**provided** [1] - 724:12
**public** [1] - 744:19
**publication** [2] - 729:24, 742:4
**purely** [1] - 715:8
**purpose** [1] - 743:15
**purposely** [6] - 707:3, 707:5, 707:10, 740:8, 746:24, 748:4
**put** [9] - 707:21, 721:8, 731:15, 734:10, 741:23, 742:16, 743:11, 745:18, 746:13
**putting** [2] - 714:11, 740:8

**Q**

**qualifications** [1] - 721:4
**qualities** [1] - 739:9
**quality** [1] - 740:15
**quantified** [1] - 713:14
**quantifying** [1] - 709:13
**quarter** [1] - 735:1

**questions** [14] - 699:19, 725:12, 725:14, 725:21, 725:22, 726:4, 728:6, 735:25, 741:2, 744:3, 744:5, 744:6
**quick** [2] - 741:25, 744:6
**quickly** [4] - 719:11, 720:10, 737:16, 741:17
**quietly** [1] - 699:6
**quite** [5] - 720:8, 746:19, 746:23, 747:2, 750:9
**quotes** [1] - 731:2

**R**

**raise** [1] - 712:13
**RAKOCZY** [3] - 698:18, 725:17, 725:20
**Rakoczy** [3] - 698:20, 725:16, 725:17
**ran** [1] - 745:13
**range** [9] - 700:17, 709:12, 710:7, 716:18, 718:2, 718:8, 729:24, 730:7, 732:11
**rapid** [1] - 719:9
**rapidly** [1] - 719:3
**rate** [4] - 719:25, 727:21, 728:17, 736:13
**rather** [1] - 707:13
**ratio** [8] - 705:6, 705:7, 706:20, 707:11, 707:17, 709:23, 713:11, 750:20
**ratios** [5] - 713:1, 736:6, 736:10, 737:9, 737:11
**RDR** [2] - 698:24, 752:11
**rea** [2] - 706:25, 747:2
**read** [2] - 749:6, 749:7
**reading** [2] - 750:23, 751:5
**reads** [1] - 749:9
**real** [4] - 719:12, 742:21, 744:2, 750:7
**realize** [1] - 737:6
**really** [12] - 699:19, 707:2, 716:18, 717:22, 728:13, 731:12, 733:10,

736:2, 738:2, 739:8, 747:4, 750:12
**reason** [8] - 706:23, 714:2, 715:3, 736:7, 736:14, 741:6, 749:19, 750:2
**reasonable** [2] - 745:7, 747:20
**reasonably** [1] - 746:19
**rebut** [2] - 701:25, 727:10
**rebuttal** [13] - 727:6, 731:20, 731:23, 732:5, 732:18, 732:23, 733:1, 738:5, 738:7, 740:3, 740:16, 744:13
**receive** [1] - 715:18
**recited** [1] - 704:23
**recognized** [1] - 730:4
**recommended** [1] - 731:13
**record** [5] - 703:2, 749:3, 751:22, 751:25, 752:8
**Recro** [3] - 700:24, 703:18
**redone** [2] - 732:25, 733:1
**reestablished** [1] - 730:21
**reestablishing** [1] - 730:17
**referenced** [1] - 720:23
**references** [1] - 718:25
**reflective** [1] - 734:5
**regarding** [1] - 719:19
**regimen** [1] - 723:4
**Reindel** [1] - 698:16
**relative** [1] - 729:10
**release** [60] - 700:1, 700:2, 700:19, 700:21, 701:14, 701:17, 701:24, 702:11, 702:13, 702:17, 705:10, 705:11, 705:12, 705:13, 705:15, 705:19, 706:7, 706:21, 707:5, 708:1, 708:11, 708:20, 708:21, 709:1, 709:7, 709:24, 710:3, 710:8, 710:23, 711:10, 711:12, 712:5, 713:19,

714:3, 716:14, 717:8, 719:25, 720:1, 720:10, 720:14, 723:14, 723:15, 723:17, 723:21, 728:11, 730:11, 730:23, 733:2, 733:19, 735:9, 735:23, 737:24, 740:22, 743:20, 743:22, 748:5, 748:13, 748:14
**release"** [1] - 706:19
**released** [6] - 702:14, 708:19, 710:13, 731:19, 743:12, 743:19
**releases** [7] - 705:13, 705:14, 710:7, 710:16, 710:18, 711:4, 724:7
**releasing** [4] - 710:4, 733:18, 734:1, 734:2
**relevance** [1] - 709:7
**relevant** [10] - 700:5, 708:1, 708:23, 709:13, 709:16, 711:13, 713:6, 717:19, 729:22, 738:7
**reliability** [1] - 736:5
**reliable** [2] - 727:14, 729:7
**reliably** [1] - 743:4
**reliance** [1] - 722:7
**relied** [3] - 703:5, 729:25, 745:14
**relies** [2] - 728:14, 742:4
**rely** [10] - 717:15, 721:9, 729:12, 730:9, 733:23, 738:11, 741:24, 745:24, 746:6, 750:6
**relying** [6] - 707:23, 721:19, 733:16, 733:17, 749:4
**remainder** [1] - 719:14
**remains** [2] - 740:10, 745:17
**remarkably** [2] - 706:13, 712:21
**remember** [2] - 735:10, 736:17
**remind** [1] - 713:12
**repeat** [1] - 751:2
**repeatedly** [1] - 708:6
**replotted** [1] - 736:22
**reported** [1] - 711:15

**Reporter** [2] - 698:25, 752:12
**represent** [1] - 723:19
**representation** [3] - 722:12, 723:2, 724:6
**representative** [7] - 700:13, 722:12, 723:5, 723:8, 723:16, 734:24, 735:1
**represented** [1] - 722:11
**represents** [2] - 705:25, 719:24
**request** [1] - 727:10
**require** [2] - 706:6, 710:9
**required** [4] - 701:19, 702:20, 708:2, 719:9
**requirements** [1] - 703:25
**requires** [1] - 740:21
**rerun** [1] - 721:1
**Research** [2] - 700:25, 703:19
**resembled** [1] - 717:1
**residence** [2] - 708:17, 723:25
**resolved** [2] - 731:18, 743:12
**response** [2] - 720:12, 733:12
**responsive** [1] - 722:7
**rest** [2] - 702:16, 717:24
**result** [6] - 701:19, 722:21, 723:12, 735:7, 748:10, 748:11
**resulted** [1] - 717:8
**results** [10] - 703:11, 704:16, 706:12, 721:2, 738:10, 740:21, 741:16, 747:1, 749:18, 750:10
**resurrected** [1] - 733:11
**review** [1] - 725:14
**reviewed** [3] - 708:1, 728:15, 736:9
**rife** [1] - 718:25
**rigged** [1] - 732:3
**rigorously** [1] - 726:7
**risk** [1] - 715:8
**rods** [1] - 713:3
**ROSE** [1] - 698:19
**rounding** [2] - 703:24, 704:1
**ROYALTY** [1] - 698:3

**Rudnic** [37] - 701:4, 705:9, 706:10, 708:24, 711:9, 711:14, 711:21, 712:11, 712:25, 714:12, 715:9, 715:12, 716:13, 716:19, 717:22, 718:5, 719:24, 721:22, 727:21, 728:11, 728:23, 729:18, 729:25, 730:9, 733:7, 734:23, 735:4, 736:6, 736:23, 737:13, 739:17, 741:1, 741:20, 741:25, 742:4, 743:8, 748:20
**Rudnic's** [3] - 712:21, 723:24, 751:13
**rule** [3] - 738:4, 741:8, 751:3
**run** [8] - 710:2, 737:15, 744:16, 744:17, 744:23, 744:24, 745:3
**running** [5] - 726:14, 743:24, 743:25, 744:2, 745:5

**S**

**salts** [1] - 709:6
**sample** [1] - 723:5
**samples** [6] - 722:8, 722:10, 722:11, 722:13, 727:1, 730:7
**satisfied** [3] - 751:16, 751:19, 751:21
**save** [1] - 721:19
**saw** [3] - 729:25, 739:15, 739:22
**scale** [8] - 710:21, 716:25, 721:13, 732:14, 732:16, 740:23
**scale-down** [2] - 732:16, 740:23
**scale-up** [3] - 716:25, 732:16, 740:23
**scaled** [2] - 732:10, 732:11
**science** [1] - 701:5
**scientific** [1] - 742:1
**scope** [1] - 745:7
**scratching** [1] - 716:12
**screen** [1] - 730:1
**second** [8] - 704:6,

727:16, 728:12, 738:10, 741:16, 741:20, 748:24

**second-stage** [5] - 727:16, 728:12, 738:10, 741:16

**secreted** [1] - 717:24

**section** [1] - 700:6

**sectioned** [4] - 731:25, 738:14, 738:16, 740:6

**sectioning** [1] - 739:17

**sections** [1] - 715:11

**see** [21] - 710:6, 713:13, 716:8, 719:21, 720:8, 720:12, 723:13, 724:7, 726:14, 730:22, 731:15, 732:21, 733:22, 733:25, 734:6, 739:20, 739:21, 741:3, 744:7, 748:19, 750:1

**seeing** [3] - 715:25, 736:19, 736:21

**seek** [1] - 699:20

**self** [1] - 717:16

**self-serving** [1] - 717:16

**SEM** [2] - 715:9, 739:17

**sense** [4] - 711:22, 713:18, 714:22, 715:17

**seriousness** [1] - 718:21

**served** [1] - 746:15

**serving** [1] - 717:16

**set** [6] - 700:6, 701:18, 718:13, 730:14, 734:5, 748:14

**several** [1] - 699:19

**shaft"** [1] - 742:9

**Shanfelder** [3] - 698:24, 752:10, 752:11

**shape** [1] - 715:20

**shooting** [1] - 712:19

**short** [1] - 708:16

**shots** [1] - 731:20

**show** [16] - 702:3, 702:11, 706:3, 708:9, 713:6, 722:2, 723:4, 723:10, 726:21, 727:8, 727:13, 738:3, 742:6, 745:20, 750:6, 751:24

**showed** [3] - 713:22, 716:20, 743:22

**showing** [1] - 739:23

**shown** [2] - 702:18, 717:7

**shows** [8] - 700:9, 704:3, 704:10, 713:10, 723:14, 725:7, 737:8, 751:24

**side** [1] - 699:17

**sides** [5] - 708:16, 746:12, 746:15, 746:19, 751:23

**sideshow** [3] - 726:3, 738:22, 746:22

**significantly** [1] - 708:25

**similar** [5] - 706:13, 709:3, 710:14, 712:21, 720:8

**simple** [4] - 711:22, 725:24, 726:7, 741:13

**simply** [1] - 721:23

**single** [6] - 703:14, 703:21, 712:16, 727:2, 743:5, 747:12

**sinks** [1] - 742:17

**sits** [1] - 742:17

**situation** [1] - 748:3

**Siwik** [1] - 698:20

**sizes** [2] - 747:18, 747:19

**skill** [1] - 720:4

**skilled** [11] - 728:9, 728:17, 728:20, 728:25, 735:8, 735:22, 738:11, 741:19, 744:19, 745:1

**skip** [1] - 725:25

**Slide** [1] - 728:4

**slides** [5] - 699:14, 725:10, 726:5, 742:2, 744:4

**Slip** [1] - 698:16

**slip** [1] - 699:6

**slowly** [1] - 742:17

**smack** [1] - 746:5

**small** [2] - 732:13, 747:18

**smoking** [1] - 741:24

**so-called** [4] - 702:16, 705:14, 708:23, 717:9

**sold** [1] - 722:4

**solid** [2] - 747:16, 749:3

**solids** [1] - 747:19

**solution** [1] - 750:2

**solvent** [4] - 715:8, 739:8, 739:9, 739:13

**someone** [2] - 747:8, 747:11

**somewhat** [1] - 707:8

**somewhere** [2] - 702:16, 729:5

**sort** [1] - 701:15

**sorts** [1] - 711:24

**sound** [2] - 742:9, 742:10

**spec** [1] - 709:25

**special** [1] - 732:1

**specifically** [1] - 749:5

**specification** [9] - 699:20, 699:24, 701:20, 706:2, 707:16, 709:10, 709:23, 712:6

**specified** [1] - 704:23

**speckling** [1] - 746:21

**speculate** [2] - 716:4, 716:5

**spilled** [1] - 726:24

**spinning** [3] - 742:7, 742:14, 742:15

**spraying** [1] - 739:10

**stage** [7] - 713:16, 715:15, 727:16, 728:12, 738:10, 741:16

**stages** [1] - 732:9

**standard** [16] - 710:21, 719:4, 723:5, 726:10, 726:15, 728:21, 729:2, 729:4, 729:6, 729:10, 731:7, 735:24, 737:18, 744:17, 744:24, 745:4

**standing** [1] - 745:23

**stands** [1] - 751:25

**Stark** [2] - 703:23, 707:25

**Stark's** [1] - 708:4

**starkly** [1] - 747:5

**start** [1] - 719:14

**started** [4] - 702:24, 709:9, 731:9, 732:13

**starts** [1] - 714:17

**state** [9] - 704:10, 705:17, 706:5, 708:17, 711:17, 712:17, 722:24, 723:22

**statement** [1] - 725:23

**statements** [1] - 752:2

**Statements** [1] - 698:4

**STATES** [1] - 698:1

**statistics** [1] - 733:25

**staying** [1] - 747:19

**stays** [3] - 747:15, 747:16, 747:23

**steady** [5] - 704:10, 706:5, 722:24, 723:22

**STEPHANOS** [1] - 698:7

**steps** [1] - 750:16

**sticking** [1] - 730:5

**still** [4] - 726:19, 737:12, 741:8, 748:10

**stir** [2] - 742:18, 750:24

**stirred** [1] - 742:20

**stock** [1] - 741:24

**stomach** [40] - 700:3, 705:20, 705:23, 705:25, 708:18, 708:19, 709:3, 709:5, 710:4, 711:17, 711:23, 712:13, 712:14, 712:17, 713:21, 717:20, 717:23, 717:24, 718:1, 718:4, 724:1, 728:22, 729:22, 730:6, 730:19, 730:21, 730:22, 737:20, 737:24, 747:6, 747:15, 747:17, 747:19, 747:21, 747:22, 748:15, 749:9, 749:19, 750:13, 751:10

**stopped** [1] - 731:7

**story** [1] - 739:24

**straight** [3] - 725:24, 726:7, 750:14

**straight-forward** [2] - 725:24, 726:7

**Street** [4] - 698:9, 698:13, 698:20, 698:23

**stress** [1] - 728:24

**stressed** [1] - 731:6

**stressing** [1] - 750:13

**strict** [2] - 708:2, 713:19

**strictly** [1] - 701:6

**strong** [2] - 725:8, 751:15

**structured** [3] - 726:4, 744:4, 748:7

**stuck** [2] - 699:19, 721:20

**studies** [1] - 719:20

**study** [5] - 719:7, 719:15, 721:1, 726:1, 742:11

**stuff** [3] - 702:25, 713:25, 750:25

**SUB** [1] - 698:3

**subjective** [1] - 747:2

**subjects** [3] - 719:22, 747:24, 748:2

**submission** [2] - 722:12, 745:18

**submissions** [1] - 702:1

**submit** [11] - 701:10, 703:1, 712:19, 714:8, 718:21, 722:13, 725:6, 727:15, 735:21, 744:10, 745:7

**submitted** [14] - 701:1, 702:10, 702:22, 703:4, 703:8, 717:17, 721:3, 721:10, 721:15, 721:20, 722:10, 745:14, 745:21, 745:24

**subset** [1] - 717:9

**substantial** [2] - 712:4, 713:15

**substantially** [3] - 736:24, 747:16, 750:11

**succeeded** [1] - 707:13

**sufficient** [2] - 703:22, 709:16

**suggest** [3] - 712:1, 724:23, 727:13

**suggesting** [1] - 732:3

**suggestion** [1] - 744:12

**Suite** [1] - 698:20

**summary** [2] - 707:19, 725:6

**Sun** [2] - 707:25, 711:7

**Sunovion** [2] - 703:8, 721:8

**support** [4] - 712:18, 719:13, 720:18, 751:15

**supported** [2] - 709:10, 712:1

**supporting** [1] - 712:17

**supports** [1] - 711:8

**supposed** [4] - 744:20, 744:21,

745:1, 750:20
**supposedly** [1] - 721:2
**surface** [2] - 715:10, 739:10
**surprise** [1] - 716:17
**surprised** [1] - 739:20
**surrounding** [1] - 719:13
**suspect** [1] - 703:1
**suspicious** [1] - 721:17
**sustained** [2] - 742:6, 742:8
**synonym** [1] - 707:3
**system** [2] - 707:12, 715:8

## T

**tablet** [1] - 735:1
**tablets** [1] - 723:9
**tainted** [1] - 721:2
**takeaway** [1] - 710:20
**tap** [2] - 711:25, 747:7
**targeting** [1] - 707:11
**TCD** [1] - 698:3
**technician** [1] - 719:10
**technicians** [1] - 719:10
**temperature** [1] - 730:19
**tension** [1] - 739:10
**term** [1] - 711:6
**terms** [6] - 699:8, 700:4, 701:23, 702:8, 706:17, 748:7
**test** [80] - 700:10, 706:12, 711:11, 716:21, 716:25, 718:6, 718:10, 718:18, 718:23, 719:9, 719:12, 721:1, 722:20, 722:21, 726:9, 726:10, 726:11, 726:15, 726:17, 726:25, 727:1, 727:2, 727:8, 727:12, 727:23, 727:24, 728:1, 728:2, 728:10, 728:24, 728:25, 729:1, 729:2, 730:23, 731:2, 731:5, 731:13, 732:21, 735:3, 735:6, 735:9, 735:18, 735:24,

736:17, 736:19, 737:18, 737:19, 737:25, 738:3, 741:18, 743:7, 743:8, 743:21, 744:16, 744:17, 744:21, 744:24, 745:4, 745:5, 745:13, 745:17, 745:20, 745:21, 746:3, 746:7, 748:2, 749:1, 749:2, 749:8, 749:25, 750:3, 751:12
**tested** [20] - 700:13, 703:3, 706:3, 719:6, 727:25, 729:19, 731:17, 731:23, 731:25, 732:6, 732:19, 733:4, 735:14, 735:20, 740:6, 740:21, 741:2, 741:22
**testified** [27] - 706:10, 709:7, 715:12, 716:16, 716:19, 717:22, 719:8, 719:24, 728:19, 728:20, 729:22, 730:15, 730:18, 731:4, 731:10, 731:12, 732:8, 733:23, 734:1, 739:1, 739:7, 739:14, 740:19, 740:22, 740:24, 742:13, 744:1
**testify** [1] - 729:9
**testimony** [22] - 701:12, 702:2, 702:5, 704:4, 704:9, 704:17, 705:25, 710:6, 711:9, 712:10, 713:8, 715:2, 716:2, 716:22, 719:19, 720:17, 723:25, 732:8, 741:4, 741:5, 747:18, 749:15
**testing** [18] - 705:22, 709:7, 721:25, 724:5, 726:23, 727:4, 727:5, 731:24, 738:1, 738:6, 738:7, 738:13, 739:24, 740:14, 743:13, 749:23, 750:7, 751:5
**tests** [7] - 718:13, 721:9, 721:11,

722:1, 726:20, 741:3, 751:8
**textbook** [1] - 734:5
**THE** [15] - 698:1, 698:7, 698:12, 698:15, 698:18, 698:22, 699:2, 699:6, 699:12, 699:16, 725:16, 725:19, 745:10, 745:12, 746:10
**theories** [2] - 733:8, 738:19
**theory** [24] - 712:25, 718:21, 719:12, 719:16, 720:18, 721:3, 727:11, 730:3, 732:5, 733:9, 733:18, 733:20, 733:21, 734:11, 734:13, 734:14, 735:20, 736:4, 738:5, 738:9, 738:21, 743:17
**therefore** [1] - 720:3
**thickness** [1] - 739:15
**thin** [2] - 715:13, 732:12
**thinly** [1] - 717:7
**thinly-applied** [1] - 717:7
**third** [2] - 704:9, 717:18
**thousands** [1] - 727:24
**three** [2] - 704:1, 733:7
**threshold** [1] - 729:11
**throw** [1] - 735:7
**throwing** [1] - 728:13
**TIGAN** [1] - 698:12
**tight** [1] - 739:2
**today** [2] - 734:18, 740:10
**together** [4] - 701:21, 707:21, 709:22, 734:10
**tons** [1] - 720:19
**took** [4] - 719:5, 723:5, 723:9, 743:10
**top** [3] - 730:3, 735:3, 735:10
**total** [2] - 704:1, 719:5
**totality** [3] - 712:22, 712:24, 713:2
**touch** [1] - 704:17
**touched** [1] - 725:11
**toxic** [1] - 715:3
**transcript** [1] - 752:7
**translating** [1] -

749:16
**treat** [3] - 748:10, 749:17, 750:21
**treatment** [3] - 704:15, 724:13, 724:20
**Trial** [2] - 698:4, 698:5
**trial** [32] - 699:23, 700:22, 701:2, 704:3, 704:17, 704:19, 706:19, 706:23, 707:2, 707:8, 708:15, 711:9, 711:15, 713:5, 713:8, 713:13, 716:2, 719:19, 719:24, 721:14, 722:7, 725:21, 733:10, 733:11, 733:12, 733:20, 734:15, 736:3, 738:23, 739:22, 744:9
**trouble** [1] - 744:13
**true** [3] - 703:7, 707:25, 750:11
**truly** [1] - 720:18
**try** [4] - 714:1, 727:23, 733:6, 740:9
**trying** [1] - 742:12
**tubes** [1] - 730:5
**Tunnell** [1] - 698:12
**twice** [1] - 715:4
**two** [13] - 700:14, 725:10, 729:18, 729:24, 734:3, 734:9, 736:7, 738:12, 741:17, 741:20, 741:24, 748:19, 749:24
**typical** [2] - 718:1, 747:24

## U

**U.S** [1] - 698:8
**ultimately** [6] - 703:1, 746:20, 746:25, 747:3, 748:7, 751:24
**unbelievably** [1] - 741:25
**uncited** [1] - 720:20
**under** [29] - 700:22, 700:23, 700:24, 703:2, 703:7, 703:16, 704:11, 705:22, 706:4, 712:8, 714:8, 721:24, 721:25, 722:2, 722:16, 722:20, 723:3,

724:11, 727:12, 728:2, 732:19, 732:20, 733:18, 736:18, 737:25, 745:7, 748:9, 748:11
**understood** [1] - 746:24
**unexpired** [1] - 740:2
**UNITED** [1] - 698:1
**units** [2] - 716:10, 716:11
**unknown** [2] - 721:13, 721:16
**unless** [1] - 744:3
**unlike** [1] - 714:10
**unproven** [1] - 741:8
**unrebutted** [4] - 730:15, 732:9, 740:23, 740:25
**unreliability** [1] - 735:8
**unsubstantiated** [1] - 717:14
**untimely** [1] - 702:25
**up** [18] - 699:15, 705:4, 709:24, 712:25, 716:6, 716:25, 720:18, 731:9, 732:10, 732:14, 732:16, 735:21, 740:13, 740:23, 743:25, 747:21, 748:22, 751:15
**US** [1] - 715:5
**uses** [2] - 715:7, 717:6
**USP** [2] - 719:8, 726:11

## V

**vacuum** [1] - 727:11
**valid** [1] - 745:21
**value** [1] - 720:6
**variability** [14] - 714:13, 729:8, 729:17, 730:5, 730:12, 731:18, 735:5, 741:16, 741:21, 743:11, 749:11, 749:13, 749:15, 749:16
**variation** [2] - 716:1, 749:13
**variations** [1] - 724:22
**versus** [5] - 700:25, 703:19, 722:6, 747:18, 750:12
**vessels** [1] - 719:6
**view** [3] - 710:21,

712:22, 732:3
**viewed** [1] - 721:16
**virtually** [1] - 734:1
**vitro** [15] - 702:2, 705:17, 706:12, 708:25, 709:2, 709:6, 711:13, 716:24, 717:15, 718:6, 718:17, 720:9, 724:4, 726:20, 748:6
**vivo** [8] - 701:17, 702:2, 706:10, 713:19, 724:1, 741:13, 741:14, 748:5
**volatile** [1] - 739:9
**volume** [1] - 711:22
**vortex** [1] - 731:6

# W

**wall** [1] - 714:12
**wants** [1] - 735:22
**warrant** [1] - 724:1
**water** [18] - 705:24, 711:18, 711:23, 711:24, 711:25, 712:12, 712:18, 715:5, 718:4, 723:12, 730:3, 730:6, 730:16, 730:18, 747:7, 747:12
**waves** [1] - 716:5
**wax** [1] - 714:11
**ways** [2] - 741:17, 749:6
**weak** [1] - 715:13
**weeks** [2] - 723:19, 751:18
**weight** [12] - 714:15, 714:22, 715:15, 715:18, 716:15, 716:17, 716:19, 716:20, 717:2, 717:6, 737:22, 740:15
**weird** [4] - 749:24, 750:1, 751:11
**welcome** [1] - 699:3
**West** [1] - 698:20
**whatsoever** [3] - 721:4, 739:19, 743:13
**whole** [5] - 707:9, 730:3, 734:5, 739:25, 746:20
**WILLIAM** [1] - 698:18
**William** [1] - 725:17

**Wilmington** [2] - 698:14, 698:23
**window** [5] - 706:11, 707:11, 707:17, 713:13, 713:19
**winds** [1] - 747:21
**witness** [1] - 701:4
**witnesses** [1] - 701:10
**wonderful** [2] - 745:10, 746:10
**wonky** [1] - 751:5
**words** [6] - 703:6, 704:21, 705:2, 706:18, 712:21, 719:3
**works** [2] - 709:19, 709:20
**world** [2] - 737:3, 750:7
**wrap** [1] - 735:21
**written** [1] - 751:17

# Y

**yellow** [1] - 733:13
**York** [1] - 698:17

# Z

**zero** [1] - 734:22